UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

_____

ANNA CURRY                                        No. 3:21 cv 00221 (SRU)

VS.

PALMETTO SURETY CORPORATION,
et. al.
                                                  JULY 10, 2023


**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT AS TO COUNTS ONE AND FOUR OF THE AMENDED
COMPLAINT**

### I.       <u>INTRODUCTION</u>

The Plaintiff has moved for partial summary judgment pursuant to Local Rule 7(a) and

Rule 56(a) of the Fed.R.of Civ.P. as to all Defendants, as to Counts One ("Unjust Enrichment")

and Count Four ("Breach of Implied Contract"), in the alternative, of the Amended Complaint

(ECF #111).

Partial summary judgment ought to be granted in favor of the Plaintiff because there are

no material facts in dispute as to those two counts.

### II.      <u>PROCEDURAL HISTORY</u>

This matter began with a Complaint at ECF #1 filed on 2/23/2021. Defendants filed a

Motion to Dismiss at ECF#18 which was denied without prejudice at ECF #48. The Defendants

filed an answer, special defenses and counterclaims at ECF#52 to which Plaintiff responded at

ECF # 53. Plaintiff filed her Amended Complaint at #111 on March 14, 2023 and an Answer,

Special Defenses and Counters were filed at ECF #114.

The Amended Complaint includes eight causes of action: unjust enrichment, conversion, civil theft, breach of implied contract, breach of implied covenant of good faith and fair dealing, fraudulent misrepresentation, breach of CUTPA  and civil forgery. With their amended answer, Defendants requested a jury trial. Plaintiff moved to strike the jury claim at #ECF 116 and Defendants have not objected to that motion. (No jury trial was previously sought by either party).

On June 30, 2023, Plaintiff filed a Motion for Summary Judgment as to the Counterclaims (ECF #120), with Defendant's response due on July 21, 2023.


III.     **BRIEF SUMMARY OF ARGUMENT**

The Defendants posted a $6,000,000 criminal appearance bond on January 9, 2020 to secure the release from custody of a criminal defendant throughout the duration of his trial.  The Plaintiff paid a premium of $147,000 on the bond on or about January 9, 2020.

Nineteen (19) days after posing the bond, on January 28, 2020, the Defendant Palmetto moved to revoke the bond and return the defendant to jail due to Palmetto's being in violation of Con.Gen.Stats. 38a-73(a) on the bond (See Exhibit A, pg. 2).

Palmetto alleged that their violation of CGS §38a-73(a) was due to a shortfall in collateral, which was an assertion they made to create a "red herring" issue intended to distract from the real issue:  that Palmetto was in violation of Connecticut law because Palmetto did not have enough capital and surplus to underwrite the bond to begin with.  That was the finding of the Connecticut Insurance Commissioner.  The Defendants later admitted as much in a Stipulation and Consent Order with the State of Connecticut Department of Insurance (See Exhibit B).

The Defendants acknowledged that they had no legal ability to underwrite the bond from the beginning.  The surety bond was void ab initio due to being in violation of Connecticut law at the outset, and the Defendants have been unjustly enriched by retaining the Plaintiff's premium money.  Despite numerous requests from the Plaintiff, the Defendants have refused to return her $147,000.  Equity requires that the Plaintiff have her premium money returned to her.  There are no disputed material issues of fact present.

### IV.    FACTS

#### A.  Background

On January 7, 2020, criminal defendant Fotis Dulos and two co-defendants were arrested in the matter of *State of Connecticut v. Dulos*.  The Court granted Dulos a $6,000,000 criminal appearance bond ("bond") to be released from custody throughout the duration of his trial.  The Defendants 24/7 and insurer Palmetto Surety Corporation posted the $6,000,000 bond on January 9, 2020 to secure Dulos' release from jail until his trial was over.  (Plaintiff's Aff. ¶¶ 5, 9).

Connecticut law CGS § 38a-73(a)  requires that any insurer doing business in Connecticut cannot underwrite a single insurance risk greater than 10% of its paid up capital and surplus unless any risk in excess of 10% of a company's capital and surplus is offset by a qualified reinsurance company.

 At the end of 2019, Palmetto had paid up capital and surplus of less than $5,000,000, enabling them to undertake a single bail bond no larger than $500,000 unless it was reinsured.  Defendants had no reinsurance at the time.  Connecticut law would therefore enable the Defendants to post a single bond no larger than $500,000.  Defendants came forward anyway to post the $6,000,000 bond, one of the largest criminal appearance bonds in Connecticut history,

and knowingly underwrote a risk that was more than 10 times larger than what Connecticut law allowed for that company.

Plaintiff paid $147,000 in premium for the bond that was to keep the defendant out of jail through trial, toward the $420,000 premium due over 15 months in accordance with the CGS § 38a-660c Premium Financing Arrangement.  (Plaintiff's Aff. ¶6).

On the morning of January 9, 2020, Plaintiff delivered to Defendant Sobota a $22,000 Cashier's check made payable to 24/7 toward the $147,000 premium.  The bond was posted the afternoon of January 9, 2020 and the defendant was released from jail.  On the morning of January 10, 2020, Plaintiff delivered to Sobota a $125,000 Cashier's check made payable to 24/7 toward the $147,000 premium. (See Exhibit C, pgs. 4-5; Plaintiff's Aff. ¶¶8, 10).

On bail bond risks that do comply with CGS § 38a-73(a), Connecticut Bail Bond law CGS § 38a-660g allows insurers the option to take collateral for a bail bond.  When posting the illegal $6,000,0000 bond, the Defendants evaluated real estate properties of the bond defendant and placed liens on those properties as collateral for the bond.  The Defendants took individual Promissory Notes of $3,000,000 each from three indemnitors and three individual Indemnity Agreements.

