**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ANNA K. CURRY | : | NO. 3:21-CV-00221 (SRU) |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| PALMETTO SURETY CORPORATION, | : | |
| 24/7 BAIL BONDS, LLC, WILLIAM | : | |
| SOBOTA, and JERRY CAO | : | |
| *Defendants* | : | JULY 10, 2023 |

**DEFENDANTS' LOCAL RULE 56(a)(1)**
**STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 56(a)(1), the Defendants submit the following statement of undisputed material facts in support of their Motion for Summary Judgment filed herewith.

**Regarding Defendant Palmetto Surety Corporation**

1.    Defendant Palmetto Surety Corporation ("PSC") is a South Carolina corporation with a principal place of business in Charleston, South Carolina, engaged in the business of, *inter alia*, issuing surety bail bonds. PSC is licensed to do business in Connecticut. Amended Complaint (Doc. 111), ¶ 2; Willis Aff., ¶ 3.[1]

2.    Scott Willis is and has been PSC's CEO since 2013, and for the period 2007 to 2013 served as PSC's COO. Willis Aff., ¶ 4.

3.    PSC has been admitted to do business as a bail bond surety company in Connecticut since 2016. Willis Aff., ¶ 5.

4.    As of January 2019, PSC was licensed to write surety bail bonds in South Carolina, North Carolina, Georgia, Florida, Tennessee, Mississippi, Louisiana as well as Connecticut. Id.

---

[1] "Willis Aff." refers to the Affidavit of Scott Willis dated July 9, 2023, attached hereto as **Exhibit A**.

5.      All states where PSC is licensed to conduct business are members of the National Association of Insurance Counselors ("NAIC").  It has been PSC's experience that all states which are members of the NAIC have passed substantially similar model codes concerning regulation of an insurer's capital and surplus. Willis Aff., ¶ 6.

6.      One such model code is S.C. Code Ann. § 38-55-30, which states, in part, "no insurer doing business in this State may expose itself to a loss on one risk in an amount exceeding ten percent of its surplus to policyholders. A risk or portion of it which has been reinsured must be deducted in determining the limitation of risk prescribed in this section" Willis Aff., ¶ 7.

7.      PSC operates with the understanding that, due to the adoption of the NAIC model code, that the regulators of NAIC member states, other than South Carolina, which admit Palmetto to do business in their state, rely upon South Carolina regulators' determination that Palmetto is in compliance with these model codes. Willis Aff., ¶ 8

8.      The South Carolina Department of Insurance ("SCDOI") has expressly informed Palmetto that it interprets S.C. Code Ann. § 38-55-30 to mean that Palmetto can "reinsure" bail bond risk which exceeds its surplus with collateral, such as real property. Willis Aff., ¶ 9.

9.      In reliance upon SCDOI's interpretation, PSC has written bail bonds that exceeded its surplus by reinsuring the excess amount through securing collateral from the named defendant and/or those individuals who provide such collateral on the defendant's behalf, in the form of cash, real estate or other property. As a result, PSC has written surety bail bonds in all jurisdictions, where it is licensed to do business in a similar fashion, using collateral provided by the defendant to reinsure any amount exceeding ten percent of PSC's Surplus, including Connecticut. Willis Aff., ¶ 10.

10.     PSC provides the SCDOI with annual audits of its outstanding surety bail bonds including those exceeding PSC's Surplus which have been collateralized by the respective defendants. Every five years, SCDOI conducts a thorough audit of PSC's books, records, and procedures at PSC's offices which include a review of all outstanding bonds, the last of which preceding issuance of the Dulos bond being conducted in 2018. The SCDOI has expressly approved PSC's use of collateral to reinsure any surety bonds exceeding PSC's capital and surplus. Willis Aff., ¶ 11.

**Regarding Defendants 24/7 Bail Bonds, LLC, William Sobota and Jerry Cao**

11.     Defendant 24/7 Bail Bonds, LLC ("24/7") is a Connecticut limited liability company licensed by the Connecticut Department of Insurance (the **"CDI"**) in the business of surety bail bonds with a principal place of business in Meriden, Conn. Amended Complaint, ¶ 3

12.     Defendant William Sobota is a bail bondsman licensed by the CDI and is the principal of 24/7. Amended Complaint, ¶ 4; Sobota Aff., ¶ 2.[2]

13.     Defendant Jerry Cao is a bail bondsman licensed by the CDI and works as a bail agent with 24/7 and PSC. Amended Complaint, ¶ 5; Sobota Aff., ¶ 3.

