EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANNA K. CURRY | : | NO. 3:21-CV-00221 (SRU) |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| PALMETTO SURETY CORPORATION, | : | |
| 24/7 BAIL BONDS, LLC, WILLIAM | | |
| SOBOTA, and JERRY CAO | : | |
| *Defendants* | : | |

### AFFIDAVIT OF SCOTT B. WILLIS

I, Scott B. Willis, being duly sworn, so hereby state the following:

1. I have firsthand knowledge of the facts set out below, I am above the age of twenty-one years, and I believe in the obligations of an oath.

2. I am the Chief Executive Officer ("CEO") of the Defendant in the above-captioned action Palmetto Surety Corporation ("PSC").

3. PSC is a surety corporation, organized pursuant to the laws of the state of South Carolina and is regulated by the South Carolina Department of Insurance ("SCDOI").

4. Prior to becoming the CEO of PSC in 2013, I served as the Chief Operating Officer of PSC from 2007 to 2013.

5. As of January 2019, PSC was licensed to write surety bail bonds in South Carolina, North Carolina, Georgia, Florida, Tennessee, Mississippi, Louisiana and Connecticut. PSC has been writing surety bail bonds in Connecticut since 2016.

6. All states that Palmetto is licensed to conduct business in are members of the National Association of Insurance Counselors ("NAIC"). It has been PSC's experience that all states which are members of the NAIC have passed substantially similar model codes concerning regulation of an insurer's capital and surplus.

7. One such model code is S.C. Code Ann. § 38-55-30, which states, in part, "no insurer doing business in this State may expose itself to a loss on one risk in an amount exceeding ten percent of its surplus to policyholders. A risk or portion of it which has been reinsured must be deducted in determining the limitation of risk prescribed in this section".

8. As CEO of PSC, it is my understanding that, due the adoption of the NAIC model code, that the regulators of NAIC member states, other than South Carolina, which admit Palmetto to do business in their state, rely upon South Carolina regulators' determination that Palmetto is in compliance with these model codes.

9. The South Carolina Department of Insurance ("SCDOI") has expressly informed Palmetto that it interprets S.C. Code Ann. § 38-55-30 to mean that Palmetto can "reinsure" bail bond risk which exceeds its Surplus with collateral, such as real property. Since Connecticut was, and is, an NAIC member state, PSC

10. In reliance upon SCDOI's interpretation, PSC wrote bail bonds that exceeded its Surplus by reinsuring the excess amount through securing collateral from the named defendant and/or those individuals who provide such collateral on the defendant's behalf, in the form of cash, real estate or other property. As a result, PSC has written surety bail bonds in all jurisdictions, where it is licensed to do business in a similar fashion, using collateral provided by the defendant to reinsure any amount exceeding ten percent of PSC's Surplus, including Connecticut.

11. PSC provides the SCDOI with annual audits of its outstanding surety bail bonds including those exceeding PSC's Surplus which have been collateralized by the respective defendants. Every five years, SCDOI conducts a thorough audit of PSC's books, records, and procedures at PSC's offices which include a review of all outstanding bonds, the last of which

preceding issuance of the Dulos bond being conducted in 2018. The SCDOI has approved PSC's collateralization of any surety bonds exceeding PSC's Surplus.

12. As of December 31, 2019, PSC's Surplus was $4,801,663.00, meaning PSC would require the posting of collateral for any surety bail bonds the amount of which exceed $480,000.00, or ten percent of its Surplus.

13. On or about January 8, 2020, PSC received a large bond request from its licensed agent in the State of Connecticut, 24/7 Bail Bonds, LLC. ("24/7").

14. Fotis Dulos ("Dulos"), the subject of said bond, was the criminal defendant in the matter State of Connecticut v. Fotis Dulos, Docket No. FST-CR20-0241180, charged with: a) Murder in violation of Conn. Gen. Stat. § 53a-54a; b) Murder-Commission of Felony in violation of Conn. Gen. Stat. § 53a-54c; and Kidnapping 1st Degree in violation of Conn. Gen. Stat. § 53a-92.

