1  I think he made that clear in his own deposition --

2  but he certainly made it clear to me that morning

3  that he didn't really like Mr. Motuzick and he

4  certainly didn't appreciate that Mr. Motuzick wasn't

5  showing up for their client, so he said, I'm going

6  to reach out to someone else.

7      Q   Okay.  Other than Mr. Motuzick and then

8  ultimately Mr. Cao, Mr. Sobota, 24/7, did you have

9  any contact with any other bondsman on January 7th

10 or 8th concerning Mr. Dulos's bond?

11     A   I did not.  I don't -- I don't even know

12 bail bonds people.  I mean, Mr. Motuzick was the

13 only bail bonds person I had ever met.

14     Q   Okay.  And do you recall when you first

15 had any interaction with -- strike that.

16     Who was the first person from 24/7 Bail Bonds

17 that you had direct interaction with, either

18 Mr. Cao, Mr. Sobota, or --

19     A   Mr. Cao.

20     Q   -- another person?

21     Okay.  Did you ever deal with anyone other than

22 Mr. Cao or Mr. Sobota with regard to 24/7 Bail

23 Bonds?

24     A   No.

25     Q   Okay.  Did you ever have any discussions

1   with anyone from Palmetto Surety Company concerning

2   the bond?

3       A    Mr. Sobota called who he said was the

4   president of Palmetto Surety the evening of

5   January 8th.  And I don't know if he used the name

6   Willis or not, but he got him on the phone and put

7   him on the speaker and there was a conversation.

8       Q    Okay.  So that was that evening of the

9   first -- the day of the arraignment?

10      A    Of January 8th.

11      Q    Okay.

12      A    Yes.

13      Q    Okay.  All right.

14      By the time you had that discussion with

15  Mr. Sobota with an apparent representative of

16  Palmetto on the speakerphone, had -- was -- had any

17  decision been made as to whether or not you would

18  be -- strike that -- that 24/7 would be issuing the

19  bond for Mr. Dulos?

20      A    There was not a decision.  You know, the

21  situation always seemed to be fluid and it always

22  seemed to revolve around this sort of nebulous black

23  box of collateral; how much collateral was needed,

24  was there enough collateral in these particular

25  properties from Mr. Dulos or not.

1    I don't know what bail bonds people were doing

2  behind the scenes, but the conversation specific to

3  that was Mr. Sobota was, you know, here's

4  information I have.  He also asked me for additional

5  paperwork -- Mr. Sobota did -- on the properties.  I

6  emphasized that, you know, I cannot vouch for the

7  properties, the date on the spreadsheet -- there's

8  no date on the spreadsheet, the need for them to do

9  their due diligence, and that the bond be done

10  aboveboard.

11    Mr. Cao, literally that afternoon I think, had

12  suggested, you know, we're good to go.  And

13  Mr. Sobota seemed to emphasize, we think it's fine,

14  we have our attorneys working on it through the

15  night, but we think it's, you know, fine.

16    Q    Okay.

17    A    But we go into the next morning and I

18  guess you never know until the thing is posted if

19  it's going to go through or not.

20    Q    Okay.

21    A    And I see the next morning that there was

22  still activities that Mr. Sobota was trying to

23  handle regarding liens and other matters as to

24  whether he was -- you know, Palmetto and 24/7 were

25  going to be able to post the bond or not.

1     So it was always more we think it's going to

2 work, but, you know, there was never a definitive

3 yes until they showed up and posted the bond.

4     Q     Okay.  And the bond was actually posted on

5 the following day on the 9th, is that correct?

6     A     Correct.

7     Q     Okay.  Were you in the courthouse that day

8 with --

9     A     I was not.

10     Q     Okay.

11     A     I was in the parking lot of the Stamford

12 courthouse.

13     Q     Okay.

14     A     The parking garage, I should say.

15     Q     Okay.  And at some point you provided

16 Mr. -- you provided 24/7, Mr. Cao or Mr. Sobota,

17 with a cashier's check in the amount of $147,000 for

18 the premium on the bond, is that right?

19     A     Not -- not -- not precisely.

20     Q     Okay.

21     A     I provided -- the evening of Wednesday,

22 January 8th, I provided him with a personal check of

23 $125,000 --

24     Q     Okay.

25     A     -- because I had to return and redeposit

1   the Capitol Bail Bonds -- the cashier's check to

2   Capital Bail Bonds to have those funds available.

3       And then the next morning I provided him with a

4   cashier's check for $22,000.

5       Q    I apologize, ma'am, for conflating those.

6       So you actually provided 24/7 Bail Bonds with

7   one personal check and one cashier's check?

8       A    Yes.

9       And then I believe the $1,000 check for

10  Mr. Dulos, I believe that was provided -- I provided

11  that that evening to Mr. Sobota.

12      Q    And that was after Mr. Dulos had been

13  released?

14      A    No, he was incarcerated.

15      Q    Oh, excuse me.

16      This is the evening of January 8th?

17      A    Yes.

18      Q    Thank you.

19      Mr. Barrett was kind enough to bring up one of

20  the exhibits that was previously marked on the

21  screen here, and that is from --

22          MR. BREWER:  Exhibit 2.

23  BY MR. BURNS:

24      Q    -- Exhibit 2.

25      And I have a hard copy I can show you.

1          MR. BURNS:  Attorney Brewer, what -- on

2      Exhibit 2, what page is that that we're looking

3      at?

4          MR. BREWER:  It's one page.  All three

5      checks in this --

6          MR. BURNS:  No, which page of the actual

7      exhibit?

