**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ANNA K. CURRY | : | NO. 3:21-CV-00221 (SRU) |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| PALMETTO SURETY CORPORATION, | : | |
| 24/7 BAIL BONDS, LLC, WILLIAM | : | |
| SOBOTA, and JERRY CAO | : | |
| *Defendants* | : | JULY 10, 2023 |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 7(a)(1), the Defendants Palmetto Surety Corp., 24/7 Bail Bonds, LLC, William Sobota and Jerry Cao (collectively, the **"Defendants"**) by and through their undersigned counsel, and submits this Memorandum in Support of their Motion for Summary Judgment filed herewith.

## I.      STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### A.      Defendant Palmetto Surety Corporation

Defendant Palmetto Surety Corporation (**"PSC"**) is a South Carolina corporation with a principal place of business in Charleston, South Carolina, engaged in the business of, *inter alia*, issuing surety bail bonds. Facts, ¶ 1.[1] As of January 2019, PSC was licensed to write surety bail bonds in South Carolina, North Carolina, Georgia, Florida, Tennessee, Mississippi, Louisiana as well as Connecticut, where it has been licensed since 2016. Facts, ¶¶ 1, 3, 4. Scott Willis is CEO of PSC. Id., ¶ 2

All states where PSC is licensed to conduct business are members of the National Association of Insurance Counselors (**"NAIC"**).  It has been PSC's experience that all states

---

[1] "Facts" refers to Defendants' Local Rule 56(a)(1) Statement of Undisputed Material Facts submitted in support of Defendants' Motion for Summary Judgment.

1

which are members of the NAIC have passed substantially similar model codes concerning regulation of an insurer's capital and surplus; Facts, ¶ 5; including South Carolina (S.C. Code Ann. § 38-55-30)[2] and Connecticut (Conn. Gen. Stat. § 38a-73).[3] PSC operates with the understanding that the NAIC member states rely upon South Carolina regulators' determination that PSC is in compliance with these model codes. Facts ¶ 7.

The South Carolina Department of Insurance (**"SCDOI"**) has expressly informed Palmetto that it interprets S.C. Code Ann. § 38-55-30 to mean that Palmetto can "reinsure" bail bond risk which exceeds its surplus with collateral, such as real property. Facts, ¶ 8. This practice is by PSC is set forth in annual audits PSC provides to SCDOI, as well as during SCDOI's thorough audit of PSC's books, records, and procedures at PSC's offices every five years, which include a review of all outstanding bonds. Facts, ¶ 10. Therefore, PSC has written bail bonds in all jurisdictions where it is licensed to do business, including Connecticut, which exceed ten percent of its surplus by reinsuring the excess amount through securing collateral from the named defendant and others on their behalf in the form of cash, real estate or other property. As a result, PSC has written surety bail bonds using collateral provided by the defendant to reinsure any amount exceeding ten percent of PSC's Surplus, including in Connecticut. Facts, ¶ 9. The SCDOI has in fact informed the Connecticut Department of Insurance (**"CDI"**) that surety companies such as PSC "can use reinsurance in the form of "legitimate collateral and [bail agents' build up funds accounts (BUF)] as an alternative to reinsurance…" Facts, ¶ 106.

---

[2] S.C. Code Ann. § 38-55-30 Provides in part which states, in part, "no insurer doing business in this State may expose itself to a loss on one risk in an amount exceeding ten percent of its surplus to policyholders. A risk or portion of it which has been reinsured must be deducted in determining the limitation of risk prescribed in this section"

[3] Conn. Gen. Stat. § 38a-73(a) reads: "No stock insurance company doing business in this state shall expose itself to loss on any one risk to an amount exceeding ten per cent of its paid-up capital and surplus; but, in determining the amount of such risk, no portion thereof that has been reinsured in any insurance company that meets the requirements of section 38a-85 or 38a-86 shall be included."

B.   **Defendants 24/7 Bail Bonds, LLC, William Sobota and Jerry Cao**

Defendant 24/7 Bail Bonds, LLC (**"24/7"**) is a Connecticut limited liability company licensed by the CDI in the business of surety bail bonds. Facts, ¶ 11. Defendant William Sobota is the principal of 24/7. Facts, ¶ 12. Defendant Jerry Cao is a bail bondsman licensed by the CDI and at all relevant times worked as a bail agent with 24/7 and PSC. Facts, ¶ 13.

Bail agents such as Cao bond out arrestees/criminal defendant utilizing insurance, i.e., the bail money, which is provided by 24/7 which underwrites the policy.  The bail agent in turn pays 24/7 a premium for the policy, which in turn is provided by the defendant or on jis behlf. Facts, ¶ 14. 24/7 acts as an underwriter for PSC, the ultimate guarantor of the policy, or surety bail bond. Facts, ¶ 15.

24/7's responsibilities as bail bondsman include: 1) underwriting the bond by gathering the relevant information from the criminal defendant/arrestee that will assist PSC in determining the latter's financial condition; 2) collecting the premium for the bail bond from the criminal defendant/arrestee; 3) once the bond is written, securing the criminal defendant/arrestee's release on bond by filing with the court PSC's power of attorney in the amount of the bail set by the court, and a Criminal Appearance Bond court form JD-CR-4; and 4) ensuring that the criminal defendant/arrestee appears at scheduled court dates as ordered by the judge in the criminal case. Facts, ¶ 16.

C.   **Plaintiff Anna Curry and Fotis Dulos**

Plaintiff Anna Curry met Fotis Dulos (**"Dulos"**) in approximately 1999-2000 while they were both employed with Ernst & Young, where they became friends. Facts, ¶¶ 17, 18. Plaintiff and Dulos developed a social relationship with each other and their respective significant others through approximately 2013, when Plaintiff moved from New York to North Carolina. Facts,

3

¶19. Thereafter, they maintained their friendship via telephone calls and text messaging. Facts, ¶ 20.

Plaintiff became aware in approximately 2017 or 2018 that Dulos was going through a separation from his then-wife, Jennifer Dulos. Facts, ¶ 21. Then on Memorial Day, May 27, 2019, Plaintiff learned from news articles that Jennifer Dulos had disappeared, and that Dulos had been arrested in connection therewith. Facts, ¶ 22-24. From reading the news, and subsequent discussions with Dulos, Plaintiff learned that, at as of June 2019, Dulos had been in a two-year relationship with Michelle Tranconis. Facts, ¶ 27.

On June 24, 2019, Plaintiff reached out to Dulos out of concern for her friend. Facts, ¶ 25. A short time later Dulos called the Plaintiff, and they maintained communications during June and July 2019. On or about July 13, 2019, at Dulos' invitation, Plaintiff went to visit Dulos at his home at 4 Jefferson Crossing in Farmington, Connecticut (**"Dulos' Home"**), for two or three days, where he was also hosting other friends. Facts, ¶¶ 26, 28. Plaintiff returned to Dulos' Home in late July or early August 2019 to stay the weekend. Facts, ¶ 29.

In September 2019 Dulos was again arrested on charges related to his wife's disappearance and was again released on bond. Although Plaintiff had learned that, following his arrest June, Dulos had secured a bail bond paid for by some of his friends, Plaintiff is not aware as to who, if anyone, other than Dulos paid for the bail bond. Facts, ¶¶ 24, 30.

In approximately October 2019, Plaintiff's relationship with Dulos evolved into a more intimate, personal relationship beyond friendship. Facts, ¶ 31. Plaintiff spent approximately two to three weeks at Dulos' Home during the months of October, November and December 2019. Facts, ¶ 32. After spending the majority of December at Dulos' Home, Plaintiff left in early January to return to North Carolina for business purposes. Facts, ¶ 33.

4

During this time period, Dulos had been advised by his attorneys that he would likely be arrested for murder and should expect bail to be set at $5,000,000.00. Facts, ¶¶ 37, 39. Plaintiff, Dulos and members of Dulos' family members discussed the matter and decided that, in the event of such arrest, Dulos should post a bail bond to secure his release. Facts, ¶ 39. Despite this decision having been made, Plaintiff never had any discussions with Dulos or his family as to who would pay for such a bail bond; Facts, ¶ 40; even though Plaintiff knew that third parties had paid for Dulos' bond in June 2019. Facts, ¶ 24.