The Plaintiff signed a Defendant Authorization form, and agreed to serve as an indemnitor to the Defendants by executing a $3,000,000 Promissory Note and an Indemnity Agreement to indemnify Palmetto if the bond defendant were to flee house arrest, flee 24-hour State Police surveillance, and evade capture from being returned to court.  (See Exhibit C, pgs. 1-3).  Plaintiff's Aff. ¶7).

A few days after Defendants posted the bond, a complaint was made to the Connecticut Department of Insurance (CTDOI) on January 16, 2020 concerning Palmetto's legal ability to underwrite the $6,000,000 due to Palmetto's insufficient capital and surplus for a bond that size. (See Exhibit D, pg.1 )  The CTDOI notified the South Carolina Department of Insurance (SCDOI). (See Exhibit D, pg. 3)  Palmetto then filed a Motion to Revoke Bond on January 28, 2020 asserting that it was in violation of Connecticut law due to insufficient collateral for the bond, not for insufficient capital and surplus, alleging that it was previously unaware of foreclosures on properties that it took as collateral. Specifically, Palmetto requested in the Motion, *inter alia*,

> "Wherefore, the surety, Palmetto Surety, requests that it be released from its surety obligation as the Defendant's collateral is insufficient to secure the bond leaving the surety in violation of law."

Between the time of the complaint to CTDOI on January 16, 2020 and Palmetto moving to revoke the bond to return the defendant to jail on January 28, 2020, the Defendants made no contact with the bond defendant, his attorneys, the Plaintiff or other indemnitors about any alleged issues with the bond or the collateral.  The Defendants did not make any attempt to resolve the alleged collateral issues by any means, including seeking other sources of collateral from the defendant, the Plaintiff, from his attorneys, or from his Indemnitors. (Plaintiff's Aff. ¶24, 25).

The Defendants routinely take collateral on their bail bonds from sources other than the bond defendant, including from unrelated third parties; but in this case, they never pursued any other source of collateral.

The Defendants even overlooked Plaintiff's offer of her own personal property and to help coordinate additional sources of collateral if needed before the bond was posted.  (Plaintiff's Aff. ¶21).  They also did not pursue any other avenues for keeping the bond in place, such as exploring the splitting of the bond liability with another surety company, which they did for another large bond that Defendants' attorney ardently fought the prosecutor and Court to keep in place.  (See Exhibit D, pgs. 59-60)

The unilateral and sudden actions of the Defendants resulted in the bond defendant's attorney having less than one hour notice to inform him at 9:45am the morning of January 28, 2020 to leave his home in 45 minutes to appear for an emergency court hearing in Stamford to be returned to jail due to not having enough collateral for his bond.

The abrupt and unexpected nature of this news was documented in a text message exchange between the bond defendant's attorney, Kevon smith, and the Defendant bail bond agent Jerry Cao on January 28, 2020 at 9:20 a.m.:

> Attorney Smith: What the f*** is going on with Dulos' bond?
> Jerry Cao:      What do you mean?
> Attorney Smith: I just got a call from the prosecutor that Palmetto ,is pulling the 6M bond and the judge is ordering us to be there this morning.
> Jerry Cao:      News to me.

Caught completely unaware by the news about the bond from his attorney, the bond defendant and Plaintiff each immediately attempted to contact the Defendant Bail Bond Agent Sobota to understand what was happening with the bond and how to resolve it.  Sobota did not answer the defendant's call nor call him back. Sobota also did not return a text message inquiry from the Plaintiff.  As the defendant was presumably preparing to leave for court, less than an hour after the he was told he would be returned to jail because his bond did not have enough

collateral, he attempted to take his life. The defendant was taken off life support on January 30, 2020.  (Plaintiff's Aff. ¶29).

The bond defendant had maintained compliance with his release conditions under the $6,000,000 bond, including appearing for a court hearing on January 25, 2020, adhering to house arrest, daily communication with his probation officer, and daily charging of the battery of his GPS ankle bracelet to ensure that his location could be surveilled by the State Police 24 hours a day.  (Plaintiff's Aff. ¶23).  The Defendants had suffered no loss on the bond before unilaterally moving to revoke it.

On June 26, 2020, the Connecticut Department of Insurance barred Palmetto from writing any new bonds in Connecticut. (See Exhibit D, pgs. 7-8). The Connecticut Department of Insurance expressly found that Palmetto was in violation of Conn. Gen. Stat. § 38-73(a) in writing the bond here which exceeded the maximum amount of a bond permitted under that statute.

The Defendants knew or should have known that the issuance of the bond was not in conformance with Connecticut law. In a reference to the bond posted here, the Connecticut Department of Insurance wrote that "the Department is fully aware that Palmetto wrote a large bond on a Connecticut risk which also exceeded the 10% of capital limitation. Because Palmetto is licensed in Connecticut, it is bound to operate in accordance with Connecticut General Statutes including CGS §38a-73(a) but it has failed to do so."  (See Exhibit D, pgs. 7-8)

B.  Defendants' Process in Underwriting the $6,000,0000 Bond

Palmettos' capital and surplus at the end of 2019 was insufficient for them to legally post the $6,000,000 bond. Nonetheless, the defendants posted the bond and took collateral to secure it. They later alleged that they were unaware of the collateral they chose to

take for the bond (see Exhibit A). Based upon their due diligence and evaluations of the properties they took as collateral;, the Defendants knew or should have known the full value of the properties before posting the bond. Defendants' lack of knowledge about the value of the collateral is a "red herring" issue on their voluntary bond revocation: the bond was invalid because they did not comply with Connecticut law, as they later admitted.

The bond defendant was arrested and taken into custody around noon on January 7, 2020. Shortly after noon on January 8, the defendant's attorneys contacted the Defendant Bail Bond Agent Jerry Cao to ask if the Defendant 24/7 would be able to post the bond that day.  (See Exhibit E).