14.     Bail agents such as Cao bond out arrestees/criminal defendant under insurance coverage; said insurance coverage is the bail money itself, which is provided by 24/7, who underwrites the policy.  The bail agent in turn pays a 24/7 a premium for its policy, paid by the criminal defendant/arrestee or its agent/indemnitor. Sobota Aff., ¶ 3.

15.     24/7 acts as an underwriter the surety company, such as PSC. PSC is the ultimate guarantor of the policy. The premium monies paid by the criminal defendant/ arrestee being bonded out are divided between the bail agent, 24/7 and PSC. Id., ¶ 4.

---

[2] "Sobota Aff." refers to the Affidavit of William Sobota dated April 16, 2021, attached hereto as **Exhibit B**.

16.     24/7's responsibilities as bail bondsman include:  1) underwriting the bond by gathering the relevant information from the criminal defendant/arrestee that will assist PSC in determining the latter's financial condition; 2) collecting the premium for the bail bond from the criminal defendant/arrestee; 3) once the bond is written, securing the criminal defendant/arrestee's release on bond by filing with the court PSC's power of attorney in the amount of the bail set by the court, and a Criminal Appearance Bond court form JD-CR-4; and 4) ensuring that the criminal defendant/arrestee appears at scheduled court dates as ordered by the judge in the criminal case. Id., ¶ 5.

**Regarding Plaintiff Anna Curry and Fotis Dulos**

17.     In late 1999, or early 2000, Plaintiff Anna Curry met Fotis Dulos while they were both employed with Ernst & Young in Boston, Mass. Curry Tr., pp. 19-20.[3]

18.     Plaintiff and Dulos established a friendship while working at Ernst & Young, in 2000 and maintained that friendship until Dulos' death. Id., pp. 22-23.

19.     Plaintiff and Dulos enjoyed a social relationship with each other and their respective significant others through approximately 2013, when Plaintiff moved from New York to North Carolina. Id., pp. 24-25.

20.     After Plaintiff moved from New York, Plaintiff and Dulos maintained contact by way of text message and phone calls. Id., p. 29.

21.     Plaintiff became aware in approximately 2017 or 2018 that Dulos was going through a separation from his then-wife, Jennifer Dulos. Id.

---

[3] Reference to "Curry Tr." is to the deposition transcript of plaintiff Anna Curry dated April 20, 2023, cited portions of which are attached hereto as **Exhibit C**.

22.     On Memorial Day, May 27, 2019, Plaintiff learned that Jennifer Dulos had disappeared by reading an article concerning her disappearance on the New York Post website, which mentioned that the missing woman was married to Fotis Dulos. Id., pp. 30-31.

23.     Plaintiff followed the news concerning the disappearance of Jennifer Dulos for the period May 27, 2019 to June 24, 2019, and learned that Dulos was a suspect in his wife's disappearance; id., pp 35-36; and specifically learned on June 6, 2019, that Dulos had been arrested in connection with the disappearance of his wife. Id., pp. 46-47.

24.     Plaintiff learned that, following his arrest on June 6, 2019, Dulos had secured a bail bond paid for by some of his friends in order to avoid pretrial incarceration. Id., p. 48.

25.     After speaking with a mutual friend, Mark Antonio Antamora; id., p. 33; and having followed the news concerning Jennifer Dulos' disappearance, on June 24, 2019, Plaintiff sent an email to Dulos out of concern for her friend. Id., p. 31.

26.     A short time after sending him the email of June 24, 2020, Dulos called the Plaintiff, and she discussed with him how he was doing under the circumstances. Id., pp. 34-35.

27.     From reading the news, and subsequent discussions with Dulos, Plaintiff learned that, at as of June 2019, Dulos had been in a two-year relationship with Michelle Tranconis. Id., pp. 36-38.

28.     Plaintiff and Dulos maintained communications during June and July 2019. On or about July 13, 2019, at Dulos' invitation, Plaintiff went to visit Dulos at his home at 4 Jefferson Crossing in Farmington, Connecticut ("Dulos' Home"), for two or three days, where he was also hosting other friends. Id., pp. 39-41.

29.     Plaintiff returned to Dulos' Home in late July or early August 2019 to stay the weekend. Id., p. 43.

30.     Dulos was arrested again in September 2019 on charges related to his wife's disappearance and was again released on bond; however, Plaintiff is not aware as to who, if anyone, other than Dulos paid for the bail bond. Id., pp. 57-58; 113-14; 119-20.