15. Bail for Dulos had been set at $6,000,000.00.

16. Upon receipt of the request from 24/7 to write the $6,000,000.00 surety bail bond for Fotis Dulos, it was immediately apparent that Dulos would be required to post collateral for the portions of the bond that exceeded $480,000.00. Because of the standards developed by the Connecticut Chief State's Attorney's Office concerning the compromise and settlement of forfeited bail bonds, limiting a surety's obligation to pay fifty percent of the full amount of the bond in the event of forfeiture, PSC required Dulos to provide a minimum of $2,520,000.00 in collateral so that PSC could write the bail bond.

17. As of January, 2020, PSC never once doubted its ability to write a bond in Connecticut, in excess of $480,000.00 so long as the excess risk was collateralized, or "reinsured".

18. The guidelines for underwriting, the process whereby collateral satisfactory to PSC would be provided to allow for the writing of the bail bond were set forth between 24/7, Dulos, his attorneys and Dulos' agent/indemnitor, Anna K. Curry ("Curry").

19. PSC was advised by 24/7 that Dulos was collateralizing the bond with equity from Dulos' real estate holdings, consisting of six parcels of real property in Connecticut. It was PSC's understanding and belief that the real property spreadsheet had been put prepared by Dulos and his attorneys..

20. PSC, through 24/7, made inquiry of Dulos and his attorneys concerning evidence of foreclosure on one of the properties. Said evidence was found by PSC on the real estate website Zillow, and PSC was assured that the matters had been taken care of and would not impair the collateral.

21. Based upon the representations made by Dulos, Curry, and Dulos' attorneys, PSC understood and believed that Dulos was providing sufficient collateral via his equity in real estate to reinsure any excess risk to PSC's own capital and reserves, thereby properly securing the bond.

22. The Dulos bond was written and issued on January 9, 2020. On that date, 24/7 posted the bond and secured Dulos' release from prison. That evening, 24/7's principal William Sobota ("Sobota") and Dulos, now out on bail, called me from Sobota's car; Dulos personally assured me that, regarding the foreclosures on several of the properties used to collateralize the bond, there were no issues with his equity.

23. Dulos provided Mr. Sobota with mortgages on the properties in favor of PSC which were recorded on the respective land records where each property was located.

24. On or about January 22, 2020, I received a telephone call from Michael Schull, a representative of the South Carolina Department of Insurance ("SCDOI"), whom I had dealt with on many prior occasions concerning PSC's surety business. Mr. Shull told me he had been contacted by the Connecticut Department of Insurance ("CDI") and was questioned about whether the Dulos bond exceeded ten percent of PSC's surplus.

25. Specifically, Mr. Shull informed me that CDI had "concerns about this bond", and Mr. Shull asked that I send over documentation of the collateral and security pledged to reinsure the bond. Based on this communication, it was our understanding that the only question being raised was whether the collateral was sufficient to reinsure the excess risk on the Dulos bond..

26. Myself, and members of my team at PSC, immediately reviewed the information concerning the collateral provided by Dulos. Despite Dulos' earlier assurances that the properties in foreclosure would not impair his equity, it became evident that foreclosures on a least two of the properties were proceeding, when we were expressly assured they were not.. The two foreclosure matters were captioned as <u>Savings Bank of Danbury v. Fore Group, Inc.</u>, FST-CV19-6044836-S and <u>Mark H. Dean as Trustee of the CT RE 2019 Trust v. Fotis Dulos</u>, HHD-CV19-611846-S.

27. On Thursday, January 23, 2020, I provided Mr. Shull with the information we had been provided concerning Mr. Dulos' collateral for the bond, including copies of the mortgages provided by Dulos, and had further discussions with Mr. Shull on Friday, January 24, 2020, concerning the need for PSC to only have collateral to satisfy fifty percent of the bond, or $3,000,000.00, in the event of a forfeiture under Connecticut law..

28. On the morning of Monday, January 28, 2020, I received a telephone call from Mr. Sobota who advised that a hearing on the bond had been called for that day by the court in the criminal proceedings against Dulos.

29. Without knowing why the hearing was noticed, I perceived this as an opportunity to clear up what appeared to be misrepresentations about the collateral provided by Dulos. I then contacted our counsel in Connecticut to discuss the deficiencies in the Dulos' collateral that had been found over the past few days, and the fact that it now appeared that PSC no longer had sufficient collateral above ten percent of PSC's Surplus to satisfy Connecticut law, Conn. Gen. Stat. § 38a-73, requirements which I understood to be identical to S.C. Code Ann. § 38.55.30, requiring reinsurance of any amount exceeding PSC's Surplus.