8          MR. BREWER:  Oh.  It's -- it's a one-page

9      exhibit.

10         MR. BURNS:  Oh, I'm sorry.

11         MR. BREWER:  It's Exhibit 2 and it's

12     actually got the Bates number FD Curry 64.

13         MR. BURNS:  Okay.  Thank you.

14   BY MR. BURNS:

15     Q    I'm just showing you a different copy of

16   it.

17         Does that Exhibit 2 contain photocopies of the

18   two checks that were provided by you to 24/7?

19     A    Well, yeah.  There are three here, but --

20     Q    Yes.

21     A    Yes, these are the checks.

22     Q    And then there's the $1,000 check for

23   Mr. Dulos?

24     A    Correct.

25     Q    Okay.  And, in addition, you were able to

1     provide some documentation concerning collateral

2     for -- to 24/7, is that correct?

3        A     Well, I -- Mr. -- you know, I didn't make

4     a determination about collateral. I wouldn't use

5     the word "collateral," that I provided information

6     about collateral. I was asked for information about

7     Mr. Dulos's assets.

8       Mr. Sobota specifically asked me regarding the

9     properties -- the real estate properties, can you

10    find appraisals, can you find Schedules As, can you

11    find tax returns. And I was able to locate a few of

12    those appraisals, a few of the Schedule As, and a

13    tax return showing ownership of Fore Group under

14    Mr. Dulos.

15       Q     And where did you find those documents?

16       A     In his home office.

17       Q     Did anyone assist you in locating those?

18       A     No.

19       Q     Okay. And --

20       A     I mean, it took some time. Mr. Dulos was

21    very organized. I think we searched under

22    "appraisals" and -- I don't recall how I actually

23    found them.

24       Q     Was Mr. Sobota present at the home when

25    you were --

1    A    He was.

2    Q    Okay. I'm showing you on a tablet what

3  was marked as Exhibit 8 here.

4      Do you recognize what's depicted on Exhibit 8?

5    A    I recognize the spreadsheet. I don't

6  recognize the handwriting.

7    Q    Okay. Fair enough. I believe that was a

8  document marked at a prior deposition as well.

9      Is that -- absent the handwriting on Exhibit 8,

10  is that the same spreadsheet that you sent to

11  Mr. Motuzick?

12    A    It is, yes.

13    Q    Okay. And you provided a copy of that

14  same spreadsheet to Mr. Sobota, correct?

15    A    I did, yes.

16      MR. BURNS: Could we see Exhibit 18?

17  BY MR. BURNS:

18    Q    I'm showing you what we've marked as

19  Exhibit 18 and it's a multipage document on this --

20  that I'm showing you on the tablet and it's also on

21  the larger screen.

22      Just scrolling through this briefly -- and then

23  I'll ask you questions -- do you recognize these

24  documents?

25    A    I do, yes.

1    Q    Okay.  And what are they?

2    Please feel free to go through them.

3    A    Well, this -- these particular

4 documents -- let me go down.

5    I think we're switching topics a little bit

6 here, but these are -- Mr. Sobota later in the

7 evening -- at that point in time I think it was

8 closer to 10 or so -- told me that in addition to,

9 you know, the other paperwork he was collecting,

10 that there would need to be two co-indemnitors to

11 the bond, but he -- those two pages were the pages

12 he had me sign and he said the co-indemnitor -- the

13 two co-indemnitors would need to sign these two

14 forms as well.  So, I took screenshots of those two

15 forms, the blank forms, and I e-mailed them to these

16 two people who had agreed to serve as

17 co-indemnitors.

18    Q    Okay.  And I apologize.  I did go a bit

19 off-topic regarding assets, but let me ask you since

20 we're looking at this document.

21    So you agreed to serve as one of Mr. Dulos's

22 indemnitors, is that correct?

23    A    On the bond I did, yes.

24    Q    On the bond.

25    And there was also a request to get these

1  additional indemnitors, one of which is a gentleman

2  by the name of Patrick McKenna, is that correct?

3      A    That's correct.

4      Q    Did you know Mr. McKenna prior to

5  January 10th, 2020?

6      A    No, I just found him in the phone book and

7  texted him up.

8      Yes, I had met him, I believe, in July or

9  August -- probably August -- August or September.

10      At some point in time Mr. Pattis had retained

11  him. I believe Mr. Pattis mentioned him in his

12  deposition with F. Lee Bailey to help with

13  investigative services for the criminal matter and

14  so I met -- Mr. McKenna stayed at the home a couple

15  of times of Mr. Dulos and I met him.

16      Q    Okay. And did Mr. McKenna agree to serve

17  as an indemnitor?

18      A    He did.

19      Q    Okay. And the second indemnitor was a --

20  I can't find it in my notes.

21      A    The second indemnitor was Guillaume.

22      Q    Guillaume, yes. Okay. Thank you.

23      And that was the gentleman previously mentioned

24  as one of the friends that Mr. Dulos was still

25  dealing with?

1    A    Yes.

2    Q    Okay.  I'm displaying what has been

3    previously marked as Exhibit 17.  If you could take

4    a look at that and see if you recognize that, ma'am.

5    A    I do.

6    Q    And what is that?

7    A    This is a screenshot of the phone -- the

8    contact I had in my phone for Mr. Sobota.

9    Q    And if you would scroll down on that

10   tablet for the additional pages on Exhibit 17, let's

11   see if you recognize those.