**D.    Dulos Arrested for Murder, Issuance of Bail Bond by Defendants**

On the morning of January 7, 2020, Dulos called the Plaintiff and told her he had been charged with the murder of his wife. Facts, ¶ 34. Dulos told Plaintiff that bail had been set at $6,000,000.00, and asked Plaintiff to contact Mark Motuzick, a bail bondsman who had secured the bail bonds in connection with Dulos' first two arrests, in order to post a bail bond in connection with the new charge of murder. Facts, ¶ 35. They had no discussions as to who was to pay for the bond. Facts, ¶ 36. Despite all of the conversations Plaintiff, Dulos and family members had over the course of the prior months, Dulos' arrest came as a shock resulting in chaos over the following hours. Facts, ¶ 41.

Plaintiff was in North Carolina that morning. She called Motuzick concerning the need for a $6,000,000.00 bond. Motuzick told her the premium for the bond would be seven percent of the face amount, or $420,150.00, and that one-third of that amount, or $148,000.00, would be required as an initial bond premium payment. Facts, ¶¶ 42, 43. He instructed her to obtain a cashier's check for $125,000.00, and asked her what assets Dulos might have for collateral. Facts, ¶ 44.

The Plaintiff then flew from North Carolina to Connecticut that morning. Upon arrival Plaintiff went to Dulos' Home where she spoke with Dulos's sister and was informed that Dulos' nieces had been in touch with Motuzick concerning obtaining a bail bond. Facts, ¶ 45. Plaintiff had no discussion with Dulos' sister, or his nieces, as to who was going to pay the bond premium. Facts, ¶ 46. She did have discussions with the sister concerning Motuzick's request concerning collateral, and she found a spreadsheet listing of Dulos' assets and liabilities consisting of real estate, vehicles and a 401(k) account, on a desk in Dulos' home office (the **"Spreadsheet"**) and sent a copy of it to Motuzick via text message. Facts, ¶47.

Plaintiff then left Dulos' Home, went to her bank, and obtained a cashier's check in the amount of $125,000.00 payable to Motuzick' s bail bond company. Facts, ¶ 48. Plaintiff had difficulty contacting Motuzick that evening. The following day, January 8, 2020, Plaintiff traveled to the courthouse for Dulos' appearance, bringing him a change of clothes. Facts, ¶ 49. But Motuzick did not appear in court that day. Facts, ¶ 50. Dulos' attorney, Norm Pattis, told Plaintiff that Motuzick was getting "cold Feet" and that "The collateral is the issue. That's where this could go bad." Facts, ¶ 51. Dulos' other attorney, Kevin Smith, then introduced Plaintiff to defendant Jerry Cao; Cao in turn contacted Sobota, who in turn contacted PSC, to let them know he would be submitting a request for a large bond. Facts, ¶¶ 52, 53.

As of December 31, 2019, PSC's capital and surplus was $4,801,663, meaning PSC would need to secure collateral from Dulos for the bond exceeding $480,000.00, ten percent of PSC's surplus. Facts, ¶ 54, 55. Under rules established by Connecticut's Chief State's Attorney, in the event a bond is forfeited, a surety can pay as little as fifty percent of the face amount of the bind if paid within seven days. Facts, ¶ 56. Therefore, PSC needed to obtain from Dulos

collateral valued at a minimum of $2,520,000.00 as reinsurance in order to write the bail bond. Facts, ¶ 56.

With Motuzick non-responsive, Plaintiff met with Sobota on the evening of January 8, 2020, concerning securing a bond for Dulos' release. She discussed with him the amount of the bond and the need for Dulos to provide collateral for the bond. She provided Sobota with the Spreadsheet, however, she never disclosed to Sobota or PSC that Pattis had reported to her that Motuzick had an issue with the collateral listed. Facts, ¶¶ 58, 61, 62. Plaintiff gave Sobota a her personal check in the amount of $125,000.00 as partial payment of the initial premium for the bail bond. Facts, ¶ 59. She also gave Sobota a check in the amount of $1,000.00, written on Dulos' checking account, because Plaintiff knew Dulos did not have sufficient funds in his bank account to cover the initial bond premium. Facts, ¶¶ 59, 60. Plaintiff already knew that Dulos had not paid for his initial bond following his arrest in June, and she did not know who paid for the bond in September. Facts, ¶¶ 24, 30.

During her meeting with Sobota, Plaintiff also signed a Financial Statement and Indemnity Agreement form (the **"Curry Indemnification Agreement"**), a "Defendant Authorization Form" and a "Promissory Note," though she dated them January 9, 2020. Facts, ¶ 67. Plaintiff understood that the Indemnity Agreement obligated her to "help with the bond being paid" in the event Dulos fled and the bond was called. Facts, ¶ 68. In addition, the Indemnification Agreement provides: Paragraph 2: "That the Indemnitors will have Defendant forthcoming before the Court named on said Bond at the time(s) therein fixed, and at such other times as may be ordered by the Court;" Paragraph 6: That the Surety may withdraw, at any time provided by law, from its Suretyship upon the bond or undertaking herein, without liability to any party." Facts, ¶ 69. Plaintiff did not understand any provision of the documents she signed

for the Defendants created an obligation or duty owed to her by the Defendants. Facts, ¶ 70.

Plaintiff understood that the bail bond was for the benefit of Dulos – to be released from custody

– and that if bond was called should Dulos fail to appear, the bond would be paid into court.

Facts, ¶ 71.

PSC was then advised by 24/7 that Dulos was collateralizing the bond with equity from

Dulos' real estate holdings, consisting of six parcels of real property in Connecticut. It was

PSC's understanding and belief that the real property Spreadsheet provided by Plaintiff had been

prepared and approved by Dulos and his attorneys. Facts, ¶ 63. PSC received the Spreadsheet,

and when looking up the properties on Zillow, learned that on property appeared to be in

foreclosure. PSC contacted 24/7 to inquire of Dulos and his counsel about the status of the

foreclosure matter and was then assured that the matter had been taken care of and that it would

not impair the collateral. Facts, ¶ 64. PSC confirmed this after Dulos' release form custody on a

phone call between Dulos, Sobota and Willis, concerning foreclosures on several of the

properties and again was assured by Dulos that there were no issues concerning his equity in

those properties. Facts, ¶ 65. Based upon the representations made by Dulos, Curry, and Dulos'

attorneys, PSC understood and believed that Dulos was providing sufficient collateral via his

equity in real estate to reinsure any excess risk to PSC's own capital and reserves, thereby

properly securing the bond. Facts, ¶ 66. Following Dulos's subsequent release form custody,

Sobota secured mortgages from Dulos on all six parcels provided as collateral and recorded the

mortgages on the respective land records where the parcels were located. Facts, ¶ 79.

The Plaintiff's discussions with Sobota, Cao and 24/7 continued to the following

morning, January 9, 2020, during which time Plaintiff gave 24/7 a cashier's check from her bank

in the amount of $22,000.00, making a total of $148,000.00 paid in full for the initial bond

premium paid to 24/7, $147,000.00 of which having been paid by Plaintiff. Facts, ¶ 72. None of the defendants asked Plaintiff to pay the bond premium from her own funds; she made the payment voluntarily. Facts, ¶ 73. Plaintiff had no expectation of being paid back by Dulos. Facts, ¶ 74. Plaintiff does not represent Dulos' estate and has no standing to maintain a legal claim on behalf of the estate. Facts, ¶ 75.

After obtaining the initial bond premium and the information concerning Dulos' collateral, on the morning of January 9, 2020, PSC posted the surety bail bond with the Court, and Dulos was released from custody, and was confined to his home where he stayed with the Plaintiff through January 28m, 2020. Facts, ¶¶ 76, 83, 84. Once he was released on January 9, 2020, Dulos was never returned to custody. Facts, ¶ 77.

Upon his release from custody, Dulos formally signed an Application for Surety Bond with PSC (the **"Application"**). Facts, ¶ 78. Plaintiff did not sign the Application, or any other application for bail bond. Facts, ¶ 78. Following Dulos' release from custody, Plaintiff did not discuss with Dulos or anyone else whether she would be reimbursed the $147,000.00 she provided for the initial bond premium, nor were there any discussions whether the $147,000.00 was a gift to Dulos. Facts, ¶ 80. Dulos did not ask Plaintiff to pay additional money for the balance of the bond premium; she understood that Dulos would be responsible for the payment of the remaining bond premium. Facts, ¶ 82. In the end, none of Dulos' family members or friends ever contributed to the payment of the bond premium. Facts, ¶ 81.