The Defendant 24/7, through Cao and Sobota, exchanged a series of emails with Palmetto pertaining to the due diligence of potential collateral for the bond between 1:30 – 3pm on January 8, 2020.  (See Exhibit F.)

Around 1:30pm on January 8, 24/7 submitted an Underwriting Approval email to Palmetto for the $6,000,000.  Palmetto CEO Scott Willis ("Willis" and COO Donnie Mescia ("Mescia") exchanged email messages about the bond, with Willis stating "Could you reach out to see what collateral they have.  This is a big National News case.  We would have to have a lot 100%."  (See Exhibit F, pgs. 1 - 8).

Shortly thereafter,  at 1:55pm Mescia shared with Willis that he was in receipt of a list of properties and stated "We are going through the listed properties to see the values we find."   The list of properties had been provided to 24/7 by the bond defendant's attorneys. (See Exhibit F, pgs. 9-11)

Around 2:15pm Willis notified Sobota that "Donnie is looking order the properties now. Of course the biggest concern is this guy have to ability to leave the states." (See Exhibit F, pg. 12 ).

Sobota responded to Willis' logical concern about the possibility of the bond defendant fleeing and escaping capture,  and emailed the following information to Willis: "His passport has been taken months ago by the police and he's on a 24 hour house arrest and surveillance by the state police."  (See Exhibit F, pg. 12 ).

A few minutes later Sobota added,  "I'm only being persistent due to the fact that they have a lot of personnel brought into court for security and other reasons and they're trying to get it done today so they do not have to bring him back tomorrow and waste all those resources." (See Exhibit F, pg. 14)

Sobota also shared with Willis, "[t]his case is extremely high profile and he is being monitored by law-enforcement 24 hours a day".  (See Exhibit F, pg. 13)

At 3pm Willis replied "If we can get the properties clocked in and promissory notes.  I have our Attorney's standing by."  (See Exhibit F, pg. 15)

The bond defendant's attorneys had provided 24/7 and Palmetto with an informal, undated financial statement spreadsheet of the defendant that included real estate properties for Palmetto to review as possible sources of collateral and to use in conducting due diligence. The spreadsheet included property addresses and undated values for list price, appraisal, and debt, including one debt entitled "PJR to Farber Estate".  (See Exhibit F, pg. 11)

On January 8, the Plaintiff met Sobota for the first time at his request at the home office of the bond defendant to coordinate paperwork that Sobota needed for the bond.  Sobota asked the Plaintiff if she could locate any appraisals for the properties listed on the spreadsheet that had

been provided to Palmetto by the bond defendant's attorney earlier that day.  Plaintiff was able to locate appraisals for a few of the properties in the defendant's home office and provided those to Sobota. (See Exhibit G). Plaintiff noted to Sobota that the values on the dated appraisals appeared to be different from the values on the bond defendant's undated spreadsheet. (Plaintiff's Aff. ¶19).

Plaintiff emphasized to Sobota that the spreadsheet was undated and that she could not personally verify whether the information listed on the spreadsheet was accurate or current.  She told Sobota that the bond defendant had mentioned to her months prior that an ownership issue regarding one of the properties had been in the news.  Plaintiff stressed that due diligence should be done by the Defendants to determine if the properties were suitable and sufficient as collateral for the Defendants on the bond.  Plaintiff noted the importance of the bond process being conducted thoroughly and referenced the high-profile nature of the criminal case.  (Plaintiff's Aff. ¶11.

Plaintiff also offered her own assets as a source of collateral if it was needed, and to help coordinate other potential collateral sources if the bond defendant's properties were not sufficient to secure the bond.   Specifically, for example, Plaintiff told Sobota about property that she owned in South Carolina, coincidentally in the "backyard" of Palmetto.  For unknown reasons, however, this source of collateral was not pursued by the Defendants before they posted the bond or at any time thereafter. (Plaintiff's Aff. ¶21).

On January 8th, at Sobota's request, Plaintiff signed a Defendant Authorization Form, a Financial Statement and Indemnity Agreement, and a Promissory Note in the value of $3,000,000 to serve as an indemnitor to Palmetto in the event that the bond defendant fled while out of custody and escaped capture thereby forfeiting the bond.

At 8am on the morning of January 9, 2020, Sobota forwarded an email to Willis with a set of collateral liens for each of the defendant's properties that were prepared by Sobota's attorney.  In response, Willis replied to Sobota that the power of attorney for the bond would be sent to him around 10:30am.  (See Exhibit H)

At 10:45am, Palmetto's Risk Control Analyst, Dollie Pilson, who described her role as helping CEO Willis collect information about collateral for large bonds, wrote to Willis, "According to what I can access on Zillow and Google Earth, these valuations seem right on target."  (See Exhibit I)  Ms. Pilson testified that she conducted Zillow and Google Earth searches on the defendant's properties but did not confirm the debt values. (See Exhibit J).

Pilson recorded the collateral properties at an overstated value as to what the bond defendant had recorded on his undated financial spreadsheet (Exhibit K). That same overstated valuation was forwarded to CEO Willis on January 27, 2020 to be shared with the South Carolina Department of Insurance (Exhibit L, M)[1].

Palmetto CEO Willis testified in his April 16, 2021 affidavit that Palmetto had found evidence of foreclosures on certain of the properties on the real estate website *Zillow*, and that when the Defendants had their very first conversation with the bond defendant, which was after they bonded him out on January 9, 2020, the bond defendant informed them of the foreclosures on his properties.  (See Exhibit N, #8 and #10).

---

[1] It should be recalled that CGS 38a-660(g0(f) states that: Any agreement that violates the provisions of sections 38a-660b to 38a-660K, inclusive, shall be void. A surety bail bond agent or insurer shall not enter into any agreement as to the value of the collateral security or other indemnity that does not reflect the actual value of such collateral security or other indemnity.