31.     In approximately October 2019, Plaintiff's relationship evolved into a more intimate, personal relationship beyond friendship. Id., pp. 45-46.[4]

32.     Plaintiff spent approximately two to three weeks at Dulos' Home during the months of October, November and December 2019. Id., p. 48.

33.     After spending the majority of December at Dulos' Home, Plaintiff left in early January to return to North Carolina for business purposes. Id., p. 55.

**Dulos Arrested for Murder, Issuance of Bail Bond by Defendants**

34.     On the morning of January 7, 2020, Dulos called the Plaintiff and told her he had been charged with the murder of his wife. Id., pp. 56-57.

35.     During their brief phone conversation that morning, Dulos told Plaintiff that bail had been set at $6,000,000.00, and asked Plaintiff to contact Mark Motuzick, a bail bondsman who had secured the bail bonds in connection with Dulos' first two arrests, in order to post a bail bond in connection with the new charge of murder. Id., pp. 58-59.

36.     Plaintiff and Dulos had no discussions on the morning of January 7, 2020, as to who was going to pay for the bail bond to secure his release. Id., pp. 59; 101-02; 109.

37.     The likely need for the posting of a bond in the event of Dulos' arrest for murder was discussed as early as September 2019. In approximately September and October 2019, Plaintiff overheard Dulos and Motuzick discussing the posting of a large bond in the range of

---

[4] Pursuant Local Rule 5 and to Paragraph 14 of the Amended Protective Order entered on June 1, 2022; see Doc. 75; the Defendants have moved to seal those portions of Ms. Curry's deposition designated as Confidential; Curry Tr. Pp. 66-87; wherein the nature of her intimate relationship with Mr. Dulos are discussed.

$5,000,000.00 in anticipation of Dulos being charged with the murder of his wife; id., pp. 89-90; including whether Dulos would need to provide collateral for any such bond. Id., pp. 90-91; 94-95.

38.     Motuzick did not believe the bond would be as high as $5,000,000.00, and assured Dulos that he would cover any bond needed when and if murder charges were brought. Id, pp. 89-90; 96-97.

39.     During September through November 2019, Dulos had been advised by his attorneys that he should post a bond to secure his pretrial release in the event he was charged with murder. Plaintiff, Dulos, and Dulos' family members had discussions during this time period where it was collectively decided he should try to secure a bail bond in the event of his arrest for murder. Id., pp. 103-107. Dulos may have also had similar discussions with two friends, Guillame Vidallet and Carlos Gendron. Id., p 107.

40.     Following the conversations overheard by Plaintiff, she did not discuss with Dulos who would be paying for the posting of such a bond. Id., pp. 94-96. And even though Plaintiff had discussions with Dulos and his family members concerning the posting of a bond upon Dulos being charged with murder as early as September 2019, there were no discussions as to who would pay for the bond. Id., pp. 108, 114-18.

41.     And although discussed since September 2019, when Dulos was arrested on January 7, Plaintiff, Dulos and his family members were inexplicably caught unaware, resulting in a sense of chaos. Curry Tr., pp. 101.

42.     After speaking with Dulos on the morning of January 7, Plaintiff contacted Motuzick concerning the posting of bond, as requested. Id., pp. 60-61. Motuzick had told

Plaintiff that the bond premium would constitute seven per cent of the bail amount, and that Dulos would be required to pay one-third of the total premium. Id., p. 100.

43.     The total premium for the bond was $420,150.00, with the initial premium deposit being $148,000.00. Amended Complaint, ¶ 11.

44.     Motuzick told Plaintiff that he would need cash for the initial bond premium payment and requested that Plaintiff secure a cashier's check in the amount of $125,000.00. Id., pp. 98-99. Motuzick had also asked Plaintiff about what assets Dulos might have as collateral. Id., pp. 123-24.

45.     Plaintiff then flew from North Carolina to Connecticut on January 7, 2020. Id., pp. 60-61. Upon her arrival, Plaintiff went to Dulos' Home, where Dulos's sister was present. She was informed that Dulos' nieces had been in contact Motuzick concerning the bond. Id., p. 109-111.

46.     Plaintiff had no discussions with Dulos' sister or other family members that morning when she was asked to pay for the bond premium. Id., p. 110-113.

47.     Plaintiff did discuss with Dulos' sister Motuzick's inquiry concerning the availability of Dulos' assets to serve as collateral for the bond. Id., pp. 124-25. Plaintiff then found a spreadsheet listing of Dulos' assets and liabilities consisting of real estate, vehicles and a 401(k) account, on a desk in Dulos' home office (the **"Spreadsheet"**); id., pp. 125-26;[5] a copy of which she forwarded to Motuzick via text message. Id., p. 142.