30. As a result of the Court noticing a hearing on the Dulos bond, PSC decided to file its own Motion to Revoke Bond, in hopes the Court would allow PSC to raise its own concerns regarding the collateral. In almost every state, the proper procedural vehicle for a surety to address any such concern is through a Motion to Revoke Bond. The grounds of PSC's Motion to Revoke werebased upon Dulos' misrepresentations as to the value of his collateral, the result of which caused, or may have caused, PSC to exceed 10 percent of its capital and surplus by reducing the applicable reinsurance.

31. The filing of the Motion to Revoke was to present PSC's position and to secure a determination from the court as to the sufficiency of the collateral posted by Dulos in a setting where all interested parties to the bond, i.e., PSC, Dulos and his counsel, and the State of Connecticut, would be present. PSC never had the intention of pursuing the actual revocation of the Dulos bond, but reasonably anticipated that Mr. Dulos would rectify any problems or concerns with the collateral, on the record, in front of the Court. Stated alternatively, PSC did

6

not reasonably expect the Court to revoke Dulos' bond, but that the Court would use the motion as a vehicle to compel Dulos to properly secure the bond, else Dulos would risk the bond being revoked for failure to comply.

32. Sobota subsequently advised me that Dulos failed to appear at the bond hearing on January 28, 2020, and that he then proceeded to Dulos' residence to secure Dulos' attendance at the hearing and that upon his arrival, police were present, and that Dulos had attempted suicide and was rendered comatose. As a result, the hearing on the bond did not go forward that day.

33. The next day, January 29, 2020, PSC appeared through Connecticut counsel at a hearing called in the Dulos criminal matter. PSC's motion to revoke was not heard on that date.

34. On January 30, 2020, PSC through counsel withdrew its motion to revoke the bond. The motion was never adjudicated.

35. As a result of Mr. Dulos' death, the Dulos bond was exonerated, and PSC was released from any obligations on the bond to the State of Connecticut.

36. On or about June 12, 2020, PSC received a letter from the CDI concerning questions they had about surety bail bonds written in Connecticut by PSC which exceeded ten percent of PSC's capital and surplus – the equivalent of PSC's "surplus" under South Carolina law – in apparent violation of Conn. Gen. Stat. §38a-73. The Dulos bond was not among the bonds specifically being questioned by the CDI, because by that point, the Dulos bond had been exonerated and was not at risk of forfeiture.

37. During PSC's discussions with the CDI, the CDI made clear that it would no longer allow PSC to write any single surety bond that exceeded ten percent of PSC's Surplus. On June 26, 2020, the CDI informed PSC that it was revoking PSC's prior authorization to write fidelity and surety bonds in the state of Connecticut; however, allowed Palmetto to service

existing bonds then outstanding. A copy of the CDI's June 26, 2020, letter is attached hereto as **Exhibit 1.**

38.  As of June 26, 2020, the then-outstanding surety bail bonds PSC was allowed to continue to service included 15 bonds that exceeded ten percent of PSC's Surplus.

39.  After subsequent negotiations with the CDI, on September 28, 2020, PSC entered into a Consent Order with the CDI whereby, *inter alia*, PSC agreed that it would no longer write surety bail bonds in excess of its Surplus. A copy of the September 28, 2020, Consent Order is attached hereto as **Exhibit 2**.

40.  In no instance did PSC's issuance of any surety bail bond in the state of Connecticut which exceeded its Surplus negatively affect its agent 24/7's obligations with respect to any criminal defendant out on bond, including Dulos, or jeopardize any criminal defendant's pretrial release from custody.

*{Remainder of page intentionally left blank}*

Further the Affiant sayeth not.

_____
SCOTT B. WILLIS

STATE OF SOUTH CAROLINA  )
                         )  ss:
COUNTY OF Charleston     )

On this 9th day of July 2023, before me the undersigned officer, personally appeared SCOTT B. WILLIS known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument and acknowledged that he executed the same for the purposes herein contained, and that the facts contained herein are true and accurate.

In witness whereof I hereunto set my hand and seal.