12   A    I do.  I recognize all of them.

13   Q    Okay.  And what does it consist of?

14   A    These are a series of text messages that

15   were exchanged between me -- myself and Mr. Sobota

16   between January 8th and January 28th, 2020.

17   Q    Okay.  And am I correct that it includes

18   some of the documentation that you were testifying

19   about previously concerning additional documents

20   about the real estate collateral to be posted?

21   A    It does.  You are correct, yes.

22   Q    Okay.  And there was a tax form that you

23   referenced that's contained in Exhibit 17 as well?

24   A    Yeah, the form 1120-S regarding the S corp

25   ownership of Fore Group.

1    I was able -- that's the only tax -- I think

2  Mr. Sobota wanted, I would imagine, a personal tax

3  return Mr. Dulos, but this was all I could find on

4  his DropBox.

5    Q    Okay.  All right.

6    I'm trying not to be redundant, but I just want

7  to take a look at Exhibit 23.

8    Ma'am, I'm showing you what's been marked as

9  Exhibit 23.  It's a two-page exhibit.

10    Do you recognize those?

11    A    I do.

12    Q    Okay.  And could you explain what that --

13  what we're looking at there?

14    A    Yeah, this is what I referred to earlier

15  as the screenshot that I took on the afternoon of --

16    Q    Okay.

17    A    -- January 7th of the spreadsheet I found

18  in Mr. Dulos's office.

19    Q    Okay.

20    A    Um, yeah, that's what that is.

21    Q    All right.  Thank you.

22    And those are the screenshots, then, that were

23  sent to Mr. Motuzick on January 7th?

24    A    That's correct.

25    Q    Okay.

1        MR. BREWER:  Did you say that was 23?

2        MR. BURNS:  That one was 23, yeah.

3    BY MR. BURNS:

4        Q    All right.

5        Showing you Exhibit 21, this is again a

6    multipage document, a two-page document.  If you

7    could take a look at that and see if you recognize

8    it.

9        A    I do.

10        Q    Okay.  And what is that?

11        A    This is one of the appraisals that I sent

12    to Mr. Sobota on the evening of January 8th.

13        Q    Okay.

14        A    That he asked for.

15        Q    Okay.

16        A    That he also took a physical copy of -- a

17    printout copy of the appraisals.

18        Q    And -- okay.

19        MR. BREWER:  I'd clarify, the appraisals

20        were in the DropBox link.

21        Is that where they are?

22        MR. BURNS:  Thank you.

23    BY MR. BURNS:

24        Q    Yes, what Exhibit 21 appears to be is a

25    copy of an e-mail showing an attachment on the first

1   page.

2        And then, the second page, is that a copy of

3   the --

4        A    That's just confirming that the e-mail was

5   delivered --

6        Q    Oh, okay.

7        A    -- to Mr. Sobota's e-mail address.

8        Q    Okay.  And the -- again, the attachments

9   to this particular e-mail were not specifically

10  attached here, but what do you understand them to

11  be?

12       A    Yeah, I think -- the appraisal documents

13  were, I think, provided.

14       Q    Okay.  And am I correct that the e-mail

15  itself is referring to a property known as

16  88 Mountain Spring?

17       A    Yes, for this one.

18       Q    Okay.  Do you still have the DropBox that

19  was utilized to transfer these documents?

20       A    It was Mr. -- I don't have it, no.  It was

21  Mr. Dulos's DropBox.

22       Q    It was.

23       A    He had, you know, a sheet of passwords

24  that he had kind of kept open and out, believe it or

25  not, on his -- in his office.  So a lot of people

1   had access to that.

2      Q   Okay.  And again, these were -- these --

3   the e-mail that we're talking about and the

4   appraisal information was transmitted on the evening

5   of January 8th to Mr. Sobota?

6      A   He was provided a hard copy of them as

7   well as the e-mail copy, yes.

8      Q   Okay.  All right.

9      And the following -- again, the following day

10   at some point the bond was posted by 24/7 and

11   Mr. Dulos was released?

12      A   Correct.  Yes.

13      Q   Okay.  After the -- after Mr. Dulos was

14   released on January 9th, between that point and

15   January 28th of 2020, did you have any discussions

16   with Mr. Dulos regarding reimbursement to you for

17   the bond premium that you paid?

18      A   We did not.

19      Q   Okay.  Did you have any discussions with

20   anyone other than Mr. Dulos during that same time

21   period, January 7th to January 28th, concerning the

22   repayment to you of the money -- the bond premium

23   that you paid?

24      A   I did not.

25      Q   Okay.  And in addition to the two checks

1    for $147,000 that you provided and the $1,000 check

2    that was provided by Mr. Dulos, there were no other

3    parties that contributed to the payment of the

4    initial bond premium, correct?

5        A    Not that I'm aware of, no.

6        Q    Okay.  And was there any discussion with

7    Mr. Dulos or any family member during that same

8    January 7th to January 28th timeframe with regard to

9    who would be responsible for paying the remaining

10   two-thirds of the bond premium beyond the initial

11   payment of $148,000?

12       A    I don't think that there was a discussion

13   about it.  It was -- I mean, obviously, Mr. Dulos

14   would be paying it.

15       Q    You said -- what made it obvious that he

16   would be paying the balance of the premium?

17       A    It was his bail bond and, you know, he had

18   access now.  He was out of jail and he had access to

19   his assets.  There was discussion about him reaching

20   out to his friends directly to see if he could raise

21   funds.

22       You know, he had expenses as well related to

23   his criminal trial that he would be looking to

24   source, but the expectation was that, you know, he

25   would pay it.