### E.   <u>Issues concerning the Dulos Bond</u>

On or about January 22, 2020, Scott Willis received a telephone call from Michael Schull, a representative of the South Carolina Department of Insurance ("SCDOI"), with whom Willis had dealt on many prior occasions concerning PSC's surety business.  Mr. Shull told

Willis that he had been contacted by the Connecticut Department of Insurance ("CDI") and that the CDI had "concerns about this bond." Shull asked Willis to send him the documentation of the collateral and security pledged to reinsure the bond, leading PSC to believe that the only question being raised was whether the collateral securing the Dulos bond was sufficient to reinsure the risk excess of PSC's Surplus. Facts, ¶¶ 85, 86.

PSC immediately reviewed the information concerning the collateral provided by Dulos and, despite Dulos' earlier assurances that the properties in foreclosure would not impair his equity, it became evident to PSC that foreclosures on a least two of the properties were proceeding, when we were expressly assured they were not. The two foreclosure matters were captioned as <u>Savings Bank of Danbury v. Fore Group, Inc.</u>, FST-CV19-6044836-S and <u>Mark H. Dean as Trustee of the CT RE 2019 Trust v. Fotis Dulos</u>, HHD-CV19-611846-S. Facts, ¶ 87. The following day, PSC provided Mr. Shull/SCDOI with the information PSC had been provided concerning Dulos' collateral, including copies of the mortgages provided. Willis and Shull spoke again the next day concerning the need for PSC to only have collateral to satisfy fifty percent of the bond, or $3,000,000.00, in the event of a forfeiture under Connecticut law. Willis Aff. ¶ 27.

### F.   <u>The Bond Hearing</u>

On the morning of Monday, January 28, 2020, Scott Willis received a telephone call from Sobota who told him that a hearing on the bond had been called for that day by the court. Facts, ¶ 88. Based on the discussions had with SCDOI just the week before, PSC understood that the Court was concerned about the collateral posted by Dulos. Perceiving that the hearing as an opportunity to clear up what appeared to be the misrepresentations about the collateral provided by Dulos, Willis contacted PSC's counsel in Connecticut to discuss the deficiencies in the Dulos' collateral that had been found over the past few days, and the fact that it now appeared that PSC

no longer had sufficient collateral to reinsure the risk above ten percent of PSC's Surplus in satisfaction of Connecticut and South Carolina law, which PSC understood to be substantively identical. Facts, ¶ 90. PSC instructed counsel to file its own Motion to Revoke Bond to raise its own concerns over Dulos' misrepresentations as to the value of his collateral and/or the threat of foreclosures in a setting where all interested parties to the bond, i.e., PSC (obligor), Dulos (principal) and his counsel, and the State of Connecticut (obligee)[4], would be present. PSC understood this was the proper procedural vehicle for a surety to address any such concerns. Facts, ¶ 91, 92. PSC never had the intention of pursuing the actual revocation of the Dulos bond, but reasonably anticipated that Dulos would rectify any problems or concerns with the collateral, on the record, in front of the Court. Stated alternatively, PSC did not reasonably expect the Court to revoke Dulos' bond, but that the Court would use the motion as a vehicle to compel Dulos to properly secure the bond, else Dulos would risk the bond being revoked for failure to comply. Facts, ¶ 92.

Dulos failed to appear at the bond hearing on January 28, 2020, and Sobota proceeded to Dulos' residence to secure Dulos' attendance at the hearing. Upon his arrival, police were present, and Sobota learned that Dulos had attempted suicide and was rendered comatose. Dulos was taken from his home and eventually to a hospital in New York. As a result, the hearing on the bond did not go forward that day. Facts, ¶¶ 93, 95.

On January 29, 2020, a hearing was held in State v. Dulos. The State's Attorney requested that the Motion to Revoke was to be marked off and that Dulos be ordered re-arrested.

---

[4] That the State of Connecticut is the obligee, or beneficiary of the surety bail bond is confirmed in a December 30, 2020, letter from Anthony Caporale, Counsel for the CDI, to Attorney Ryan McGuigan, counsel for PSC, wherein the CDI acknowledged that Conn. Gen. Stat. § 38a-73(a) "was enacted to protect the solvency of any insurance company doing business in our State and to protect Connecticut residents, or *in the case of an insurer underwriting surety bail bonds, the State*…" (Emphasis added). Facts, ¶ 110.

The Court ordered that Dulos be re-arrested and raised the bond by $500,000.00. The State sought no other conditions of release. No action was taken on the Motion to Revoke, and the Dulos bond remained in force and effect. Facts, ¶ 94.

On January 30, 2020, PSC's counsel withdrew the Motion to Revoke, and it was never adjudicated. Dulos died the same day, and as a result, Dulos' bail was deemed exonerated by the act of God, and the Defendants were released from their obligation on the bond to the State of Connecticut. *See* State v. Sheriff, 301 Conn. 617, 626 (2011). Facts, ¶¶ 95-97.

### G.   Conn. Dept. of Insurance's Action

On or about June 12, 2020, several months after the Dulos bond had been exonerated, PSC received a letter from the CDI concerning questions they had about surety bail bonds written in Connecticut by PSC which exceeded ten percent of PSC's capital and surplus – the equivalent of PSC's "surplus" under South Carolina law – in apparent violation of Conn. Gen. Stat. §38a-73. The Dulos bond was not among the bonds specifically being questioned by the CDI, because by that point, the Dulos bond had been exonerated and was not at risk of forfeiture. Facts, ¶ 98.

During PSC's subsequent discussions with the CDI, the CDI made clear that it would no longer allow PSC to write any single surety bond that exceeded ten percent of PSC's Surplus. Facts, ¶ 99. In a June 26, 2020 letter from Kathy Belfi, Director of Financial Regulation for the CDI, to Scott Willis of PSC, concerning PSC's writing of surety bail bonds in excess of ten percent of its Surplus, which acknowledges that ***"the South Carolina Department of Insurance allows Palmetto to use collateral and/or agent's build up fund accounts to offset the gross risk on any one bond***…," PSC was advised by the CDI for the first time since it began doing business in Connecticut that "the [CDI] only allows the amount of risk to be reduced through

12

reinsurance obtained from an insurer that is licensed or approved in the Company's state of domicile." (Emphasis added). Facts, ¶ 100. The CDI, however, continued to allow PSC to service its then-existing surety bail bonds, including 15 bonds that exceeded ten percent of PSC's capital and surplus. Facts, ¶¶ 101, 102. In no instance did PSC's issuance of any surety bail bond in the state of Connecticut which exceeded its Surplus negatively affect its agent 24/7's obligations with respect to any criminal defendant out on bond, including Dulos, or jeopardize any criminal defendant's pretrial release from custody. Facts, ¶ 103.

After subsequent negotiations with the CDI, on September 28, 2020, PSC entered into a Consent Order with the CDI whereby, *inter alia*, PSC agreed that it would no longer write surety bail bonds in excess of ten percent of its capital and surplus. *Facts, ¶ 104* Willis Aff., ¶ 39; A copy of the September 28, 2020, Consent Order is attached to the Willis Affidavit as Exhibit 2.

Prior to being told in June 2020 by the CDI that it could not use collateral to reinsure the amount of a surety bail bond exceeding ten percent of its surplus, PSC understood that any such restriction deviating from such practice allowed by the SCDOI would have been stipulated to in its certificate of authority issued by Connecticut. Facts, ¶ 105.

Communications between the SCDOI and the CDI, and internal communications within the CDI, make clear that the issue of whether PSC could properly utilize collateral to reinsure the excess risk on bonds exceeding ten percent of its surplus was an unsettled issue. The SCDOI expressly informed the CDI in an email exchange on March 5, 2020, that the use of collateral as reinsurance was permissible under South Carolina law. Facts, ¶ 106.[5] Commenting on the

---

[5] In the March 5, 2020, email exchange, Michael Shull of the SCDOI informed Maura Welch of the CDI that "Our department has taken the approach to let bail bond companies reduce their retention by using collateral and BUF funds for the agent who wrote a bond. Our law states that a company can't retain more than 10% of their C&S, but reinsurance can be used to reduce the retention. We view legitimate collateral and BUF funds as an alternative to reinsurance to accomplish the same intent of lowering the exposure to C&S." Facts, ¶ 106.