Superior Court records[2] indicate that a foreclosure action on the defendant's 61 Sturbridge Hill Rd New Canaan, CT property began with a lis pendens filed on November 26, 2019 and a civil complaint filed on December 10, 2019 *(Savings Bank of Danbury v. Fore Group, Inc.,* FST-CV19-6044836-S).  Title and court records show that a foreclosure action on the bond defendant's  4 Jefferson Crossing property was commenced on September 10, 2019 with a lis pendens recorded on September 9, 2019 *(Mark H. Dean as Trustee of the CT Re 2019 Trust v. Fotis Dulos,* HHD-CV19-611846-S). An Internet search of "4 Jefferson Crossing Farmington, CT" returns a search result to a September 10, 2019 dated www.courant.com article entitled "Foreclosure action taken against Farmington home where Fotis Dulos…".

The Defendants were aware of foreclosures on the properties on or before January 9, 2020, and did not seek any additional collateral at that time or any other time. Instead, Defendants moved forward with the bond and collected another $125,000 toward the premium from the Plaintiff on January 10, 2020. Sabota deposited the checks on January 13, 2020.

At the time of posting of the bond, agent Sobota indicated he was required to install a GPS tracking application on the bond defendant's phone, but he did not do so.  The day after the defendant was released from custody, the Plaintiff reached out to inquire of Sobota when he would return to install the GPS tracking application on the defendant's phone, but Sobota never did so. This omission would appear to show that he had little concern about the bond defendant fleeing and Defendants risking a loss on the bond.

2. *Defendants' Experience with Connecticut Bail Bond Industry*

The Defendants have years-long experience underwriting bail bonds in Connecticut.

---

[2] Connecticut Case Lookup, effective July 10, 2023.

Palmetto originally obtained their certificate of authority in Connecticut around 2016 after employing Adam Hyde. At all relevant times, Mr. Hyde served as Risk Manager at Palmetto and received a percentage of the premiums underwritten in Connecticut. He previously owned and operated one of the largest bail bond companies in Connecticut called Budge Bail Bonds and testified that he became familiar with the rules ad regulations of the Connecticut bail bond business during that time. (Exhibit O).

Defendant Sobota became a licensed bail bond agent in Connecticut in 2001 and served as Managing General Agent for Palmetto. He was recruited to Palmetto by Mr. Hyde. Defendant Cao was a Connecticut licensed bail bond agent with 24/7 beginning in 2012.

The Defendants therefore would be expected to have full knowledge of Connecticut bail bond law, but even so, they willingly came forward to underwrite a bond that was more than ten times larger than they could legally underwrite.

### 3.  <u>STANDARD FOR SUMMARY JUDGMENT</u>

A motion for summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" *Am. Int'l Group, Inc. v. London Sm. Int'l Corp.*, 664 F.2d 348,351 (2d cir. 1981) (quoting *Heyman v. Commerce and Indus. Ins. Co.*, 524 F. 2d 1317, 1319-20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist*., 963 F.2d 520, 523 (2d Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.,* 577 U.S. 242, 248 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci*, 923 F. 2d 979, 982 (2d Cir. 1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Id.

A dispute concerning material fact is not created by a mere allegation in the pleadings, or by surmise or conjecture. *D'Amico v. City of New York*, 132 F.3d 145, 149, (2d Cir. 1998); *see also Stuart & Sons, L.P. v. Curtis Pub. Co., Inc.,* 456 F. Supp. 2d 336, 342 (D. Conn. 2006) (citing *Applegate v. Top Assoc., Inc*., 425 F. 2d 92, 96 (2d Cir. 1970); *Quinn v. Syracuse Model Neighborhood Corp*., 613 F. 2d 438, 445 (2d Cir. 1980)). Also, "[c]onclusory allegations will not suffice to create a genuine issue." *Del. & Hudson Ry. Co. v. Conrail*, 902 F.2d 174, 178 (2d Cir. 1990).

## 4.   **ARGUMENT**

A. <u>The Defendants' Bond was Void Ab Initio, Entitling Plaintiff to a Return of All Sums She Paid to Them</u>

The legal and equitable consequence of Defendants' bond being in violation of Connecticut law is that it was void ab initio as illegal and contrary to the public policy of the State of Connecticut. Defendants are 100% responsible for the violation of Connecticut law making them entirely culpable for the illegality of the bond. See *Gonzales vs. National Union Fire Insurance of Pittsburg,* 2016 WL 5107033 (S.D.N.Y., 2018).[3]

---

[3] Ultimately decided on a standing issue.

Generally, under Connecticut law, a Contract made in violation of a statute is illegal and unenforceable. *Couldrock & Bohan, Inc. vs. Societe Generale Securities, Corp*, 93 F.Supp 2d 220 (D. Conn 2000).

The term void ab initio is defined as null from the beginning (Blacks Law Dictionary (10th Ed 2014), (defining "void ab initio"  as "[n]ull from the beginning, as from the first moment when a contract is entered into."). S*ee Conlin v. Mortg. Elec. Registration Sys., Inc.,* 714 F.3d 355, 361 n.6 (6th Cir. 2013) ( "Void ab initio is defined as null from the beginning")

Connecticut courts have reviewed the issue of the validity of contracts which violate the law. See *C.R. Klewin Northeast, LLC vs. Bridgeport*, 282 Conn 54 (2007). There, the Connecticut Supreme Court determined that if the contract in question was void ab initio (there to be determined by an arbitration panel), then its terms could not be enforced. The Court linked the enforcement of an illegal contract with a strong public policy argument. See *Haynes Construction Co. vs. Casella & Son Construction Inc.,* 36 Conn App 29, cert den. 231 Conn. 916 (1994).