48.     After spending approximately an hour at Dulos' Home on January 7, Plaintiff left and, as requested by Mr. Motuzick, went to her bank and obtained from her personal savings account a cashier's check payable to Capital Bailbonds for $125,000.00. Id., pp. 100, 103.

---

[5] A copy of the Spreadsheet is attached hereto as **Exhibit D.** See Curry Tr., pp. 138-39.

49.     After securing the cashier's check, Plaintiff had difficulty connecting with Motuzick. The following day, Plaintiff appeared at the courthouse where Dulos was to appear bringing a change of clothes for Dulos at the request of his attorneys. Id., pp. 128-30.

50.     Motuzick did not appear in at the courthouse on the morning of January 8, and Dulos' attorneys became frustrated. Id., pp. 130-31.

51.     Attorney Pattis informed Plaintiff that Motuzick was "getting cold feet" and that "The collateral is the issue. That's where this could go bad." Burns Aff., ¶ 4, Ex. 1. [6]

52.     Plaintiff was then introduced by Attorney Smith to the defendant, Jerry Cao, a bail bond agent working with defendant 24/7. Curry Tr., p. 130-31; Sobota Aff., ¶ 7.

53.     Cao contacted Sobota for assistance in underwriting the $6,000,000.00 bond. Sobota Aff., ¶ 7. Sobota then contacted PSC to indicate that 24/7 would be requesting a bond in that amount for Dulos. Id., ¶ 8; Willis Aff., ¶ 13.

54.     As of December 31, 2019, PSC's Surplus was $4,801,663.00, meaning PSC would require the posting of collateral for any surety bail bonds the amount of which exceed $480,000.00, or ten percent of its Surplus. Willis Aff., ¶ 12.

55.     Upon receipt of the request from 24/7 to write the $6,000,000.00 surety bail bond it was immediately apparent that Dulos would be required to post collateral for the portions of the bond that exceeded $480,000.00. Willis Aff., ¶ 16.

56.     Because of the standards developed by the Connecticut Chief State's Attorney's Office concerning the compromise and settlement of forfeited bail bonds, limiting a surety's obligation to pay fifty percent of the full amount of the bond in the event of forfeiture, PSC

---

[6] A copy of the text message exchange is attached as Exhibit 1 to the Affidavit of Attorney Joseph B. Burns dated July 102, 2023, attached hereto as **Exhibit E**.

required Dulos to provide a minimum of $2,520,000.00 in collateral so that PSC could write the

bail bond. Willis Aff., ¶ 16; *see* Chief State's Attorney Surety Bond Compromise Schedule.[7]

57.    The guidelines for underwriting, the process whereby collateral satisfactory to

PSC would be provided to allow for the writing of the bail bond were set forth between 24/7,

Dulos, his attorneys and Dulos' agent/indemnitor, Anna K. Curry ("Curry"). Willis Aff., ¶ 18.

58.    Plaintiff met with Sobota on the evening of January 8, 2020, and had discussions

with Sobota and a phone call with a representative of PSC concerning the posting of a bail bond

for Dulos, and Dulos' assets available for collateral. Id., p. 133.

59.    That evening Plaintiff gave Sobota a personal check in the amount of $125,000.00

as well as a check in the amount of $1,000.00, written on Dulos' checking account, as partial

payment of the initial premium for the bail bond. Id., pp. 134-35.

60.    Plaintiff knew Dulos did not have sufficient funds in his bank account to cover the

initial bond premium, and only wrote a single check from his account, on his behalf, in the

amount of $1,000.00. Curry Tr., pp. 177, 180.

61.    That same evening, Plaintiff also provided Sobota with a copy of the Spreadsheet

which she had provided to Motuzick. Curry Tr., pp. 137-38.

62.    Plaintiff did not inform Sobota or Cao of the concerns Motuzick had concerning

the use of the property listed on the Spreadsheet as collateral for the bond. Curry Tr., p. 132.

63.    PSC was advised by 24/7 that Dulos was collateralizing the bond with equity

from Dulos' real estate holdings, consisting of six parcels of real property in Connecticut. It was

---

[7] A copy of the Chief State's Attorney Surety Bond Compromise Schedule is attached as **Exhibit F**, at Table 10, from the Connecticut Legislative Program Review & Investigations Committee report, "Bail Services in Connecticut" dated December 2003, found at https://www.cga.ct.gov/2003/pridata/Studies/Bail_Final_Report.htm.

PSC's understanding and belief that the real property Spreadsheet provided by Plaintiff had been prepared and approved by Dulos and his attorneys. Willis Aff., ¶ 19.