_____
NOTARY PUBLIC

Printed Name: Skyla D Holycross

My Commission Expires: 10.3.2024

Skyla D. Holycross
Notary Public, State of South Carolina
My Commission Expires 10/03/2024

9



# STATE OF CONNECTICUT

*INSURANCE DEPARTMENT*

SENT VIA EMAIL TO swillis@palmettosurety.net

June 26, 2020

Mr. Scott Willis
Palmetto Surety Corporation
75 Port City Landing, Suite 130
Mount Pleasant, SC 29464

**EXHIBIT**
Willis Ass.
1 -PSC MSJ

Re:  Connecticut Certificate of Authority for Palmetto Surety Corporation ("Palmetto" or "the Company")

Dear Mr. Willis:

Your response to the Connecticut Insurance Department's ("the Department") letter to you dated June 12, 2020 has confirmed that Palmetto is not in compliance with Connecticut General Statute ("CGS") §38a-73(a) which states as follows:

> No stock insurance company doing business in this state shall expose itself to loss on any one risk to an amount exceeding ten per cent of its paid-up capital and surplus; but, **in determining the amount of such risk, no portion thereof that has been reinsured in any insurance company that meets the requirements of section 38a-85 or 38a-86 shall be included**.

Although the South Carolina Department of Insurance allows Palmetto to use collateral and/or agent's build up fund accounts to offset the gross risk on any one bond, the Department only allows the amount at risk to be reduced through reinsurance obtained from an insurer that is licensed or approved in the Company's state of domicile.

The Financial Regulation Division considers all the operations of the Company when determining if it maintains adequate capital to support the business it writes in Connecticut. In your response, you described an instance where the Company wrote a large bond on a risk located in South Carolina. The location of the risk is not relevant when applying our statutes. The total amount at risk of $2.5 million exceeded the 10% limit under CGS §38a-73(a) and the fact that it was written puts the entire Company at risk. Should there be a default and the collateral was not immediately available to cover the amount owed, Palmetto may become insolvent. In addition only the build up funds retained from the bail bondsman that wrote the large bond could be used to pay the court.

Additionally, the Department is fully aware that Palmetto wrote a large bond on a Connecticut risk which also exceeded the 10% of capital limitation. Because Palmetto is licensed in Connecticut, it is bound to operate in accordance with Connecticut General Statutes including CGS §38a-73(a) but it has failed to do so.

www.ct.gov/cid
P.O. Box 816 Hartford, CT 06142-0816
An Equal Opportunity Employer

CTDOIFOI000062

Pursuant to CGS § 38a-41 and Connecticut Regulations § 38a-8-104(b)(2) the Department has the authority to suspend an insurer's license or reduce, suspend, or limit the volume of business being accepted or renewed when cause has been found. Based upon the above, the Department has found such cause to exist and has taken the following action: effective June 26, 2020 a restriction was placed on Palmetto's license in Connecticut, prior authorization to write fidelity and surety line of business is revoked and the Company may continue only to service its existing bonds outstanding. The amended license will be mailed to you.

Palmetto may reapply to the Department to have the line of authority reinstated only after it can prove that it will operate in accordance with Connecticut Statutes.

Sincerely,

*Kathy Belfi*

Kathy Belfi, CPA
Director Financial Regulation
Connecticut Insurance Department

cc:  Commissioner Mais, CT
     Michael Shull, SC Insurance Department

# STATE OF CONNECTICUT
*INSURANCE DEPARTMENT*


EXHIBIT
Willis Aff
2 PSC MSJ

IN THE MATTER OF: )
)
PALMETTO SURETY CORPORATION ) Docket No.: MC 20-94
)
Respondent )

## Stipulation and Consent Order

It is hereby stipulated and agreed between Palmetto Surety Corporation and the State of Connecticut Insurance Department by and through Andrew N. Mais, Insurance Commissioner, to wit:

WHEREAS, Palmetto Surety Corporation ("Respondent"), NAIC # 13121, is an insurer domiciled in the State of South Carolina and is currently authorized to write fidelity and surety lines of business in Connecticut;

WHEREAS, the Department received information indicating that the Respondent's financial condition had become such that the Respondent did not possess sufficient reserves for the protection of Connecticut insureds and the payment of outstanding obligations;