1    Q    Okay.  Was it -- did you anticipate being

2    one of those friends who would help him pay those

3    additional expenses?

4    A    No.  No.

5    Q    Was there any discussion with Mr. Dulos

6    concerning that?

7    A    Concerning that --

8    Q    You making additional payments beyond the

9    147 that you made?

10   A    No.  And he certainly didn't ask me to.

11   Q    Okay.

12   A    I mean, I just paid $147,000.

13   Q    Okay.

14   A    But there were no discussions of me paying

15   anything further.

16   Q    Okay.  And with regard to his -- your

17   understanding that he was going to seek additional

18   funds from friends, did -- were you aware of any

19   specific friends that he would be relying upon to do

20   that?

21   A    He was composing a list of numerous

22   friends that he was going to reach out to.  I

23   couldn't give you any of their specific names, but,

24   you know, he had -- Mr. Dulos had friends with

25   significant financial means all over the world and

1    some of them had shown that they were supportive of

2    him.  His plan was to re-engage with some of those

3    folks and see if they would continue being

4    supportive of him.

5        Q    To the best of your recollection, did

6    Mr. Dulos actually make contact with any of the

7    individuals that he was listing?

8        A    I have no idea who all Mr. Dulos

9    contacted.  I mean, he was on the phone all day, you

10   know, making phone calls, messaging.

11       I was working, again, so -- and, you know, he

12   was obviously talking to his friends about other

13   matters as well.

14       I don't -- I don't know.  He might have already

15   started asking, or not.

16       Q    To the best of your knowledge, did he ever

17   receive any funds from any of those friends that he

18   had listed or any other source to help to pay for

19   the additional bond premium?

20       A    Not that I'm aware of, no.

21       Q    Was it your expectation that when and if

22   these wealthy friends of Mr. Dulos's would begin to

23   provide him with financing for this bond that you

24   would receive reimbursement for the $147,000 that

25   you had paid?

1      A    That was never discussed, no.

2      Q    Was it your intention to make a gift of

3  the $147,000 to Mr. Dulos?

4      A    I don't -- I don't think I had a

5  particular intention.

6          This came to be because, you know, again, the

7  logistics of it.  I had the funds available in my

8  savings account.  His funds at the time were tied up

9  in his 401(k) and there was an attempt to get them

10  transferred out that didn't happen in the timeline

11  that was, you know, being urged that he get out on

12  the bond.

13          So there really was no thought in whether it

14  was a gift or not.

15      Q    Okay.

16      A    It just wasn't -- it wasn't discussed.

17          MR. BURNS:  Okay.  Let me see.  If we

18      could pull up on the screen Exhibit 35.

19  BY MR. BURNS:

20      Q    Exhibit 35 contains several pages of

21  documents that were produced earlier in this matter

22  and consists of a series of text messages that are

23  Bates numbered.  I'm referring to what's been Bates

24  numbered as -- the last three digits are page 215.

25          I'm scrolling down to try to get there, ma'am.

1    behalf while he was alive, correct?

2        A    In certain circumstances, as I understand

3    it, yes.

4        Q    And as I understood, acting on his behalf

5    included acting on his behalf in terms of getting a

6    bail bond, getting bonded out of jail, whatever that

7    required, is that correct?

8        A    When you say "whatever that required," I'm

9    not sure what you would mean.

10       Q    Sure.

11       A    But in the instance of helping him with

12   his bail bond, I did that, yes.

13       Q    However, as we went over with my first or

14   second question, the power of attorney ceased to be

15   effective upon Mr. Dulos's death, correct?

16       A    I think so.  As far as I know.  I'm not an

17   attorney, but I think that's how it works.

18       Q    You don't currently represent his estate,

19   Mr. Dulos's estate?

20       A    I never represented Mr. Dulos's estate.

21       Q    In fact, you at no have any agency on

22   behalf of the estate of Fotis Dulos, do you?

23       A    I never did.  I currently don't either,

24   no.

25       Q    In no way in this lawsuit are you acting

1   as a representative of Mr. Dulos, Mr. Dulos's

2   estate, nor are you acting as any type of

3   subrogation interest for Mr. Dulos's legal

4   positions, correct?

5       A    No.   Correct.

6       Q    Mr. Burns asked you about the $147,000.

7   Now, I kind of need to go back through that, the

8   bond premium you paid.  I didn't quite understand

9   the factual recitation.

10      Did you and Mr. Dulos ever have any

11  communication whatsoever that you would be writing a

12  check or a series of checks or two different checks

13  for $147,000?  Was that ever discussed in any terms

14  whatsoever?

15      A    I think I answered that a couple of times,

16  and the answer is no, there were no conversations to

17  that effect.

18      Q    That's what I'm unclear about.

19      So how -- how did he know that the bond premium

20  had been written if you never discussed it?  I mean,

21  was he not out there trying to gets the bond premium

22  together?  How did he know he had to write a check

23  $1,000, for instance, if he didn't know you were

24  writing a check for 147?

25      A    I wrote the check for $1,000 on his behalf

1   that evening.  And then the other question -- are

2   you saying how is it possible he didn't know

3   beforehand or -- I'm not clear.

4       Q   Yeah, I guess that's one question.

5       So when we looked at the series of checks that

6   were Exhibit 2 -- I can pull them up when we need

7   to.

8       A   I've got them imprinted in my memory,

9   Mr. Brewer.  I don't need you to pull them up.

10      Q   That's okay.  I'm doing this for the

11  record, not your memory.