SCDOI's position in internal email exchange, members of the CDI commented that SCDOI's

position "is fine *but I don't think it is our interpretation here in CT*." (Emphasis added). Facts,

¶ 107.  Internal email exchanges at CDI in August of 2020, and as late as December 2020, again

discuss the apparent differences in the two state's interpretation on the use of collateral to satisfy

their respective laws. Facts, ¶¶ 108, [6] 109.[7]

## II.   <u>ARGUMENT</u>

### A.   <u>STANDARD OF REVIEW</u>

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is

appropriate "if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] party

seeking summary judgment always bears the initial responsibility of informing the district

court of the basis for its motion, and identifying those portions of 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits,

if any,' which it believes demonstrate the absence of a genuine issue of material fact."

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); see

Fed. R. Civ. P. 56(c)(1)(A).

"A motion for summary judgment may be granted only where there is no genuine

dispute as to any material fact and the moving party is entitled to judgment as a matter of

law. Fed. R. Civ. P. 56(a). 'A genuine issue of material fact exists if "the evidence is such

---

[6] In an August 25 – August 26, 2020 email concerning the pending Consent Order, Maura Welch of CDI states "The South Carolina Department of Insurance allows Palmetto to use collateral and/or agent's build up funds accounts to offset the gross risk on any one bond, the CID only allows the amount of risk to be reduced through reinsurance obtained from an insurer that is licensed or approved in the Company's state of domicile." Facts, ¶ 108.
[7] In an internal email exchange at CDI on December 11, 2020, concerning PSC and its compliance with the September 28, 2020 Consent Order, Maura Welch again circulates Mr. Shull's March 5, 2020, statement concerning the SCDOI's position allowing collateral to serve as reinsurance for bonds written in excess of ten percent of an insurer's surplus, and reports that "SC has a very similar statute [S.C. Code Ann. § 38-55-30] …We, of course, are sticking to a strict interpretation of [§ 38a-73] while SC interprets their statute differently." Facts, ¶ 109.

that a reasonable jury could return a verdict for the nonmoving party.'" Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 113-14 (2d Cir. 2017) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). Which facts are material is determined by the substantive law. Anderson, 477 U.S. at 248. 'The same standard applies whether summary judgment is granted on the merits or on an affirmative defense . . . .' Giordano v. Market Am., Inc., 599 F.3d 87, 93 (2d Cir. 2010)." Stroud v. Federal Bureau of Prisons, Docket No. 3:22-cv-00799 (KAD), 2023 U.S. Dist. LEXIS 116675, at *7-8 (D. Conn. July 7, 2023).

"The moving party bears the initial burden of informing the court of the basis for its motion and identifying the admissible evidence it believes demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, *supra*, 477 U.S. 323. Once the moving party meets this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). He cannot 'rely on conclusory allegations or unsubstantiated speculation,' but 'must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact.' Robinson v. Concentra Health Servs., 781 F.3d 42, 44 (2d Cir. 2015) (internal quotations omitted). To defeat a motion for summary judgment, the nonmoving party must present such evidence as would allow a jury to find in his favor. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000)." Stroud v. Federal Bureau of Prisons, *supra,* 2023 U.S. Dist. LEXIS 116675, at *8.

**B.     PLAINTIFF CURRY LACKS STANDING TO BRING THE CLAIMS SET FORTH IN THE AMENDED COMPLAINT**

**1.     Plaintiff lacks standing as she has no injury in fact.**

Plaintiff maintains that because Defendants "admitted" that it was in violation of Conn. Gen. Stat. § 38a-73 in its never-adjudicated, subsequently withdrawn Motion to Revoke Bond, the Dulos bond was therefore void ab initio and she failed to get the benefit of the bargain for which she paid the initial premium. Plaintiff lacks standing because she fails to allege jurisdictional facts establishing that she suffered an "injury in fact," a necessary element of standing; the absence of an allegation of "injury in fact" in Curry's pleading is amplified by a factual record which discloses that: 1) the Defendants' performed all of their obligations under the Dulos Bond; 2) the Dulos Bond was still in full effect up until the date of Dulos' death; 3) no adverse consequences ever occurred due to inadequacies in the Dulos Bond to her or to Dulos and 4) when, six months after Dulos' death, the CDI restricted PSC's authority to write, it allowed PSC to continue servicing its existing bonds outstanding including those, like the Dulos bond, exceeded ten percent of its capital and surplus.

"Article III restricts federal courts to the resolution of cases and controversies … That restriction requires that the party invoking federal jurisdiction have standing – the personal interest that must exist at the commencement of the litigation." Carter v. HealthPort Technologies, 822 F.3d, 47, 55 (2d Cir. 2016) citing Davis v. Federal Election Comm'n, 554 U.S. 724, 732, 128 S. Ct. 2759, 171 L. Ed. 2d 737 (2008). "The doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." (Citations omitted). Spokeo, Inc. v. Robins, 578 U.S. 330, 337 136 S. Ct 1540, 194 L.Ed.2d 635 (2016).

16

"Our cases have established the irreducible constitutional minimum of standing consists of three elements. The Plaintiffs must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) is likely to be redressed by a favorable judicial decision. The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these three elements." (Citations omitted). Spokeo v. Robins, *supra,* citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). "If any of these three elements is missing, the federal court lacks jurisdiction to entertain the action." Rothstein v. UBS AG, 708 F.3D 82, 91 (2d Cir. 2013).

Injury in fact is the "first and foremost of standing's three elements." Spokeo, Inc. v. Robins, *supra*, 578 U.S. 338-39. "To establish 'injury in fact,' a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." (Emphasis added).(Citations and internal quotation marks omitted). Id. at 339. "An injury in fact must…be 'concrete…' A 'concrete' injury must be 'de facto;'" that is, is must actually exist. See Black's Law Dictionary 479 (9th ed. 2009). When we have used the adjective 'concrete,' we have meant to convey the usual meaning of the term – 'real,' not 'abstract.' Webster's Third New International Dictionary 472 (1971); Random House Dictionary of the English Language 305 (1967)." Spokeo v. Robins, *supra*, 578 U.S. 340.

Plaintiff's payment of the initial bond premium was an advance, a loan, or a gift, to Dulos, rather than a payment *she* was obligated to make to the Defendants. Plaintiff provided the money to Dulos without his asking; she made no arrangements with other members of the Doulos family, or his friends, to make the payment. She never discussed repayment with Dulos, even after he was released. Further, plaintiff admits she has no

authority to be seeking repayment of the premium on behalf of Dulos' estate, or any other legally recognized basis to obtain a refund. But any such claim made by or on behalf of Dulos would suffer the same fate in any event. Dulos obtained his freedom in exchange for the premium payment, and he, too, did not suffer any injury in fact.

Dulos received the full benefit of the bail bond, without fully paying for it, and, thus, suffered no injury in fact. If Dulos suffered no injury in fact, he would have no standing to pursue this claim. Thus, even if Curry's has a claim which is derivative of Dulos', which is denied, Curry cannot pursue a claim that Dulos himself would have no rights to pursue, and therefore Curry has no standing.

Plaintiff complains that "Defendants have provided no benefit to the Plaintiff." Amended Compl. ¶ 15. Plaintiff simply cannot sustain this allegation. The Defendants posted a $6,000,000.00 surety bail bond to secure the release of her friend with whom she had been living for the previous three months and with whom she enjoyed an intimate relationship, a friend of twenty years. The Dulos bond was honored by the criminal court the prosecuting authority up until the time of Dulos' death, after which it was exonerated. More complete performance a bail bondsman could not make.