Similar to surety bond cases, contracts violating state usury laws have been found to be void ab initio. *See Adar Bays LLC vs. Genesys ID, Inc*., 962 F.3d 6, 89 (2d Cir. 2020).*Moss v. First Premier Bank*, 2020 WL 5231320 (EDNY, 2020). If the contract is void ab initio, the Courts do not hold portions of the contract enforceable, but rather the entire contract is void. *Signature Fin. LLC vs, Neighbors Global Holodings, LLC*, 281 F.Supp 3d, 438 (SDNY 2017).

Of interest is *Day v. Seblatnigg,* 341 Conn 815 (2022), where the Connecticut Supreme Court held that a trust illegally created was void ab initio, and was thus null and void and unenforceable. A similar result pertains here: the surety bond was illegal when made, as in *Day,*

and thus was void ab initio. The parties should be placed back where they were before the illegal

bond and the Plaintiff restored to her bond premium and is entitled to damages.

B. <u>Enforcing Defendants' Illegal Bond Would Violate Connecticut Public Policy</u>

1. *Facts Justifying a Public Policy In Voiding Surety Bonds from*
   *Insurers in Violation of CGS § 38(a)-73(a)*

A short time after Palmetto was notified by the Connecticut Department of Insurance in

January 2020 that it had written a bond in violation of Connecticut law, at least three (3) states

undertook warnings, supervision, or disciplinary action with Palmetto regarding concern about

Palmetto's compliance with each state's law limiting the size of insurance risks that can be

underwritten, including South Carolina, North Carolina, and Connecticut, suggesting that

insurance limitation of risk law is a matter of substantive public policy for states.

The Connecticut Department of Insurance (CTDOI) undertook regulatory action against

Palmetto in response to a complaint about the $6,000,0000 bond that continued for over ten

months, action which included extensive correspondence with Palmetto and Palmetto's attorney

and resulted in the Connecticut Insurance Commissioner twice revoking Palmetto's license to

write new business in Connecticut pursuant to cause under Connecticut Regulations § 38a-8-

104(b)(2).

Connecticut Regulations § 38a-8-104(b)(2) states as follows:

[i]f the Commissioner determines that the continued operation of the insurer licensed to
transact business in this state may be hazardous to its policyholders, creditors or the
general public, then the commissioner may, upon such determination, issue an order
requiring the insurer to reduce, suspend or limit the volume of business being accepted or
renewed."

The Commissioner revoked Palmetto's license to do business in the state of Connecticut

in June 2020 and again in December 2020 for repeat violation of Connecticut law CGS § 38a-

73(a).

Palmetto ultimately acknowledged that it was conducting business in a manner that was not in the best interest of Connecticut residents and that it had underwritten a surety bail bond issued to a Connecticut resident in violation of current statutory requirements.

The Department was first notified about Defendants underwriting the $6,000,000 bond several days after it was posted by a complaint from Connecticut bail bond agent, Mary Anne Casey, on January 16, 2020.  Casey alerted the Department of her concern "regarding the financial stability of Palmetto Surety and their legal ability to execute a bond of this size." Casey referenced that she was aware from Palmetto's "financials posted, as of 2018, [that] their capital and surplus was $4,661,605" and stated therefore, that "[t]he only way a bond of this size could have been executed legally [by Palmetto] is if another company was willing to reinsure them" (See Exhibit D, pg. 1).  Casey's email was referring to a bail bond company being limited to underwriting a single bond no greater than 10% of its capital and surplus unless any excess is reinsured by another insurance company, revealing her knowledge of the Connecticut General Statute 38a-73 which states:

> **Sec. 38a-73. (Formerly Sec. 38-110). Limitation of risks.** (a) No stock insurance company doing business in this state shall expose itself to loss on any one risk to an amount exceeding ten per cent of its paid-up capital and surplus; but, in determining the amount of such risk, no portion thereof that has been reinsured in any insurance company that meets the requirements of section 38a-85 or 38a-86 shall be included.

In response to Casey's email, the Connecticut Department of Insurance began an investigation into the bond in accordance with Connecticut's laws and regulations and contacted the South Carolina Department of Insurance (SCDOI), the domiciliary regulator of Palmetto. (See Exhibit D, pg. 3).

By March, 2020, the SCDOI informed the CTDOI about its confidential supervision order for Palmetto.  The SCDOI monitored the bonds that Palmetto underwrote to ensure that the Company remained in compliance with South Carolina Code 38-55-30, South Carolina's law regarding insurer's limitation of risks.  (See Exhibit D, pgs. 4-5)

In early June 2020, the North Carolina Department of Insurance sent a letter to Palmetto CEO Willis that it had three bonds outstanding for a defendant totaling $3,600,000 with insufficient collateral for the bond and therefore was in violation of North Carolina General Statute 58-3-110 regarding 10% limitation of risk, requesting that Willis provide "[a]n explanation for this violation, including how the violation occurred, [a]nd [t]he Company's plan to return to compliance with N.C. G. S. § 58-3-110, including the date by which the Company will return to compliance and any corrective actions being taken by the Company to ensure future large bonds are not written in violation of N.C.G.S. § 58-3-110." (See Exhibit P)

In June 2020, the Connecticut Department of Insurance notified Palmetto that their license to do business in Connecticut was being revoked due to their violation of Connecticut law.  Specifically, in a June 26, 2020 letter to Palmetto, the Department stated that Palmetto CEO Willis' response to the Department's letter dated June 12, 2020 had confirmed that Palmetto was not in conformance with CGS § 38a-73(a). The Department also specifically clarified for Willis, "In your response, you described an instance where the Company wrote a large bond on a risk located in South Carolina.  The *location* of the risk is not relevant when applying our statutes. The total amount at risk of $2.5 million exceeded the 10% limit under CGS 38a-73a and the fact that it was written puts the entire Company at risk."  *(Emphasis added)*