64.     PSC, through 24/7, made inquiry of Dulos and his attorneys concerning evidence of foreclosure on one of the properties.  Said evidence was found by PSC on the real estate website Zillow, and PSC was assured that the matters had been taken care of and would not impair the collateral. Willis Aff., ¶ 20.

65.     Following Dulos' eventual release from custody, Willis, Sobota and Dulos spoke on a conference call during which Dulos personally assured them that, regarding the foreclosures on several of the properties used to collateralize the bond, there were no issues with his equity. Willis Aff., ¶ 22.

66.     Based upon the representations made by Dulos, Curry, and Dulos' attorneys,  PSC understood and believed that Dulos was providing sufficient collateral via his equity in real estate to reinsure any excess risk to PSC's own capital and reserves, thereby properly securing the bond. Willis Aff., ¶ 21.

67.     On the evening of January 8, Plaintiff signed a Financial Statement and Indemnity Agreement form (the "Curry Indemnification Agreement")[8], a "Defendant Authorization Form"[9] and a "Promissory Note."[10]  at Sobota's request. Curry Tr., pp. 139-40; 160-61; 229. Plaintiff dated the documents January 9, 2020. Curry Tr., pp. 161-62.

68.     Plaintiff understood that the Indemnity Agreement obligated her to "help with the bond being paid" in the event Dulos fled and the bond was called. Curry Tr., p. 196.

---

[8] See Burns Aff., Exhibit 2, for copy of the Indemnification Agreement.
[9] See Burns Aff., Exhibit 3, for copy of the Defendant Authorization Form.
[10] See Burns Aff., Exhibit 4, for copy of the "Promissory Note."

69.    In addition, the Indemnification Agreement provides: Paragraph 2: "That the Indemnitors will have Defendant forthcoming before the Court named on said Bond at the time(s) therein fixed, and at such other times as may be ordered by the Court;" Paragraph 6: That the Surety may withdraw, at any time provided by law, from its Suretyship upon the bond or undertaking herein, without liability to any party." Burns Aff., Ex. 2.

70.    Plaintiff did not understand any provision of the documents she signed for the Defendants created an obligation or duty owed to her by the Defendants. Curry Tr., pp. 146; 190-92; 248.

71.    Plaintiff understood that the bail bond was for the benefit of Dulos – to be released from custody – and that if bond was called should Dulos fail to appear, the bond would be paid into court. Curry Tr., pp. 146; 200; 215-19.

72.    The discussions with Sobota, Cao and 24/7 continued to the following morning, January 9, 2020; id., pp. 133-34; during which time Plaintiff gave 24/7 a cashier's check from her bank in the amount of $22,000.00, making a total of $148,000.00 paid in full for the initial bond premium paid to 24/7, $147,000.00 of which having been paid by Plaintiff. Id., p. 135; see Amended Complaint, ¶ 12.[11]

73.    None of the defendants asked Plaintiff to pay the bond premium from her own funds; she made the payment voluntarily. Curry Tr., pp. 242-43.

74.    Plaintiff had no expectation of being paid back by Dulos. Curry Tr., p. 184.

75.    Plaintiff does not represent Dulos' estate, and has no standing to maintain a legal claim on behalf of the estate. Curry Tr., pp. 176-77.

---

[11] See Burns Aff., Exhibit 5, for copy of the three checks.

76.     After 24/7 and PSC received the information concerning Dulos' collateral, including the Spreadsheet, on the morning of January 9, 2020, PSC posted the surety bail bond with the Court, and Dulos was released from custody. Curry Tr., p. 62; Amended Complaint, ¶ 10; Willis Aff., ¶ 22.

77.     Upon his being released from custody on January 9, 2020, Dulos was never returned to custody. Curry Tr., p 185.

78.     Upon his release from custody, Dulos formally signed an Application for Surety Bond with PSC (the "Application"). Burns Aff., Ex. 6. Plaintiff did not sign the Application, or any other application for bail bond. Curry Tr., pp. 216.

79.     The collateral used by 24/7 and PSC consisted of a total of six parcels of real estate. Sobota secured mortgages from Dulos on all six parcels and recorded the mortgages n the respective land records where the parcels were located. Sobota Aff., ¶ 12; Willis Aff., ¶ 23.

80.     Following Dulos' release from custody, Plaintiff did not discuss with Dulos or anyone else whether she would be reimbursed the $147,000.00 she provided for the initial bond premium; Curry Tr., p. 145; nor were there any discussions whether the $147,000.00 was a gift to Dulos. Id., pp. 148-49.