WHEREAS, the Department alleges that the Respondent has underwritten a surety bail bond issued to a Connecticut resident in an amount in excess of ten percent of the Respondent's paid up capital and surplus, in violation of current statutory requirements;

WHEREAS, on June 26, 2020, in response to the Respondent's above referenced financial condition and statutory violation, the Department restricted the Respondent's license and revoked the Respondent's prior authority to write fidelity and surety lines of business in Connecticut, limiting the Respondent's authority to servicing existing business;

WHEREAS, the Commissioner alleges that the conduct described above is in violation of sections 38a-14 and 38a-73(a) of the Connecticut General Statutes and constitutes cause pursuant to Sections 38a-2 and 38a-41 of the Connecticut General Statutes and Section 38a-8-104 of the Regulations of Connecticut State Agencies Department for the imposition of fines and/or for the suspension of an insurer's license, or for the Department to reduce, suspend or limit the amount of business that the Respondent is allowed to accept or renew;

WHEREAS, on August 26, 2020 the Respondent submitted financial information and documentation to the Department indicating that the Respondent had increased its reserves so that it now possesses a sufficient amount of capital and surplus for the protection of Connecticut residents under the current statutory and regulatory guidelines;

WHEREAS, in an effort to avoid the expenses and uncertainty of litigation and/or an administrative proceeding, the Respondent admits the allegations contemplated by the Department and, in that respect, voluntarily waves;

a. Any right to a hearing;

b. Any requirement that the Commissioner's decision contain a statement of findings of fact and conclusions of law; and

c. Any and all rights to object to or challenge before the Commissioner or in any judicial proceedings any aspect, provision or requirement of this Stipulation and Consent Order.

WHEREAS, the Respondent agrees to pay a fine in the amount of $5,000.00 (five thousand dollars), payable upon the execution of this Stipulation and Consent Order;

WHEREAS, the Respondent agrees to maintain an amount of capital and surplus at a sufficient level for the protection of Connecticut insureds;

WHEREAS, the Respondent agrees that it will not in the future underwrite surety bail bonds in excess of ten percent of the Respondent's capital and surplus in any jurisdiction;

WHEREAS, the Respondent agrees to submit a semi-annual filing (in June and December) to the Foreign Licensing Unit attesting to all bonds issued along with the amount underwritten;

WHEREAS, the Department agrees to lift the current restrictions on the Respondent's license and to restore the Respondent's authority to place surety and fidelity business in Connecticut;

WHEREAS, the respondent agrees that its authority to write business in Connecticut shall be immediately reduced or suspended if the Respondent violates any conditions of this Stipulation and Consent Order.

NOW THEREFORE, upon the consent of the parties, it is hereby ordered and adjudged that:

1. The Respondent is assessed a fine in the amount of $5,000.00 (five thousand dollars) to be paid upon execution of this Stipulation and Consent Order.

2. The Respondent shall maintain at all times in the future an amount of capital and surplus at sufficient levels to pay existing obligations.

3. The Respondent shall not in the future underwrite surety bail bonds in excess of ten percent of the Respondent's capital and surplus in any jurisdiction.

4. The current restrictions on the Respondent's license are hereby lifted and the Respondent's authority to place surety and fidelity business in Connecticut is hereby restore.

Consented and agreed to on this 25th day of September, 2020.

Palmetto Surety Corporation

By: _____

## CERTIFICATION

The undersigned deposes and says that she/he has duly executed this Stipulation and Consent Order on this ____24th____ day of ____September____ 2020, for and on behalf of Palmetto Surety Corporation; that she/he is the ____CEO____ of such Company, and she/he has authority to execute and file such instrument.

By: _Scott B. Willis_

STATE OF  SC       )
                   ) SS
COUNTY OF CHARLESTON )

On the ____24th____ day of ____September____ 2020, before me personally appeared ____Scott B. Willis____ ____, signer and sealer of the foregoing Stipulation and Consent Order, and acknowledged same to be her/his free act and deed.

Notary Public / BOLLIE T. PILSON
State of South Carolina
My Commission Expires April 19, 2023 / the Superior Court

---

Section Below To Be Completed by State of Connecticut Insurance Department

---

Dated at Hartford, Connecticut this  30th  day of  September  2020.

_____
Andrew N. Mais
Insurance Commissioner