12      A   Okay.

13      Q   You're saying you wrote, in Exhibit 2, the

14  top personal check from Fotis Dulos's account?

15      A   I did, yes.

16      Q   That is your name -- excuse me.

17      That is your handwriting on the top check of

18  Exhibit 2?

19      A   Uh-huh.  (Affirmative.)

20      Q   Is that a yes?

21      A   Yes.

22      Q   And you didn't sign "Anna Curry as power

23  of attorney for Fotis Dulos," you just signed Fotis

24  Dulos's name, is that correct?

25      A   That's right.

1    Q    You're talking over me again.  Please

2    allow me to finish the question.  It just makes her

3    life so much easier.

4         THE WITNESS:  I'm so sorry that I'm

5         causing you problems.

6    BY MR. BREWER:

7    Q    That's okay.  She's nodding along with it.

8    She does appreciate it.

9    So how did you know -- how did you not even

10   write a check, then, for $148,000?  How did you know

11   to go to Fotis Dulos's account and write a check for

12   $1,000, imprinting his name on the check?

13   A    I would imagine that was a request from

14   Mr. Sobota.  I don't recall why.  I mean, I had

15   another $1,000 in my account, so I would imagine

16   there was a particular reason that it was done that

17   way, but I don't recall what it was.

18   Q    When you wrote these three checks, was

19   Mr. Dulos currently incarcerated at that time?

20   A    He was.

21   Q    Did you know how much money Mr. Dulos had

22   in that account when you wrote that check?

23   A    I did not.

24   Q    Were you ever privy to how much money

25   Mr. Dulos had in any of his accounts?

1    A    No.

2    Q    How did you know there was enough money in

3    the account to the cover the $1,000 check you wrote?

4    A    I assumed there was that amount of money

5    in there.  I can't say that I saw a bank statement,

6    that I recall, to prove it.  I mean, there -- I

7    just -- I don't recall that.

8    Q    Did Mr. Dulos have $148,000 that he could

9    have -- that was in that account that you could have

10   just written a check for $148,000 from his account?

11   A    I don't recall what he had in this

12   People's United Bank account.  His spreadsheet

13   showed that he had over $400,000 or so in his

14   401(k).

15   Q    I guess I'm just asking why didn't you --

16   since you were writing Mr. Dulos's name on his

17   checks, why didn't you just write a check on his

18   account for $148,000?

19   A    Well, I don't think -- obviously I

20   don't -- he didn't have $148,000 in his People's

21   United Bank account from that period of time and

22   there was an attempt to get the money out of his

23   401(k).

24   Q    How do you know he didn't have $148,000?

25   And I ask that question because you told me you had

1  And you can keep asking the question, but the

2  answer is not going to be different.  The answer is

3  no.

4       Q    You're answering the question what did you

5  discuss.  I'm asking a question of what did you

6  expect.  What was in Ms. Curry's head.

7       Did you have a personal expectation while

8  Fotis Dulos was alive that you would ever see the

9  $147,000 of premium checks you wrote?

10      A    I did not necessarily have that

11  expectation, no.

12      Q    To be clear, on January 9th, 2020, while

13  Mr. Dulos was alive, when you wrote the checks for

14  $147,000, you had no expectation of being repaid

15  those moneys from Mr. Dulos, his family, or any

16  other source, is that correct?  Is that what I hear

17  you saying?

18      A    I think that's generally correct, yes.  I

19  did not necessarily have an expectation that it

20  would be paid back or not be paid back.

21      Q    When you paid the $147,000 for Mr. Dulos's

22  bond, what did you expect to happen?

23      A    I expected that a legal bail bond would be

24  provided which would afford Mr. Dulos the

25  opportunity to stay out of custody through his

1    trial.

2        Q    Okay.  Did you expect Mr. Dulos to be

3    released from jail?

4        A    I believe that's what a bail bond is for,

5    so yes, that was the expectation.

6        Q    Was Mr. Dulos released from jail?

7        A    For a period of time he was, yes.

8        Q    Did Mr. Dulos ever go back to jail after

9    January 9th, 2020?

10        A    He did not go to physical jail, no.

11        Q    Did he go to metaphorical jail?  Is there

12    some other jail you're referencing?

13        A    I guess that depends on what you think

14    death is, but --

15        Q    Well, I'm -- unfortunately, I don't

16    know --

17        A    We're in the physical, so yeah, he did not

18    go back to physical jail.

19        Q    This will go quickly if we can just have

20    kind of direct conversation.  I appreciate that in

21    advance.

22        So Mr. Dulos never went back to jail after

23    January 9th, 2020, correct?

24        A    Correct.

25        Q    Did you have -- in terms -- and we will go

1    language.

2        Q    Are you saying that only --

3        A    I can read -- let me clarify.  I can read

4    it and, from a layperson, understand it.

5        Q    As a layperson, tell me which of the

6    documents you signed outlines the obligations or

7    duties that Palmetto Surety or 24/7 owed to you?

8        A    Sir, I don't know, but I paid $147,000 to

9    your client for a bail bond that was illegal from

10   the beginning, apparently.

11       Q    I've placed Exhibit 47 in front of you.

12       Do those constitute all the known documents

13   that you signed with Palmetto Surety and 24/7, yes

14   or no?

15       A    I signed three documents.  I signed the

16   financial statement and indemnity agreement, I

17   signed the defendant authorization form, and I

18   signed a promissory note --

19       Q    Are all of those documents --

20       A    -- stating I would be an indemnitor for a

21   bond that I thought was a legal bond.