24/7's primary obligation on the Dulos bond was to take all necessary steps to secure Dulos' release, and once Dulos was out on bail, to ensure that he appear in court as ordered. PSC's primary obligation on the Dulos bond was to serve as its guarantor. Until Dulos failed to appear at the hearing scheduled for January 28, 2020, he remained at liberty (under court-imposed conditions of release) entirely due to Defendants fulfilling their responsibilities on the bond. At the hearing subsequent to Dulos' suicide attempt on January 29, 2020, when he was in custody under guard in New York, both the State's

Attorney and the Court reaffirmed the continuing validity of the Dulos bond. And, had

Dulos not committed suicide and his bond remained in place, the CDI would have allowed

the Defendants to continue to service Dulos' bond just as it allowed PSC to continue

servicing *fifteen* other bonds exceeding ten percent of its surplus and capital as of June

2020.

Curry's claim hinges on Palmetto's filing a motion to revoke the Dulos bond.

Plaintiff maintains that this was an admission that the bond was "illegal." However, the

Motion to Revoke is based solely on the deficiencies subsequently found, as

misrepresented by Dulos and his agents, including Plaintiff, concerning the value of Dulos'

collateral. And even when these deficiencies were brought to the attention of the Court, the

Dulos bond was never treated as a nullity. Significantly permitting PSC to continue to

service its existing "excessive" bonds by the CDI, the agency charged with enforcing

compliance with Connecticut insurance law, should be given deference. *See* Potvin v.

Lincoln Sevr. & Equip. Co., 298 Conn. 620, 63031 (2010); T.Y. v. N.Y.C. Dep't of Educ.,

584 F.3d 412, 418 (2d Cir. 2009). Thus, the Plaintiff cannot even allege a *prospective*

injury, given that 1) Dulos will never be compelled to return to custody, and 2) there is no

reason to believe that the Court would have ordered the Dulos bond revoked, or that the

CDI would not have allowed the Defendants to continue servicing it.

Further as stated by the CDI; Facts, ¶ 110; and set forth in Connecticut case law, it

is clear that the party in interest, the beneficiary, the obligee, under a surety bail bond is the

State of Connecticut; not the defendant, Dulos, and certainly not Plaintiff, a non-party to

the contract. "The purpose of the bail system is to reduce the expense of the state in

detaining the accused pending trial by permitting pretrial release, subject to certain

conditions, such as the posting of bond, to ensure the appearance of the accused at trial."

State v. Sheriff, 301 Conn. 617, 626 (2011); see State v. Menillo, 159 Conn. 264, 269

(1970) ("the primary purpose of bail is to secure an accused person's presence at trial").

While research discloses no similar case on point involving a bail surety bond, a

decision from a district court within the Second Circuit is instructive. In Ross v. AXA

Equitable Life Ins. Co., 115 F. Supp. 3d 424 (W.D.N.Y 2015), aff'd by Summary Order,

680 Fed. Appx. 41 (2d Cir. 2017), insureds who had bought life insurance policies from the

defendant carrier sued as a putative class on the grounds that the defendant had, through

concealment and subterfuge, used captive reinsurers to avoid capital and reserve

requirements mandated by New York State law, thereby potentially exposing the insureds

to an inability to collect on a valid claim. Id. at 429-30. The gravamen of plaintiffs' claim

of injury was that they had paid premiums for a product that was far more insecure than

represented by the defendant. Id. at 431.

The defendant filed a 12(b) (1) motion arguing that plaintiffs lacked Article III

standing. Id. The district court granted it, on the grounds that the plaintiffs failed to allege

jurisdictional facts establishing the requisite "injury in fact," because they did not allege

that the defendant failed to perform its side of the bargain. "In short, plaintiffs received

what they bargained for – life insurance," where a colorable claim to surmount a standing

challenge would require allegations that they received less than what was promised. Ross

v. AXA Equitable Life Ins., supra, 115 F. Supp. 435-36 and collecting cases. The district

court concluded that because plaintiffs' claimed injury rested on the occurrence of a

number of events not alleged, because such events were contingent on facts that had never

transpired – namely the chain of events due to undercapitalization that would have led to

the defendant defaulting on its obligations to the plaintiffs – then their "theory of injury…is far too hypothetical, speculative, and uncertain to constitute an imminently threatened injury worthy of federal judicial intervention." Id. at 437-38. The Second Circuit, in affirming, agreed that plaintiffs had failed to allege jurisdictional facts, in that there was no claim that defendant had failed to perform its obligations despite its undercapitalization. Ross v. AXA Equitable Life. Ins. Co., 680 Fed. Appx. 41, 46 (2d Cir. 2017).

As in the Ross case, the injury Plaintiff alleges fails to meet the threshold requirements for an "injury in fact" under our standing jurisprudence. It is impermissibly conjectural and hypothetical, in that it is based on events that never transpired – Dulos being re-arrested due to Defendants' noncompliance with the statute – the probability of which is a matter of speculation. See Spokeo v. Robins, *supra*, 578 U.S. 339. Her unsupported claim that she received no benefit is belied by the uncontestable fact that the Defendants performed their responsibilities under the bond until Dulos' suicide rendered further performance impossible, thereby rendering her injury "abstract," rather than one that "actually exists," lacking the requisite de facto "concreteness" required of an injury in fact for the plaintiff to have standing. See id.

## 2.   As a Non-Party to The Bail Bond Contract, Plaintiff Lacks Standing

"It is well settled that one who [is] neither a party to a contract nor a contemplated beneficiary thereof cannot sue to enforce the promises of the contract . . . ." (Internal quotation marks omitted.) Dow & Condon, Inc. v. Brookfield Development Corp., 266 Conn. 572, 579 (2003). In the case, Plaintiff is not a party to the surety bail bond contract. She has acknowledged this herself. Facts, ¶ 78. The parties to the contract are PSC and the

State of Connecticut, with Dulos serving as principal, or the person paying for the insurance policy – the bail bond – insuring the State.[8]

Bonds are contracts, and suretyship status is created through a tripartite agreement "whereby one party (the surety) becomes liable for the principal's or obligor's debt or duty to the third-party obligee." <u>Balboa Ins. Co. v. United States</u>, 775 F.2d 1158, 1160 (Fed. Cir. 1985). Thus, when the surety performs the underlying obligation by completing work or paying subcontractors, the surety fulfills not only its contractual obligation under the bond but also the general contractor's contractual duties to the obligee and to subcontractors. *See* <u>Penn National v. City of Pine Bluff, et. al,</u> 354 F.3d 945 (8th Cir. 2004); *see* <u>Regency Sav. Bank v. Westmark Partners</u>, 756 A.2d 299, 302 (Conn. App. Ct. 2000) (a guarantee is a type of contract whereby the guarantor promises to answer for the debt of another). The statutory purpose of a bond is to protect the obligee, in this instance the Court

Plaintiff did sign an Indemnity Agreement, agreeing to act as a guarantor for Dulos' physical appearance and on the loss of any forfeited bond. However, said Indemnity Agreement does not make her a party to the bond, had nothing to do with her voluntary payment of the bond premium on behalf of Dulos and does not obligate any Defendants to provide Plaintiff a bail bond; nor does the Indemnification Agreement specify obligation any Defendant owes Plaintiff. The Indemnification Agreement is essentially a guarantee by Plaintiff of Dulos' obligations to PSC. "The contract of guarantee is no doubt an agreement separate and distinct from the contract between the lender and the borrower." <u>Alling Paper</u>

---

[8] Peter A. Alces, THE LAW OF SURETYSHIP AND GUARANTY § 1:1 (2020 update). The Restatement refers to the debtor as "principal obligor", the creditor as "obligee", and the surety as "secondary obligor." See RESTATEMENT (THIRD) OF SURETYSHIP & GUARANTY § 1 cmt. d (1996). In the construction context, the debtor/principal obligor may also be referred to as the "principal" when acting as a general contractor, with the owner as obligee. When the general contractor elects to require bonds from its subcontractors, the general contractor is then the obligee, with the subcontractor serving as principal on the bonds provided. See, e.g., Philip L. Bruner & Patrick J. O'Connor, Jr., 4A BRUNER & O'CONNOR ON CONSTRUCTION LAW § 12:2 (2020 update).

Co. v. Massinin, 31 Conn.Supp. 154, 156 (1974); *see also* Graybar Electric Co. v. Opp, 138

Ga.App. 456, 457, 226 S.E.2d 271, amended, 140 Ga.App. 481, 231 S.E.2d 494 (1976). In

describing the Indemnity Agreement, Plaintiff admits that she was obligating herself to

guaranty indemnity to PSC of the $6 Million bond, should PSC suffer an estreatment loss on

the bond's penal sum, which never occurred.