The Department further wrote, "Additionally, the Department is fully aware that Palmetto wrote a large bond on a Connecticut risk which also exceeded the 10% capital

limitation…[Palmetto] is bound to operate in accordance with Connecticut General Statutes including CGS § 38a-73(a) but it has failed to do so.  Pursuant to CGS § 38a-41 and Connecticut Regulations § 38a-8-104(b)(2) the Department has the authority to suspend an insurer's license or reduce, suspend, or limit the volume of business being accepted or renewed when cause has been found.  Based upon the above, the Department has found such cause to exist and has taken the following action:  effective June 26, 2020 a restriction was placed on Palmetto's license in Connecticut, prior authorization to write fidelity and surety line of business is revoked". (See Exhibit D, pgs. 7-8)

In July 2020 Palmetto's Connecticut lawyer requested a stay of the June Order revoking Palmetto's Connecticut license.  The Department denied the request stating that it had determined that "Palmetto's RBC has fallen below 200%, indicating that, under current statutory and regulatory guidelines and requirements, Palmetto does not currently have a sufficient amount of reserves for the protection of Connecticut insureds.  As such, the Commissioner is not inclined to issue a stay of the Order, *especially in light of Palmetto's recent actions in underwriting a bond issued to Connecticut residents in violation of specific statutory requirements*." (*Emphasis added)* (See Exhibit D, pgs. 9-10)

In late August 2020, Palmetto renewed its request to the Department through its lawyer for a stay of the Order, indicating that it had increased its capital and surplus to reach an RBC of 204% to "[have] a sufficient amount of reserves for the protection of Connecticut residents under current statutory and regulatory guidelines and requirements." Here, Palmetto through its attorney acknowledged that the intent behind the law was that of protecting residents.  (See Exhibit D, pgs. 11-12)

Prior to lifting the Order and in order to avoid litigation, the Insurance Commissioner required Palmetto to enter into a Stipulation and Consent Order signed on September 28, 2020. In the Stipulation and Consent Order, Palmetto agreed with the Department's allegations that Palmetto had "underwritten a surety bail bond issued to a Connecticut resident in an amount in excess of ten percent of [Palmetto's] paid up capital and surplus, in violation of current statutory requirements" and Palmetto agreed that it "will not in the future underwrite any surety bail bonds in excess of ten percent of its capital and surplus in any jurisdiction." The Department acknowledged that on August 26, 2020 Palmetto had submitted information showing that it had increased its reserves so that it possessed "a sufficient amount of capital and surplus for the protection of Connecticut residents under the current statutory and regulatory guidelines." (See Exhibit D, pgs. 15 – 19)

A month later, in October 2020, Palmetto violated the Stipulation and Consent order by underwriting a bond in in excess of 10% of its capital and surplus that was located in North Carolina. Palmetto's lawyer claimed that Palmetto was not clear about the meaning of "any jurisdiction" when agreeing in the Stipulation and Consent Order to not "in the future underwrite surety bail bonds in excess of ten percent of capital and surplus *in any jurisdiction.*" The Department had previously clarified this very matter for Palmetto in its June 26, 2020 letter when it wrote that "[t]he location of the risk is not relevant when applying our statutes." (See Exhibit D, pg. 7). Additionally, before Palmetto underwrote the violative North Carolina bond, the Department had taken additional steps in October to further clarify the application of "any jurisdiction" for Palmetto in a letter to the CEO after the SCDOI informed the Department that it did not believe that Palmetto was clear about the application of the Connecticut law to "any

jurisdiction".  (See Exhibit D, pgs. 20-23).   However, Palmetto and its  lawyer continued to

assert that they did not understand the application of "any jurisdiction."

Palmetto's license to underwrite bail bonds in Connecticut was again revoked in

December 2020.  The Department denied Palmetto's attorney's immediate attempt to have the

revocation lifted indicating that it would not be in the best interest of the State to do so.  (See

Exhibit D, pgs. 27-32).

In February 2021, Palmetto's lawyer again requested that the Department reinstate

Palmetto's Connecticut license due to an increase in capital and surplus, asserting that his client

did understand the application of CGS § 38a-73(a), and that Palmetto had put controls in place to

prevent future errors.  (See Exhibit D, pgs. 33-40)

One such control that was referenced was that "[a] Newsletter went out to all agents on

2/28/20 regarding the large bond approval process",  a month after Palmetto admitted it could not

legally perform the $6,000,000 bond, including in the newsletter a recommendation that agents

"find a property attorney to assist with liens and title searches."  (See Exhibit D, pgs. 41-43)

Palmetto's CEO personally confirmed to the Department in February 2021 that it would

not underwrite bonds in any location in excess of 10% capital and surplus in any location and

would notify all of its agents of the requirement.  (See Exhibit D, pgs. 38-39).  On March 9,

2021, Palmetto's Connecticut license was reinstated in correspondence from the Department of

Insurance.  (See Exhibit D, pgs. 44-45).  A day later the CEO oversaw the posting of a bond in

violation of CGS § 38a-73(a).  (See Exhibit D, pgs. 46-47).  The CTDOI again alerted Palmetto's

lawyer of this violation.  (See Exhibit D, pgs. 48-49).    Palmetto's lawyer wrote to the

Department that Palmetto would add more funds to its capital and surplus account by the end of

the month to cover the repeat violation.  (See Exhibit D, pg. 50).

Separate correspondence in May 2021 between the Department and Senior Assistant State's Attorney Cynthia Serafini about another large bond of the Defendants reiterated the Department's focus that Palmetto maintain compliance with CGS § 38a-73(a).  (See Exhibit D, pg. 54).