81.     In the end, none of Dulos' family members or friends ever contributed to the payment of the bond premium. Curry Tr., pp. 122-23; 145-46.

82.     Dulos did not ask Plaintiff to pay additional money for the balance of the bond premium; she understood that Dulos would be responsible for the payment of the remaining bond premium. Curry Tr., p. 146-47.

83.     Dulos, was ordered confined to his home as a condition of his release from custody, was ordered confined to his Dulos' Home. Id., p. 63-64.

84.     While Dulos was on pretrial release from January 9, 2020, through January 28, 2020, Plaintiff stayed with Dulos at Dulos' Home. Id., p. 66.

**Hearing on Dulos Bond**

85.     On or about January 22, 2020, Scott Willis of PSC received a telephone call from Michael Schull, a representative of the South Carolina Department of Insurance ("SCDOI"), with whom Willis had dealt on many prior occasions concerning PSC's surety business.  Mr. Shull told Willis that he had been contacted by the Connecticut Department of Insurance ("CDI") and was questioned about whether the Dulos bond exceeded ten percent of PSC's surplus. Willis Aff., ¶ 24.

86.     Specifically, Mr. Shull informed Willis that CDI had "concerns about this bond", and Mr. Shull asked that I send over documentation of the collateral and security pledged to reinsure the bond.  Based on this communication, it was PSC's understanding that the only question being raised was whether the collateral securing the Dulos bond was sufficient to reinsure the risk excess of PSC's Surplus. Willis Aff., ¶ 25.

87.     PSC immediately reviewed the information concerning the collateral provided by Dulos. Despite Dulos' earlier assurances that the properties in foreclosure would not impair his equity, it became evident to PSC that foreclosures on at least two of the properties were proceeding, when we were expressly assured they were not..  The two foreclosure matters were captioned as Savings Bank of Danbury v. Fore Group, Inc., FST-CV19-6044836-S and Mark H. Dean as Trustee of the CT RE 2019 Trust v. Fotis Dulos, HHD-CV19-611846-S. Willis Aff., ¶ 26

88.     On Thursday, January 23, 2020, PSC provided Mr. Shull/SCDOI with the information PSC had been provided concerning Dulos' collateral for the bond, including copies of the mortgages provided by Dulos, and had further discussions with Mr. Shull on Friday,

January 24, 2020, concerning the need for PSC to only have collateral to satisfy fifty percent of the bond, or $3,000,000.00, in the event of a forfeiture under Connecticut law. Willis Aff. ¶ 27.

89.     On the morning of Monday, January 28, 2020, Scott Willis of PSC received a telephone call from Mr. Sobota who advised that a hearing on the bond had been called for that day by the court in the criminal proceedings against Dulos. Willis Aff., ¶ 28.

90.     PSC understood that the Court was concerned about the collateral posted by Dulos. Perceiving that the hearing as an opportunity to clear up what appeared to be the misrepresentations about the collateral provided by Dulos, Willis contacted PSC's counsel in Connecticut to discuss the deficiencies in the Dulos' collateral that had been found over the past few days, and the fact that it now appeared that PSC no longer had sufficient collateral to reinsure the risk above ten percent of PSC's Surplus, in satisfaction of Connecticut and South Carolina law, Conn. Gen. Stat. § 38a-73 and S.C. Code Ann. § 38.55.30, respectively, which PSC understood to be substantively identical. Willis Aff., ¶ 29.

91.     As a result of the Court noticing a hearing on the Dulos bond, PSC decided to file its own Motion to Revoke Bond, in hopes the Court would allow PSC to raise its own concerns regarding the collateral.  In almost every state, the proper procedural vehicle for a surety to address any such concern is through a Motion to Revoke Bond.  The grounds of PSC's Motion to Revoke were specifically based upon Dulos' misrepresentations as to the value of his collateral and/or the threat of foreclosures, the result of which caused, or may have caused, PSC to exceed 10 percent of its capital and surplus by reducing the applicable reinsurance. Willis Aff., ¶ 30.

92.     The filing of the Motion to Revoke was to present PSC's position and to secure a determination from the court as to the sufficiency of the collateral posted by Dulos in a setting where all interested parties to the bond, i.e., PSC (obligor), Dulos (principal) and his counsel,

and the State of Connecticut (obligee), would be present. PSC never had the intention of pursuing the actual revocation of the Dulos bond, but reasonably anticipated that Dulos would rectify any problems or concerns with the collateral, on the record, in front of the Court.  Stated alternatively, PSC did not reasonably expect the Court to revoke Dulos' bond, but that the Court would use the motion as a vehicle to compel Dulos to properly secure the bond, else Dulos would risk the bond being revoked for failure to comply. Willis Aff., ¶ 31.