22       Q    Are all those documents present in

23   Exhibit 47?

24       A    I'm sorry?

25       Q    Are all of the documents that you signed

1   present within Exhibit 47?

2        A    I believe so.

3        Q    Please tell me which of the documents in

4   Exhibit 47 spell out the duty or obligation that

5   Palmetto Surety or 24/7 owed to you in black and

6   white.

7        A    I would have to probably spend time

8   reading it here, but --

9             MR. BREWER:  Go off the record.

10            Please take your time and read them.

11       We'll take a short recess while you read

12       through them.  I'll come back and reask the

13       question.

14            VIDEOGRAPHER:  Off record, 4:16.

15            MR. BREWER:  Does five minutes seem

16       sufficient, or do you need longer?

17            THE WITNESS:  No, we can -- we can resume.

18            MR. BREWER:  Okay.

19            THE WITNESS:  I think -- yeah.

20            Again, I don't know how to answer your

21       question.

22            MR. EINHORN:  We're not on the record yet.

23            VIDEOGRAPHER:  Stand by.

24            Back on record, 4:16.

25

1    BY MR. BREWER:

2        Q    Ms. Curry, we went off the record and I

3    gave you the opportunity to reread the documents

4    that you signed with Palmetto Surety and 24/7.

5        I'll re-ask the question.

6        Which of the documents that you signed spells

7    out in black and white or English language the

8    obligations Palmetto Surety or 24/7 owed to you,

9    Anna Curry?

10       A    I don't -- I just don't know how to answer

11   the question, is what I'm -- that's my answer.  I

12   don't know how to answer it.

13       Q    Well, show me -- you keep mentioning -- I

14   think I know the reason why.

15       Is it per chance because none of those

16   documents contain any verbiage stating that Palmetto

17   Surety or 24/7 owe you an obligation?  Isn't that

18   correct?

19       A    I don't know if it's correct or not.

20       I believe that when you pay an entity money for

21   a transaction, they owe a service in return.  How

22   that's couched in a legal concept, I don't know

23   because I'm not an attorney.

24       Q    That's the whole issue, ma'am.  I'm not

25   trying to ask you legal concepts, I'm asking about

1   the documents you signed.  It's much simpler.

2       Please, if you don't know how to answer the

3   question about the documents you signed, I'm asking

4   you to read through them and find for me where it

5   says Palmetto Surety owes you an obligation of some

6   sort.  Can you do that?

7           MR. EINHORN:  Well, you've asked her that

8       same question several times.

9           I'm going to instruct my client that if

10      you can answer it again -- and you've answered

11      it several times -- go ahead, but there's no

12      obligation on you to continue to answer the

13      same question over and over again.

14          MR. BREWER:  Well, I actually disagree in

15      the sense that she's not answered the question.

16          In fact --

17          MR. EINHORN:  She's not answered it the

18      way you like, but she's answered the question.

19      You may not be happy with her answer, but she's

20      answered it.

21          MR. BREWER:  I would disagree with that.

22          MR. EINHORN:  Okay.

23          MR. BREWER:  It's much easier.

24  BY MR. BREWER:

25      Q    Can you find any language --

1    A    I didn't fully -- I didn't fully read it.

2    Q    Well, then let's going off the record

3    again.  Take your time.

4    A    Are we moving on from this, or are we

5    continuing to go in circles?

6    Q    We're actually going --

7    A    The answer is going to be the same.

8    Q    Okay.  I'm going to keep giving you these

9    opportunities because I will be filing a motion

10   afterwards.

11   A    You like to threaten filing motions,

12   Mr. Brewer.

13        MR. EINHORN:  Just for the record, my

14        client's been asked the same question several

15        times.  She's given the same answer several

16        times.  She's now been asked to go off the

17        record once again and she indicates it's not

18        necessary and her answer continues to be the

19        same.

20        So at this point, having asked the same

21        question now four times at least and the answer

22        being the same every time, I'm going to

23        instruct you that if you have a different

24        answer obviously you can give it, but if your

25        answer is the same, please move on, Mr. Brewer.

1          MR. BREWER:  You're instructing her not to

2      answer?

3          MR. EINHORN:  I'm instructing her only if

4      she's got something different to say.  If she

5      answers the same, we're -- you're just not

6      happy with her answer, but that's not grounds

7      for asking the same question again.

8   BY MR. BREWER:

9      Q    Ms. Curry --

10         MR. BREWER:  I'll try a different tact.

11         We can go on.

12         VIDEOGRAPHER:  We never went off that last

13     time.

14  BY MR. BREWER:

15     Q    The agreements you say you signed, the

16  financial statement and indemnity agreement, the

17  promissory note, and the defendant authorization

18  form, right?  Those are the three you identified?

19     A    Correct.

20     Q    That would be 47-B, 47-C, and 47-E,

21  correct?

22     A    That's what I believe.  That's what it

23  looks like.

24     Q    Okay.

25     A    I think there's two 47-Es.

1    Q    47-B, which is the second page of

2    Exhibit 47, is an indemnity agreement and financial

3    statement wherein you agree to indemnify Palmetto

4    Surety, correct?

5    A    That's what it looks like, yes.

6         If there's an issue -- the way your client

7    described this to me is that these two documents

8    were formalities pertaining to if the defendant

9    flees and the bond is called.  That was what I

10   assumed I was signing to indicate that if the

11   defendant fled, I am going to step up and make

12   sure -- help with the bond being paid -- paid out,

13   if it had to be paid out.