"A plaintiff who lacks standing is not entitled to have his claims litigated in federal

court. Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 117 (2d Cir. 1991)."

Delacroix v. Lublin Graphics, 993 F. Sup. 74, 81 (D. Conn. 1997). As a non-party to the

contract, Plaintiff lacks standing, and therefore summary judgment should enter in favor of

the Defendants as a matter of law.

### 3.       Complete Performance Renders Plaintiff's Claims Moot

"When a contract or a provision thereof is in violation of law but has been fully

performed, the courts have variously sustained the contract, reformed it to correct the illegal

term, or allowed recovery under an implied contract theory; the courts have not, however,

simply declared the contract void ab initio." A.T. & T. v. United States, 177 F.3d 1368,

1376 (Fed. Cir. 1999) (en banc)); s*ee also* O'Connor v. Uber Techs, Inc., 311 F.R.D. 547,

561 (N.D. Cal. 2015) *reversed on other grounds*, 904 F.3d 1087 (9th Cir. 2018) (upholding

the policy that severance of statutorily offensive contract provision "is favored in order to

prevent parties from gaining undeserved benefit or suffering undeserved detriment as a

result of voiding the entire agreement — particularly when there has been full or partial

performance of the contract."); United States ex rel. Raggio v. Jacintoport International,

LLC, Civil Action No. 10-01908 (BJR), 2015 U.S. Dist. LEXIS 116431, at *14 (D.D.C.

Mar. 12, 2015) (declining to hold contract void ab initio on alleged violation of federal

competitive bidding requirements holding to "it would be unconscionable" to allow defendant to avoid claims of having overcharged for services rendered after having received payment and the contract having been fully performed by the parties five years earlier.); Barber v. Golden Seed Co., Inc., 129 F.3d 382 (7th Cir. 1997) (same, applying Illinois law); Armendariz v. Found. Health Psychcare Servs., Inc., 24 Cal. 4th 83, 123-24, 99 Cal. Rptr. 2d 745, 6 P.3d 669 (2000) (same).

In ASH, Inc. v. Mesa Unified Sch. Dist. No. 4, 138 Ariz. 190, 673 P.2d 934 (App. 1983), plaintiff, a dealer of school busses, sought to void a contract between defendant school district and a third party competitor for the purchase and sale of school busses. The Court of Appeals upheld the trial court's determination that the plaintiff's claim was moot: "The school buses were delivered to Mesa Schools which paid for and used them. … The contract between Mesa Schools and [third-party] All American has been fully performed, and the writ of mandamus requested by ASH is clearly futile." ASH, Inc. v. Mesa Unified Sch. Dist. No. 4, 138 Ariz. at 191-92.

Given the Defendants full performance, and the benefits received, Plaintiff's claims are moot, thereby depriving the court of subject matter jurisdiction. *See* Hassoun v. Searls, 976 F.3d 121, 127 (2d Cir. 2020) ("When a case becomes moot, the federal courts lack subject matter jurisdiction over the action.") (alteration adopted) (internal quotation marks and citation omitted)). Summary judgment should enter for Defendants.

## B.    THE SURETY BAIL BOND CONTRACT IS NOT VOID AB INITIO

### 1.    Plaintiff Lacks Standing to Declare the Contract Void

Once again, Plaintiff's lack of standing as a non-party to the contract issues renders her unable to challenge the contract. "The general rule is that only a party (actual or alleged) to a

contract can challenge its validity. Obviously the fact that a third party would be better off if a contract were unenforceable does not give him [or her] standing to sue to void the contract. Thus, only parties to a contract have standing to void it." (Citation omitted; internal quotation marks omitted.) Amica Mut. Insur. Co. v. Fassarella Pro Painting & Design, LLC, Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. FST-CV10-6003636-S, 2011 Conn. Super. LEXIS 1725, *14 (Jul. 8, 2011); *See also* New England Bus. Advisors, Inc. v. Jay-Arr Slimwear, Inc., Superior Court, judicial district of Fairfield at Bridgeport, Docket No. CV9O 27 24 47 S , 1993 Conn. Super LEXIS 1253, *2 (May 19, 1993) ("[Connecticut law] do[es] not confer upon a non-party the right to request the court to void a contract made with the parties.").

## 2.    The Contract is Not Void Ab initio Under the Circumstances

The Connecticut Supreme Court "has often stated that 'the principle that agreements contrary to public policy are [unenforceable] should be applied with caution and only in cases plainly within the reasons on which that doctrine rests . . . .' (Internal quotation marks omitted.) Williams v. Vista Vestra, Inc., 178 Conn. 323, 328, 422 A.2d 274 (1979), quoting Twin City Pipe Line Co. v. Harding Glass Co., 283 U.S. 353, 356-57, 51 S. Ct. 476, 75 L. Ed. 1112 (1931)." Solomon v. Gilmore, 248 Conn. 769, 790, 731 A.2d 280 (1999).

"'Generally, agreements contrary to public policy, that is those that negate laws enacted for the common good, are illegal and therefore unenforceable.' [12 Havemeyer Place Co., LLC v. Gordon, 76 Conn. App. 377, 389, cert. denied, 264 Conn. 919 (2003)]. Id., 389. 'Whether a contract is unlawful is usually determined as of the time of its making and is not affected by subsequent changes of facts. . . . A lease is not necessarily void if, reasonably, the prohibition can be made legal through administrative or judicial action.' (Citations omitted, internal quotation marks omitted.) Id., 390." Stick v. Mattress Direct Ct, Docket No. HHD CV-19-

6110466-S, 2022 Conn. Super. LEXIS 185, at *15-16 (Super. Feb. 8, 2022). "[N]o court will lend its assistance in any way toward carrying out the terms of a contract, the inherent purpose of which is to violate the law." (Internal quotation marks omitted.) <u>12 Havemeyer Place Co., LLC v. Gordon</u>, *supra*, 76 Conn. App. 385.

In <u>Sagal v. Fylar</u>, 89 Conn. 293, 295, 93 A. 1027 (1915), the Conn. Supreme Court of Errors rejected the broad application of the principal that "every contract made for or about any matter or thing which is prohibited and made unlawful by statute is a void contract, though the statute does not mention that it shall be so, but only inflicts a penalty upon the offender," and limited its application to cases where "the undertaking was itself a forbidden one." "The question is one of legislative intent to be gathered from the language of the statute read in the light of the circumstances with which it deals, the remedial object apparently in view, and such considerations of public policy as may be involved in the conflicting claims of construction." <u>Id.</u>, 89 Conn. 296-97. "[T]here is no inflexible rule of arbitrary application for the determination of the effect by implication of the prohibitory statute. The question is one of legislative intent to be gathered from the language of the statute read in the light of the circumstances with which it deals, the remedial object apparently in view, and such considerations of public policy as may be involved in the conflicting claims of construction." (Citations omitted) <u>Id.</u>, 89 Conn. 297.

The legislative purpose of § 38a-73(a) seems clear: to preclude a bond being written in excess of ten percent of the surety's capital and surplus. However, this insurance statute is applied to another statutory scheme, the dual underlying purpose of which is to provide for bail bonds to secure the release of criminal defendants and ensuring that they are returned to court when order or required. Therefore, the Dulos bond contract was anything but a

contract the purpose for which is illegal.

First, the right of an accused to bail is enshrined in the State Constitution; "Article first, § 8, of the constitution of Connecticut guarantees certain rights to an accused person in 'all criminal prosecutions,' including the right 'to be released on bail upon sufficient security, except in capital offenses, where the proof is evident or the presumption great....' This court has interpreted the constitutional bail provision strictly, concluding that, 'in all cases, even capital cases not falling within the [stated] exception, bail in a reasonable amount should be ordered.' State v. Menillo, 159 Conn. 264, 269, 268 A.2d 667 (1970); see also State v. Ayala, 222 Conn. 331, 342–43, 610 A.2d 1162 (1992) ('[a criminal] defendant has a fundamental constitutional right to bail pending trial in all [cases] but [those involving] certain capital offenses')." State v. Anderson, 319 Conn. 288, 300 (2015).