In this instance, unlike with the $6,000,000 bond, Palmetto, 24/7, and their lawyer worked to find a solution that would enable Defendant 24/7 to maintain a large bond that was the subject of revocation by the prosecutor due to perceived violation of law.  Judge Frank Iannotti revoked the bond in question due to his understanding that the splitting of the bond's liability between sureties was not allowed by Connecticut Insurance Law.  (See Exhibit D, pgs. 56 and 59-60).  Attorney Serafini additionally noted that no premium amount was listed on the bond as being paid to the bondsperson and that no collateral was listed as being taken for the bond.  24/7's lawyer challenged the prosecutor to ensure that the bond could be re-posted and remain in place, noting that the Insurance Department confirmed that Palmetto would not be in violation of CGS § 38a-73(a) if they split the bond liability with another surety.  (Exhibit D, pgs. 59-60)

The totality of the regulatory warnings and actions undertaken by the Connecticut Department of Insurance, the South Carolina Department of Insurance, and the North Carolina Department of Insurance with Palmetto regarding its violation of state's insurance limitation of risks laws reveal that compliance with insurance limitation of risk laws is a matter of true public policy and, in particular, that violation of such was deemed by the Connecticut Insurance Commissioner to be "hazardous to its policyholders, creditors or the general public".

2.    *The Surety Bond Violates Public Policy and is Void Ab Initio*

Determining if this surety bond violates public policy is a two-step process. The first step in determining if a contract violates public policy is to determine whether an explicit and dominant public policy can be identified. See, e,g. *State vs Connecticut State Employees Ass'n*, 287 Conn. 258 (2008). Statutes are a good source of determining public policy. See *State vs. New England Health Care Employees Union*, 271 Conn, 127, 138 (2004).

> Rather than requiring that public policy be grounded on a particular type of source, however, in determining whether a party has satisfied its burden of demonstrating the existence of a well- defined, public policy  we have instead focused our inquiry on whether the alleged public policy is in fact clearly discernible in the purported source. *MedValUSA Health Programs, Inc. v. MemberWorks, Inc.,* 273 Conn. 634, 657–58, 872 A.2d 423, cert. denied sub nom. *Vertrue, Inc. v. MedValUSA Health Programs, Inc.,* 546 U.S. 960, 126 S.Ct. 479, 163 L.Ed.2d 363 (2005).]

*Schoonmaker vs. Cummings & Lockwood of Connecticut, P.C.,* 252 Conn 416, 435 (2000).

>  Indeed, we have in the past found a clear statement of that policy in some objectively stated form, such as a statute, city charter or rule of professional conduct. Although we do not decide that a statement in such a form is always required as the predicate for the public policy exception, we nonetheless adhere to the principle that the public policy  must be explicit, well defined and dominant...." (Internal quotation marks omitted.) Id., at 661, 872 A.2d 423.

*MedvalUSA Health Programs, Inc. vs. Memberworks, Inc.,* 273 Conn 634, 661 (2005).

The second step is to determine if the surety bond violates that public policy. Here, Palmetto admitted that it violated Connecticut law.

The Connecticut Insurance Commissioner found Palmetto's illicit conduct to be "hazardous to its policyholders, creditors or the general public" pursuant to Connecticut Regulations 38a-8-104(b)(2). What is the purpose of law requiring criminal bail bond companies to have adequate capitalization? Clearly, its purpose is to protect the public from having a  bail bond issued which is later recalled due to its adequacy. A person or defendant having paid a bond premium for the release of a defendant from custody throughout the duration of the

defendant's case would thus be recalled into incarceration for no fault of his own, with fiunds substantially depleted to be able to purchaser a second and legal bail bond.

The Restatement (Second) of Contracts § 181 (1981) is helpful as to determining whether a violation of law also violates public policy, such as to make an arrangement unenforceable:

> "[i]f a party is prohibited from doing an act because of his failure to comply with a licensing, registration or similar requirement, a promise in consideration of his doing that act or of his promise to do it is unenforceable on grounds of public policy if (a) the requirement has a regulatory purpose, and (b) the interest in the enforcement of the promise is clearly outweighed by the public policy behind the requirement." The Restatement states generally where a party has failed to comply with a statute, regulation, or other requirement, and the applicable rule has a "regulatory purpose," the contract may not be enforceable. A rule has a "regulatory purpose" when it ensures minimum standards, rather than being designed largely to raise revenue. Restatement (Second) of Contracts § 181. If the court decides that the requirement has a regulatory purpose, it must then weigh the interests favoring enforcement of the contract against the public policy behind the requirement.

The Restatement (Second) of Contracts § 179 further indicates that courts consider "the need to protect some aspect of the public welfare" when determining whether statutory or regulatory violation renders a contract unenforceable.

Here, the dominant and well defined public policy is set forth by statute: Conn.Gen.Stats. §38-73a. The Defendants' conduct offends that public, as set forth by statute, and renders the surety bond void ab initio (from the start). Plaintiff is entitled to a return of her premium paid of $147,000.00.

C.   The Defendants Have Been Unjustly Enriched By Retaining Plaintiff's Premium

The plaintiff alleges unjust enrichment by the defendants. "Unjust enrichment is a legal doctrine to be applied when no remedy is available pursuant to a contract." (Internal quotation marks omitted.) *Burns v. Koellmer,* 11 Conn.App. 375, 383, 527 A.2d 1210 (1987). Connecticut

Courts have had occasion to define unjust enrichment, as summarized in *Hospital of Cent.*

*Connecticut v. Neurosurgical Associates, P.C.*, 139 Conn.App 778, 784 (2012):

> "Unjust enrichment applies wherever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract.... A right of recovery under the doctrine of Unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another.... With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties and apply this standard.... Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy.... Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." (Internal quotation marks omitted.) *Vertex, Inc. v. Waterbury,* 278 Conn. 557, 573, 898 A.2d 178 (2006); see also *American Express Centurion Bank v. Head,* 115 Conn.App. 10, 16, 971 A.2d 90 (2009); M. Taylor & D. Krisch, Encyclopedia of Connecticut Causes of Action (2009) p. 65.

It is undisputed that the Defendants' bond violated Connecticut law and they executed  a Consent Decree, agreeing to this fact (see Exhibit B).