93.     Dulos failed to appear at the bond hearing on January 28, 2020, and Sobota proceeded to Dulos' residence to secure Dulos' attendance at the hearing. Upon his arrival, police were present, and that Dulos had attempted suicide and was rendered comatose. As a result, the hearing on the bond did not go forward that day. Willis Aff., ¶32.

94.     On January 29, 2020, a hearing was held in State v. Dulos. Jan. 29, 2020 Tr., passim;[12] Willis Aff., ¶ 33. The State's Attorney prosecuting Dulos, in addressing the Court, indicated that the Motion to Revoke was to be marked off; Jan. 29, 2020 Tr., p 1; and that Dulos (then in hospital in New York) be ordered re-arrested. Id. The hearing concluded with the Court ordering that Dulos be re-arrested and ruling that "I'm going to raise the bond by $500,000.00 on the murder file [.]" Id. p. 4. Other than the increase in bond, in the event that Dulos recovered, the State indicated it would have no other conditions of release. Id., p. 2. No action was taken on the Motion to Revoke, and the Dulos bond remained in force and effect.

95.     It is uncontested that, after Dulos was removed from his home, he was ultimately transferred to a medical facility in New York, where he died on January 30, 2020.

96.     On January 30, 2020, PSC through counsel withdrew its motion to revoke the bond. The motion was never adjudicated. Willis Aff., ¶ 34.

---

[12] A copy of the January 29, 2020, hearing transcript held in State v. Dulos at the Stamford Superior Court is attached hereto as **Exhibit G**.

97.     It is uncontested that, upon Dulos' death, Dulos' bail was deemed exonerated by the act of God, and the Defendants were released from their obligation on the bond to the State of Connecticut. *See* <u>State v. Sheriff</u>, 301 Conn. 617, 626 (2011); Willis Aff., ¶ 35.

**<u>Conn. Dept. of Insurance's Revokes PSC's Prior Authorization to Write Surety Bonds</u>**

98.     On or about June 12, 2020, several months after the Dulos bond had been exonerated, PSC received a letter from the CDI concerning questions they had about surety bail bonds written in Connecticut by PSC which exceeded ten percent of PSC's capital and surplus – the equivalent of PSC's "surplus" under South Carolina law – in apparent violation of Conn. Gen. Stat. §38a-73. The Dulos bond was not among the bonds specifically being questioned by the CDI, because by that point, the Dulos bond had been exonerated and was not at risk of forfeiture. Willis Aff., ¶ 36.

99.     During PSC's subsequent discussions with the CDI, the CDI made clear that it would no longer allow PSC to write any single surety bond that exceeded ten percent of PSC's Surplus. Willis Aff., ¶ 37.

100.     In a June 26, 2020 letter from Kathy Belfi, Director of Financial Regulation for the CDI, to Scott Willis of PSC, concerning PSC's writing of surety bail bonds in excess of ten percent of its Surplus, which acknowledges that **_"the South Carolina Department of Insurance allows Palmetto to use collateral and/or agent's build up fund accounts to offset the gross risk on any one bond_**…," PSC was advised by the CDI for the first time since it began doing business in Connecticut that "the [CDI] only allows the amount of risk to be reduced through reinsurance obtained from an insurer that is licensed or approved in the Company's state of

domicile." (Emphasis added) See June 26, 2020 letter, attached as Exhibit 1 to Willis Aff;; *see* Mescia Tr., pp. 85-86; 87.[13]

101.    In the June 26, 2020, letter, the CDI informed PSC that it was revoking PSC's prior authorization to write fidelity and surety bonds in the state of Connecticut; however, allowed Palmetto to service existing bonds then outstanding. Willis Aff., ¶ 37.

102.    As of June 26, 2020, the then-outstanding surety bail bonds PSC was allowed to continue to service by the CDI included 15 bonds that exceeded ten percent of PSC's Surplus. Willis Aff., ¶ 38.

103.    In no instance did PSC's issuance of any surety bail bond in the state of Connecticut which exceeded its Surplus negatively affect its agent 24/7's obligations with respect to any criminal defendant out on bond, including Dulos, or jeopardize any criminal defendant's pretrial release from custody. Willis Aff., ¶ 40.