14   Q    Did you actually read Exhibit 47-B?

15   A    At what point in time?  When I signed it?

16   Q    When you signed it.

17   A    Yes.

18   Q    And did you --

19   A    I would assume I did.

20   Q    And did you understand it when you signed

21   it?

22   A    I may not have read it very closely,

23   but --

24   Q    Did you read item six in 47-B?

25   A    I think all this presumes that the bond is

1      A    I have read it.

2      Q    -- or you don't know because you don't

3    understand it?

4      A    I have read it, I just -- I don't know.

5      Q    Is it likely that because there aren't any

6    words in here that say 24/7 or Palmetto Surety has

7    some sort of responsibility to you?

8      A    I'm sorry.  Could you say that again?

9      Q    Is it possibly because this document,

10   47-B, does not recite the words sufficient to

11   outline a responsibility or obligation to you?

12     A    No, it's because this is a legal document,

13   right, legal language.  I can read it from a

14   layperson's standpoint, but I don't know legally the

15   ramifications of it, which is why I retained an

16   attorney in this matter.

17     Q    Do you have an understanding that if

18   Mr. Dulos failed to appear in court and the

19   $6 million would have to paid, that it would not

20   have been paid to you?

21     A    I'm sorry.  Say that again?

22     Q    Sure.

23   There was a $6 million bond, right?

24     A    Correct.

25     Q    Do you have an understanding that the

1   take their life to murder.  Those are two very

2   different things.

3       Q    Mr. Dulos wrote a letter indicating he was

4   taking his own life, correct?

5       A    That he was attempting to take his own

6   life, yes.

7       Q    The actual agreement to provide the bail

8   bond itself was not signed by you, correct?

9       A    Which agreement are you referring to?

10      Q    The application for bail bond.  That is

11  Exhibit 47-K in front of you.

12      A    This form entitled -- Exhibit K -- I can't

13  read the top of it.  Okay.  This states "Application

14  for Appearance Bond Palmetto Surety Corporation."

15      Is that what you're referring to?

16      Q    I'm going to hand you 46, which is the

17  best copy.  If you'd like to refer to 46, you can.

18      A    I think it's just where the staples are

19  located.

20      Is that the form you're referring to?

21      Q    It is the one called "Application for

22  Appearance Bond."

23      A    And what are you asking, if I signed this?

24      Q    Did you sign this document?

25      A    I did not sign this particular application

1  form, no.

2      Q    Does your name appear anywhere on this

3  document?

4      A    It does appear down there as best friend.

5      Q    Does your name appear as a signator to

6  this document?

7      A    Are you saying -- is this -- you're saying

8  this is the full agreement for the bail bond?

9      Q    Does the Palmetto Surety Corporation

10  Application for Appearance Bond have a signature

11  line for Anna Curry?

12      A    I did not sign this document, no.

13      Q    Did you sign any other agreement that

14  expressly states that you were applying for a bail

15  bond?

16      A    Me personally?

17      Q    You personally.

18      A    I never signed for a bail bond.  I was not

19  a criminal defendant, so no, I didn't need to be

20  released from -- personally released from custody.

21      Q    Do you understand what "indemnity" means?

22      A    Generally speaking, to hold someone, I

23  guess, to -- if someone is harmed, that you're going

24  to make them whole, but, again, I'm not an attorney.

25  I can comment from a layperson's standpoint, but I

1  would very much hesitate to say whether I'm accurate

2  or not.

3      Q     You have a college degree, correct?

4      A     I do, but that's not a legal degree.

5      Q     You have a college degree from Duke

6  University?

7      A     That's correct.

8      Q     You are a financial planner, or have been

9  a financial planner, for ultra-high-wealth

10  individuals?

11      A     In the past, yes.

12      Q     Does that require you to read over

13  agreements and documents on their behalf to help

14  advise them on those?

15      A     Sometimes it does, yes.

16      Q     Did you have to have some basic

17  understanding of those documents in order to advise

18  your ultra-high-wealth clients?

19      A     I never advise them on legal matters,

20  which was explicitly stated and highly indicated not

21  ever to do as not being an attorney.

22      Q     Did you have to have some basic

23  understanding of the documents you read in order to

24  do your job advising your ultra-high-net-wealth

25  clients?

1    A    That was not a stipulation anywhere in any

2    job application or certification that I received

3    that I had to have the ability to basically

4    understand -- if you're talking about legal

5    documents, that was not indicated anywhere.

6    Q    So if I understand you correctly, you're

7    saying you read documents for your high-net-worth

8    clients that you didn't understand and talked to

9    them about them even though you had no idea what

10   they said?  That's what I hear you saying.

11   A    No, that's not -- Mr. Brewer, that's not

12   what I said.

13   Q    Help me out, then.

14   A    I stated if I read any documents,

15   particularly legal documents, I would always

16   disclose that I'm not an attorney --

17   Q    Sure.

18   A    -- and I can share with you my layperson's

19   viewpoint of what this legal document might mean,

20   but you should consult an attorney for legal advice.

21   Q    When you paid the $147,000 for the

22   premium, can you agree with me that the full premium

23   had not been paid for the $6 million bond?

24        The full premium was, like, $420,000, correct?

25   A    That's correct, yes.

1    Q   So the full payment for Mr. Dulos's bond

2  was actually never delivered to Palmetto Surety or

3  24/7, was it?

4    A   Not that I'm aware of, no.

5    Q   Did Mr. Dulos have an obligation to fully

6  pay the premium for his bond?