Second, "[t]he purpose of the bail system is to reduce the expense of the state in detaining the accused pending trial by permitting pretrial release, subject to certain conditions, such as the posting of bond, to ensure the appearance of the accused at trial. See generally P. Rice, 'Bail and the Administration of Bail in the State of Connecticut,' 4 Conn. L. Rev. 1 (1971)." State v. Sheriff, 301 Conn. 617, 626 (2011).

The Defendants provided Dulos with a surety bail bond so he could be released form custody while awaiting jail, satisfying the first purpose of bail bonds. The Defendants never had a chance to demonstrate their performance of their obligation to the State given the short duration of Dulos' release; however, there is no evidence that they ever breached their obligation to the State, that being producing him in court when required.

Further, where a party is excusably ignorant of statutory requirements when entering into a contract, yet fully performs on the contract nonetheless, he is entitled to enforcement

of the contract.

> If a party enters into an illegal bargain and is justifiably ignorant of the facts creating the illegality and the other is not, the innocent party may recover on the contract if he (she) can show that he (she) would have been ready, willing and able to perform but for the illegality. Law of Contracts, Calamari & Perillo, § 22-2, p. 891.

> If a promisee is excusably ignorant of facts or of legislation of a minor character, of which the promisor is not excusably ignorant and in the absence of which the promise would be enforceable, the promisee has a claim for damages for its breach but cannot recover damages for anything that (he) (it) has done after (he) (it) learns of the facts or legislation.

> Restatement (Second) Contracts, § 180.

Cheryl Terry Enters. v. City of Hartford, Superior Court, judicial district of New London,

Docket No. 547097, 2001 Conn. Super. LEXIS 537, *19 (Feb. 22, 2001)

Given that, on January 9, 2020, the Defendants were performing their services in

conformance with South Carolina law which they reasonably understood to be in

compliance with Connecticut law; that the Defendants fully performed under the contract; ,

and their excusable misunderstanding of their ability to continue to do "business as usual"

favor enforcement of the contract, and rejection of the Plaintiff's claims. Th totality of such

circumstances simply do not warrant the draconian outcome sought by Plaintiff.

### D.    PLAINTIFF CANNOT ESTABLISH THE ELEMENTS OF HER REMAINING CAUSES OF ACTION

Even if Plaintiff is determined to have standing, which is denied, Plaintiff's claims

must fail as to the enumerated causes of action. In the Amended Complaint, even in a light

most favorable to the non-movant.

### 1.    **Plaintiff Cannot Establish Unjust Enrichment**

To the extent Plaintiff does have standing, which is denied, Plaintiff clearly

obtained the benefit of the bargain without fully paying for it.  Dulos was released from jail

and stayed out of jail until he committed suicide.  Plaintiff stayed at Dulos' home and received the benefit of his company every day and every night until Dulos took his own life.  "A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another." Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co., 231 Conn. 276, 282 (1994). "Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefitted, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." Id. at 283 (1994).

Here Defendants fully performed, and the Plaintiff received the benefit of the Defendants' performance. From the perspective of a criminal defendant seeking a bail bond, the only concern is that the Defendant be released from jail until the day of his court hearing, which Dulos was afforded that right and benefit until Dulos took his own life. Plaintiff's arguments that she is entitled to a "legal bail bond" is not a proper analysis of a detrimental damage, as she was not entitled to any bond, per her own admission, and the Court accepted the bond instrument and released Dulos, meaning the benefit was properly received.

> **2.    Plaintiff Cannot Establish Conversion or Civil Theft, Pursuant to Conn. Gen. Stat. § 52-564**

Plaintiff cannot establish the causes of action for Conversion or Civil Theft, since she cannot show Defendants stole any property of hers that she owned title to. Importantly, Curry testified that money does not have title, and that she voluntarily provided her partial payment of the partial premium, for Dulos' bond, without anyone

asking her to do so.

Conversion is the "unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights." Aetna Life & Cas. Co. v. Union Trust Co., 230 Conn. 779, 790 (1994); *see* Gilbert v. Walker, 64 Conn. 390, (1894) ("It is some unauthorized act, which deprives another of his property permanently or for an indefinite time; some unauthorized assumption and exercise of the powers of the owner to his harm. The essence of the wrong is that the property rights of the plaintiff have been dealt with in a manner adverse to him, inconsistent with his right of dominion, and to his harm."). There are two types of conversion, the first of which occurs where "possession of the allegedly converted goods is wrongful from the outset" and the second which "arises subsequent to an initial rightful possession." Maroun v. Tarro, 35 Conn. App. 391, 396 (Conn. App. Ct.1994). Under the second class of conversion, a rightful possession may become wrongful in one of three ways: (1) "a wrongful detention," (2) "the exercise of an unauthorized dominion over the property," or (3) "a wrongful use of the property." Luciani v. Stop & Shop Cos., Inc., 15 Conn. App. 407, 410 (Conn. App.Ct. 1988).

Plaintiff's claims under either theory of conversion must fail, for in both instances, Plaintiff cannot prevail on her claim that the Defendants' possession of the bond premium was unauthorized. Dulos specifically contracted with Defendants for a bail bond. He was required to pay for it. Plaintiff voluntarily paid it for him, as a gift or otherwise. As a result thereof, the Defendants performed. There was no change in the status of the parties at any time.  Her claims therefore must fail as a matter of law.

Plaintiff cannot prevail on her claim of civil theft for the same reasons. "The elements of civil theft are also largely the same as the elements to prove the tort of

conversion, but theft requires a plaintiff to prove the additional element of intent over and above what he or she must demonstrate to prove conversion." (Citation omitted; internal quotation marks omitted.) <u>Sullivan v. Delisa</u>, 101 Conn. App. 605, 619-20, cert. denied, 283 Conn. 908 (2007). Plaintiff cannot establish that Defendants' possession of the bond premium was unauthorized; it was received in exchange for the posting of the bond. Such also precludes the possibility under the facts of this case that the Defendants *intentionally* stole her money. The Defendants were operating under a well-founded belief that their conduct was legal and authorized at all times and in all respects.  Plaintiff cannot show or produce any evidence that Defendants committed larceny, stole form her, or otherwise had the requisite mens rea to commit any theft.

### 3. <u>Plaintiff Cannot Pursue Implied Contract/Breach of Covenant of Good Faith and Fair Dealing Claims</u>

Plaintiff's claims for breach implied contract, and/or breach of the implied covenant of good faith and fair dealing must fail. The relevant contract for the provision of the bail bond was with Fotis Dulos. Therefore, the terms of that contract, the Application for Bail Bond must govern, and there are no terms of the contract that concern the statutory provisions complained of in this lawsuit herein, and none of the terms of these instruments outline anything other than that Dulos received all of the benefit that he had bargained to receive under any agreement. The Plaintiff's claims that the contract void ab initio failing, the existence of the contract precludes claims of an implied contract concerning the same subject matter.

"'A true implied contract can only exist where there is no express one….' <u>Collins v. Lewis</u>, 111 Conn. 299, 304, 149 A. 668 (1930)." <u>Hefferon Ins., Inc. v. Aetna Life Ins. Co.</u>,

Docket No. CV990594581, 2003 Conn. Super. LEXIS 1009, at *3 (Super. Apr. 17, 2003).

"[A]n express contract between the parties precludes recognition of an implied-in-law

contract governing the same subject matter." (Internal quotation marks omitted.) <u>Town of</u>

<u>New Hartford v. Connecticut Resources Recovery Authority</u>, 291 Conn. 433, 454-55

(2009); <u>Northrop Grumman Corp. v. United States,</u> 47 Fed. Cl. 20, 41 (2000) (same); *see*

<u>Feng v. Dart Hill Realty, Inc.</u>, 26 Conn.App. 380, 383, cert. denied, 223 Conn. 912 (1992).

("Proof of a contract enforceable at law precludes the equitable remedy of unjust

enrichment." (Citations omitted; internal quotation marks omitted.)

Moreover, Plaintiff's written Indemnification Agreement subsumes the terms of any

implied agreement and contains no language regarding any specific terms or requirements

regarding the provision of a bail bond, nor the premium payment for the same, and

contains indemnification and hold harmless language by and between Plaintiff and

Defendant PSC, for any loss or harm to PSC arising from the bond.