Plaintiff paid the Defendants a $147,000.00 premium toward a bail bond that would keep the criminal defendant out of jail through the pendency of his case. The Defendants have acknowledged that they did not have the legal ability to underwrite this bond. Their surety bond as void ab initio as it was in violation of Connecticut law at the outset and the Defendants have been unjustly enriched by retaining Plaintiff's premium. Despite numerous requests, Defendants have refused to return her $147,000.00. It is as to this inequitable conduct that the Plaintiff seeks equitable relief.

The plaintiff was an indemnitor on a criminal surety bond between Fotis Dulos and Palmetto. Her claim in unjust enrichment is for the return of the $147,000.00 premium. *Town of New Hartford v. Connecticut Resource Resources Recovery Authority,* 291 Conn. 433 (2009).

Defendants also received a benefit from Plaintiff's indemnity of the bond contract with the bond defendant. Although unjust enrichment typically arises from a plaintiff's direct transfer of benefits to a defendant, it also may be indirect, involving, for example, a transfer of a benefit from a third party to a defendant when the plaintiff has a superior equitable entitlement to that benefit. See, e.g., Restatement (Third), Restitution and Unjust Enrichment  § 48, comment (d)(1) (Tentative Draft No. 5, 2008) (discussing "cases in which the defendant has been compensated or reimbursed by a third party for costs or expenditures incurred by the claimant"). "If a payment to [a] defendant is an asset to which the claimant (as against defendant) has the paramount entitlement, the law of restitution and unjust enrichment supplies a claim to recover the amount in dispute." Id., § 48, comment (a).

Because the defendants themselves acknowledge that the surety bond was illegal (e.g., filing a motion to revoke the same), they had no express contract with the bond defendant, and thus were unjustly enriched by retaining the premium by the Plaintiff.  It is as to this inequitable conduct that the Plaintiff seeks the Court's application of the equitable relief.

In terms of Plaintiff's damages, the measure of damages for unjust enrichment is really restitution. See *New Hartford, supra*, 291 Conn. At 460.  ("[d]amages are intended to provide a victim with monetary compensation for an injury to his person, property or reputation ... whereas restitution aims to deprive a defendant of unjustly obtained benefits" [citation omitted; internal quotation marks omitted] ). A recovery under a theory of unjust enrichment is an equitable claim.

> A right of recovery under the doctrine of unjust enrichment  is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another.... With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties and apply this standard.... Unjust

enrichment is, consistent with the principles of equity, a broad and flexible
remedy....

*New Hartford, supra*, at 451-452, *Meaney v. Connecticut Hosp. Ass'n, Inc*., 250 Conn 500, 511-

512, (1999).


    D.  <u>Alternatively, Plaintiff is Entitled to Summary Judgment on Her Claim for Breach of
Implied Contract</u>


       As set forth above, Plaintiff is entitled to summary judgment on her claim for unjust

enrichment, as the bail bond that defendants purported to issue is void ab initio, and defendants

would therefore be unjustly enriched if they were allowed to retain the $147,000 premium

Plaintiff paid for that bond.  In the alternative, if the Court finds that the Plaintiff is not entitled

to summary judgment on her unjust enrichment claim, she is nevertheless entitled to summary

judgment on her claim for breach of implied contract.  Pursuant to the parties' implied

agreement, Plaintiff agreed to pay – and did pay – the $147,000 premium, and Plaintiff also

served as Indemnitor on the bond, in exchange for which Defendants agreed to issue a valid,

legal bail bond for the defendant for the duration of his criminal trial.  Defendants, however,

indisputably did not fulfill their end of the bargain despite purporting to do so, as the bond was

void ab initio – see Section 4A above –  which was irrefutably shown by their action to move to

revoke the bond before the bond defendant's trial had commenced or concluded.   Accordingly,

Plaintiff is entitled to the return of the premium deposit she paid for the bond.


       As in *Town of New Hartford, infra*, an implied contract here arises from one party's

being unjustly enriched to the detriment of the other party. "An implied in law contract is another

name for a claim of Unjust Enrichment." *See Rent-A-PC, Inc. v Rental Management. Inc*. 96

Conn App 600, 606 (2006). Connecticut courts are clear that a contract relationship is not

necessary for a recovery based upon unjust enrichment. *Schirmer v. Souza*, 126 Conn. App 759, 1054 (2011), "…we are guided by ample appellate decisional precedent and legal authority that a contractual relationship is not a prerequisite to recovery based on unjust enrichment. *Gagne v. Vaccaro*, 255 Conn 390, 401. See also S. Williston, Contracts (4th Ed. Lord 2003) 1479, at p. 272.

The implied contract in question is that the Plaintiff paid Defendant  a premium of $147,000 in consideration of their posting  a bond that would guarantee the freedom of the bond defendant throughout the pendency of his case. They breached that contract, by not providing a legal bond, which they admit.

### V.   <u>CONCLUSION</u>

There was no surety bond in existence here from the start as Defendants acknowledge that it was contrary to Connecticut law (see Exhibit A). As such, it was void ab initio, and under a theory of unjust enrichment, the Plaintiff should receive the return of her $147,000.00 premium.  'Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy. *Cecio Bros., Inc.* v. *Greenwich,* [supra, at 564, 244 A.2d 404].' " *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.,* supra, at 283, 649 A.2d 518.

If there was no surety bond, there would be no reason for a premium.


Respectfully Submitted,

BY */s/ Jonathan J. Einhorn*
JONATHAN J. EINHORN
129 WHITNEY AVENUE
NEW HAVEN, CT 06510
FED BAR ct 00163
203-777-3777
einhornlawoffice@gmail.com

<u>CERTIFICATION</u>

I hereby certify that on this 10th day of July, 2023, a copy of the foregoing Statement was filed electronically or served by mail on anyone unable to accept electronic filing. Parties may access this filing through the Courts CM/ECF System.

/s/ *Jonathan J. Einhorn*
JONATHAN J. EINHORN