104.    After subsequent negotiations with the CDI, on September 28, 2020, PSC entered into a Consent Order with the CDI whereby, *inter alia*, PSC agreed that it would no longer write surety bail bonds in excess of its Surplus. Willis Aff., ¶ 39; A copy of the September 28, 2020, Consent Order is attached to the Willis Affidavit as Exhibit 2.

105.    Prior to being told by the CDI that it could not use collateral to reinsure the amount of a surety bail bond exceeding ten percent of its Surplus, PSC understood that any such restriction deviating from such practice allowed by the SCDOI would be stipulated to in the certificate of authority issued by the foreign jurisdiction after the foreign jurisdiction consulted with the SCDOI. Mescia Tr., pp. 86-88.

---

[13] Reference to "Mescia Tr." is to the deposition transcript of Donnie Mescia, COO of PSC, dated April 5, 2022, cited portions of which are attached hereto as **Exhibit H**.

106.     In an email exchange between representatives of the CDI and SCDOI on March 5, 2020, concerning PSC, Michael Shull of the SCDOI informed Maura Welch of the CDI that "Our department has taken the approach to let bail bond companies reduce their retention by using collateral and BUF funds for the agent who wrote a bond. Our law states that a company can't retain more than 10% of their C&S, but reinsurance can be used to reduce the retention. We view legitimate collateral and BUF funds as an alternative to reinsurance to accomplish the same intent of lowering the exposure to C&S." Burns Aff., Ex. 7.

107.     In the same email string referred to in the preceding paragraph, on June 5, 2020, CDI personnel address the position of the SCDOI as set forth by Mr. Shull in part, as follows. Kathy Belfi, writes to Maura Welch "That is fine *but I don't think it is our interpretation here in CT*." (Emphasis added). Antonio Caporale responds to *inter alios*, Ms. Belfi and Ms. Welch, "I agree with Kathy." Burns Aff., Ex. 7.

108.     In an internal email exchange at CDI between August 26, 2020, and September 1, 2020, addressing an August 25, 2020, letter from PSC's counsel concerning PSC and its compliance with the September 28, 2020 Consent Order, Muara Welch again acknowledge that that "The South Carolina Department of Insurance allows Palmetto to use collateral and/or agent's build up funds accounts to offset the gross risk on any one bond, the CID only allows the amount of risk to be reduced through reinsurance obtained from an insurer that is licensed or approved in the Company's state of domicile." Burns Aff., Ex. 8.

109.     In an internal email exchange at CDI on December 11, 2020, concerning PSC and its compliance with the September 28, 2020 Consent Order, Maura Welch again circulates Mr. Shull's March 5, 2020, statement concerning the SCDOI's position allowing collateral to serve as reinsurance for bonds written in excess of ten percent of an insurer's surplus, and reports that

"SC has a very similar statute [S.C. Code Ann. § 38-55-30] …We, of course, are sticking to a strict interpretation of [§ 38a-73] while SC interprets their statute differently." Burns Aff., ¶ 9.

110.    In a December 30, 2020, letter from Anthony Caporale, Counsel for the CDI, to Attorney Ryan McGuigan, counsel for PSC, the CDI acknowledged that Conn. Gen. Stat. § 38a-73(a) "was enacted to protect the solvency of any insurance company doing business in our State and to protect Connecticut residents, ***or in the case of an insurer underwriting surety bail bonds, the State…***" (Emphasis added). See Burns Aff., Ex. 10.

Respectfully submitted,

PALMETTO SURETY CORPORATION,

By: */s/ Barrett R. Brewer*_____

Barrett R. Brewer, Es. – *Pro Hac Vice*
Fed. Bar. No. sc8081
Brewer Law Firm, LLC
510 Mill Street, Suite 2B
Mount Pleasant, SC 29464
Telephone: 843-779-7454
Fax: 843-779-7456
Email: barrett@brewerlawfirmsc.com

*and*

PALMETTO SURETY CORPORATION,
24/7 BAILBONDS, LLC, WILLIAM
SOBOTA and JERRY CAO,

By: */s/ Joseph B. Burns*_____

Joseph B. Burns, Esq.
Fed. Bar. No. ct00403
Crumbie Law Group, LLC
100 Pearl Street, 12th Floor
Hartford, CT 06103
Telephone: 860-725-0025
Fax: 860-760-0308
Email: jburns@crumbielaw.com

## **<u>CERTIFICATE OF SERVICE</u>**

 I hereby certify that on July 10, 2023, the foregoing was filed electronically and was served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent electronically to all registered E-filers in this case by operation of the Court's electronic filing system as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

*/s/ Joseph B. Burns*_____

Joseph B. Burns