7    A   I think your client had an obligation to

8  provide a legal bond.  Yes, Mr. Dulos would have had

9  an obligation to pay fully for a legal bond, but

10  your clients would have been owed a full premium for

11  a legal bond.

12    Q   By the time Mr. Dulos died, though, he

13  didn't have any prospects for fully paying the

14  premium on that bond, did he?

15    A   You're incorrect on that.  I don't know

16  where you're coming up with that information from.

17    Q   Great.

18  Who was going to pay the remaining premium

19  balance?

20    A   I believe I testified to this earlier that

21  he had funds in his 401(k) and that he was

22  contacting -- you're frowning.

23  Can I finish my answer?  Okay.

24  He had funds in his 401(k) and he was

25  contacting friends of significant financial means to

1    my attorney informed me of.

2        Q    I'm handing you Exhibit 14.

3        Please tell me where in Exhibit 14, the motion

4    to revoke bond, is Palmetto Surety admitting that

5    the Fotis Dulos bond was illegal?

6        A    It must be in section No. 5.

7        Q    Okay.

8        A    They're exceeding the -- they've exceeded

9    the limitations of risk set by that particular law.

10       Q    It doesn't say the bond is illegal, does

11   it?

12       A    You're correct.  I don't believe it does

13   in here, but it says it the exceeded the statute --

14   the limitations of the statute, so I don't know -- I

15   would imagine a lawyer considers that illegal if

16   it's not in line with the statute, but I don't know,

17   maybe not.

18       Q    Okay.  Did Jerry Cao or Palmetto Surety or

19   Bill Sobota or 24/7 ask or solicit Anna Curry

20   expressly to provide them with $147,000?

21       A    They showed up to do the bond, presuming

22   that they could do the bond legally, and requested

23   payment for the bond.

24       Q    Did Palmetto Surety, Bill Sobota, 24/7, or

25   Jerry Cao expressly request Anna Curry to pay

1   $147,000 as premium for a bond?

2       A    Mr. Sobota was meeting with me personally

3   and he requested that amount of money, so I don't

4   know how you want to phrase that.

5       Q    Sure.

6       He requested an amount of money in a meeting

7   you were at.  That doesn't mean he's asking you to

8   pay that money, does it?

9       A    I guess you could say that.

10      Q    In fact, as I understood it, you

11  voluntarily wrote the $147,000 worth of checks

12  without anyone asking you to do it was your prior

13  testimony, correct?

14      A    I said that Mr. Dulos didn't ask me do it.

15  I don't know if I said "anyone," but that is

16  correct, no one else asked me to do it and -- but

17  the money was paid under the representation that it

18  was a legal bond that was being written.

19      Q    Do you recall where you were when Bill

20  Sobota or 24/7 or Jerry Cao mentioned the words

21  "legal bond" to you?

22      A    Um -- I'm sorry.

23      I don't believe they did mention the words

24  "legal bond," but, you know, I think one presumes

25  when a professional shows up at the table to do a

1    from jail, yes.

2        Q    But I want the express answer to the

3    question I asked.

4        When asked about your obligation to pay the

5    remaining premium on the bail bond -- that line of

6    questioning -- you stated, "it was his bail bond,"

7    meaning Fotis Dulos's bail bond, correct?

8        A    I just want to clarify that I didn't have

9    an obligation to pay any more premium toward the

10   bail bonds.  I just want to be clear on that, that

11   we're not twisting the question.

12       I had no obligation.  I never mentioned I would

13   pay additional premium.  I never signed anything

14   that I'd pay an additional premium.  So if we can

15   just establish that for the record.

16       Secondly, I may have referred to in general

17   terms -- as I'm using a lot of general terms in the

18   five hours and counting here -- that I may refer to

19   it as Mr. Dulos's bail bond.  The bail bond was to

20   release Mr. Dulos from jail.

21       Q    As you understand the situation, you

22   didn't have any obligation to anyone to even pay the

23   $147,000, correct?

24       A    Out of the clear blue sky just to give a

25   stranger $147,000?  No, I don't have an obligation

1                    CERTIFICATE

2    STATE OF CONNECTICUT

3    ss:  New Haven

4    COUNTY OF NEW HAVEN

5

6              I, Victorine D. Hennessey, a Notary

7    Public in and for the State of Connecticut, duly

8    commissioned and qualified and authorized to

9    administer oaths, do hereby certify that I was

10   attended at the law office of Crumbie Law Group,

11   LLC, 100 Pearl Street, Connecticut, on April 20,

12   2023, starting at 10:00 a.m., by counsel for the

13   respective parties as appears in the herein-entitled

14   cause and the deponent named in the foregoing

15   deposition, to wit: ANNA K. CURRY; that said

16   deponent was by me duly sworn and thereupon

17   testified as appears in the foregoing deposition;

18   that said deposition was taken stenographically by

19   me in the presence of counsel for the respective

20   parties and reduced to typewriting under my

21   direction; that the foregoing is a true and correct

22   transcript of the testimony.

23              I also certify that I am neither of

24   counsel nor attorney to either of the parties to

25   said suit, nor am I an employee of either party to

1   said suit, or of either counsel in said suit, nor am

2   I interested in the outcome of said cause.

3           Witness my hand and Seal as such Notary

4   Public at New Haven, Connecticut this 1st day of

5   May, 2023.

6

7

8                          _____

9                          VICTORINE D. HENNESSEY
                            COURT REPORTER
10                          NOTARY PUBLIC

11

12  My Commission Expires:

13  November 30, 2025

14

15

16

17

18

19

20

21

22

23

24

25