Although the covenant of good faith and fair dealing is implied in every contract, a

plaintiff cannot state a claim for breach of the implied covenant simply by alleging a

breach of the contract, in and of itself. "A claim for breach of the covenant of good faith

and fair dealing is not a stand-alone claim. It derives from a contract, express or implied.

cf. <u>Carford v. Empire Fire & Marine Ins. Co.</u>, 94 Conn. App. 41, 891 A.2d 55 (2006). 'To

constitute a breach of [the implied covenant of good faith and fair dealing], the acts by

which the defendant allegedly impedes the plaintiffs right to receive benefits that he or she

reasonably expected to receive under the contract must have been taken in bad faith.'

<u>Alexandru v. Strong</u>, 81 Conn.App. 68, 80-81, 837 A.2d 875, cert. denied, 268 Conn. 906,

845 A.2d 406 (2004). "Bad faith in general implies both actual and constructive fraud, or a

design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive ... Bad faith means more than mere negligence; it involves a dishonest purpose." (Internal quotations marks omitted.) De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., [269 Conn. 424, 433 (2004)]" Massaro v. Ocean State Job Lot of CT2009, LLC, Superior Court, Judicial District of New London At New London, Docket No. Docket No. KNL-CV21-6051268-S, 2023 Conn. Super. LEXIS 280, *6 (March 3, 2023). There is no basis, and no evidence that the Plaintiff can present, to satisfy the bad faith requirements to present such a claim,

And, once more, she lacks the standing to make such a claim: In order to pursue a claim of the breach of the covenant of good faith and fair dealing, Plaintiff must demonstrate that she has a contractual relationship with the Defendants. Grass v. Perez, Superior Court, judicial district of Hartford, Docket No. CV-06-50-04493-S, 2008 Conn. Super. LEXIS 279 (February 4, 2008) (granting motion to dismiss for lack of contractual relationship with defendant). Plaintiff is party to the Indemnification Agreement, but her claims do not arise out of that document. She is seeking to recover money paid by or on behalf of Dulos for securing the bail bond and is a stranger to that transaction. Her claims in this regard must fail.

### 4.    Plaintiff Cannot Prevail on Fraudulent Misrepresentation

"The essential elements of fraudulent misrepresentation are: (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to at upon it; (4) and the latter did so act on it to his injury. Fraudulent misrepresentation must be proven

by clear and convincing evidence." (Citations omitted) <u>Dulara Bldg. & Invest. Corp. v.</u> <u>Boston Five Mortg. Copr.</u>, Superior Court, judicial district of Middlesex, Docket No. 64203, 1994 Conn. Super. LEXIS 1316, *3 (May 23, 1994). Simply stated, the undisputed material facts is that the Defendants, in representing that they could write the Dulos bond, had every belief that they were authorized to do so. Thus Plaintiff cannot establish the second and third elements of this cause of action, and her claim must fail.

### 4. <u>Plaintiff Cannot Prevail on her CUTPA Claim</u>

"To determine whether a party's conduct violates [the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §42-110a et seq.], the court must consider the following criteria: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some [common-law], statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. Although all three criteria do not need to be satisfied to support a finding of unfairness; id.; a key element of CUTPA is that the conduct involve some level of aggravated behavior." (Citations, internal quotations omitted) <u>LPP</u> <u>Mortgage Ltd. v. Underwood Towers L.P.</u>, 205 Conn. App. 763, 835-36 (2021).

For all of the reasons set forth and argued above, there is nothing in the record, no disputed issue of material fact, that could lend itself to allow Plaintiff to demonstrate that the Defendants' actions were unfair, deceptive, offends public policy, or caused substantial injury to consumers. There is no scintilla of evidence in the record that the Defendants' conduct could be considered as involving any level of aggravated behavior. Plaintiff cannot

prevail on her CUTPA claim as a matter of law.

### 5. Plaintiff Cannot Prevail on her Civil Forgery Claim

"General Statutes §52-565 provides: 'Any person who falsely makes, alters, forges or counterfeits any document, or knowingly utters, as true, any document falsely made, altered, forged or counterfeited, shall pay double damages to any party injured thereby.' 'Forgery is "[t]he false making or the material altering of a document with the intent to defraud." Black's Law Dictionary 650 (6th Ed. 1990).' <u>Criscuolo v. Shaheen</u>, 46 Conn.Sup. 53, 60, 736 A.2d 947 [24 Conn. L. Rptr. 307] (1999). '[I]n order to recover damages under §52-565, the plaintiff must have proved that the defendant either had forged the challenged documents or had knowingly uttered, as true, the forged documents.' <u>Aksomitas v. Aksomitas</u>, 205 Conn. 93, 102, 529 A.2d 1314 (1987) (constructive knowledge not sufficient under statute). Under this section, the plaintiff must prove that he suffered an actual injury. <u>Criscuolo v. Shaheen</u>, supra, 60." <u>Lettman v. Lovett</u>, Superior Court, judicial district of Hartford, Docket No. CV156062936S, 2018 Conn. Super. LEXIS 1658, at *7 (Aug. 1, 2018).

Notably an "actual injury" must be pled and proven to sustain a forgery claim. See <u>Rudnick v. Piscitelle</u>, Superior Court, judicial district of New Haven, Docket No. CV115033918S, 2014 Conn. Super. LEXIS 254 (Feb. 3, 2014); *see also* <u>Cummings v. Liberty Mut. Grp., Inc.</u>, Superior Court, judicial district of Tolland, Docket No. TTD-CV18-5011646-S, 2022 Conn. Super. LEXIS 1886 (Aug. 4, 2022) ("The statutory text [of 52-565] expressly requires injury to the plaintiff. If there has been no concurrence of damage or injury with the asserted forgery the statutory cause of action has not been made out.").

As discussed previously, Plaintiff has failed to allege an actual injury. Here, her cause of action appears to be more along the lines of a special defense to Defendants 24/7, Sobota and Cao's counterclaim seeking enforcement of an agreement to pay the balance of the bond premium.[9] In fact, Plaintiff has filed a Motion for Summary Judgment addressed to that Counterclaim (Doc. 120).  Plaintiff has made no payments under the allegedly forged agreement, and therefore has suffered no injury. Her harm is purely speculative, and her action must fail as a matter of law.

## III.   **CONCLUSION**

Plaintiff has no standing to pursue any or all of the claims set forth in her Amended Complaint. The Defendants, acting in good faith and in an honest belief that their actions were approved by the insurance departments of both South Carolina and Connecticut, entered into a surety bail bond contract with Fotis Dulos to secure his release from jail while awaiting trial on the murder charges brought against him. Plaintiff, a stranger to the transaction, paid the initial bond premium to the Defendants as a gesture of friendship, on a completely voluntary basis, on behalf of Dulos, and the Defendants performed, securing Dulos' release from custody, where he stayed until he took his own life. Dulos was never returned to custody. There is no basis to declare the Defendants' contract with Dulos void ab initio, and Plaintiff lacks standing to try to do so. She has suffered no loss or injury caused by the Defendants' actions.

Summary judgment should enter in favor of all of the Defendants, on all of Plaintiff's causes of action, as a matter of law.

---

[9] Defendant PSC is not a party to the Counterclaim.

Respectfully submitted,

PALMETTO SURETY CORPORATION,

By: */s/ Barrett R. Brewer*_____
Barrett R. Brewer, Es. – *Pro Hac Vice*
Fed. Bar. No. sc8081
Brewer Law Firm, LLC
510 Mill Street, Suite 2B
Mount Pleasant, SC 29464
Telephone: 843-779-7454
Fax: 843-779-7456
Email: barrett@brewerlawfirmsc.com

- and -

PALMETTO SURETY CORPORATION,
24/7 BAILBONDS, LLC, WILLIAM
SOBOTA and JERRY CAO,

By: */s/ Joseph B. Burns*_____
Joseph B. Burns, Esq.
Fed. Bar. No. ct00403
Crumbie Law Group, LLC
100 Pearl Street, 12th Floor
Hartford, CT 06103
Telephone: 860-725-0025
Fax: 860-760-0308
Email: jburns@crumbielaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2023, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Joseph B. Burns*_____
Joseph B. Burns