UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

_____

ANNA CURRY                                                              No. 3:21 cv 00221 (SRU)

VS.

PALMETTO SURETY CORPORATION,
et. al.                                                                            September 6, 2023

# REPLY TO DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff is entitled to summary judgment on counts one and four (in the alternative) of her amended complaint, and nothing in Defendants' Opposition (ECF #135) dictates otherwise.

I.   Introduction

The Plaintiff has moved for Partial Summary Judgment as to Count One ("Unjust Enrichment") and, in the alternative, Count Four ("Breach of Implied Contract") per the Amended Complaint at ECF #125, and the Defendant's Memorandum in opposition was filed at ECF #135. Plaintiff files this Reply Memorandum in response. Defendants complain about Plaintiff's compliance with Local Rule 56(a)(3), but an Amended Statement of Material Facts was filed by Plaintiff at ECF #136 which addresses that issue as raised in their Memorandum.

In this Reply, Plaintiff will respond to those legal issues raised by Defendants in their Memorandum, which have not been previously addressed. Any overlapping issues raised in Plaintiff's opposition to Defendants' cross-motion for summary judgment. (ECF #146) are incorporated herein.

II.     **Argument**

   A.     <u>Plaintiff has Standing to Bring the Claims Raised in Her Complaint.</u>

In its Memorandum in Opposition to Plaintiff's Partial Motion for Summary Judgment, Defendants claim that the Plaintiff lacks standing because she was not a party to the bail bond contract and in that she has no injury in fact (Defendants Memorandum, ECF 135, Sec B(1)).

Plaintiff extensively briefed this issue in her Memorandum in Opposition to Defendants' Motion for Summary Judgment at ECF #146, Sec. V(A), and her arguments there are incorporated herein by reference, the same as if fully set forth herein.

Defendants conceded that the bond was void ab initio in their admission to the Connecticut Department of Insurance (CTDOI) (ECF 125-5 Stipulation and Consent Order). Defendants admit that they were in violation of statutory requirements when issuing the bond (ECF 125-5), yet incorrectly contend that Plaintiff lacks standing in this matter as a deflection to illicitly retain $147,000 for a 19-day bail bond.

Defendants argue that Plaintiff was a non-party to the bond arrangement and that she suffered no injury in fact, even though she paid Defendants nearly $150,000 for a bond to remain in place throughout the bond defendant's criminal trial, a bond that the Defendants acknowledged they were not permitted to issue, and that contravened several statutes at the time they posted the bond.

Despite confessing to a Connecticut State Court that the bond should be revoked 19 days after issuing the bond (ECF 125-4 Motion to Revoke Bond) and despite the South Carolina Department of Insurance (SCDOI) advising that the $147,000 premium should be refunded (ECF 146 Ex. E Shull to Willis Refund Email), Defendants now ask this Court to rule, instead, that the

bond was valid and enforceable, and that Defendants should keep the bond premium they fraudulently obtained.

### 1. Plaintiff's Relation to the Bond Arrangement Affords Her Standing

Defendants argue that Plaintiff was a non-party to the bond with no standing in this lawsuit while simultaneously maintaining a lawsuit against her for alleged breach of contract based on a forged Unpaid Premium Plan (see ECF #114), attempting to steal an even greater sum of money for their illegal bond than Plaintiff herself has already lost on the illegal bond. Defendants' action suing the Plaintiff for breach of contract is admission that Defendants view the Plaintiff as a legitimate party to the bond arrangement with standing in this matter.

Defendants have attempted to create a red herring and diminish Plaintiff to a simple guarantor that would ensure the bond defendant's appearance in Court, and they conflate this with guaranty law by alleging that the Indemnity Agreement she signed was nothing more than a guaranty agreement. (ECF #135, pgs. 22-23). The purpose of Plaintiff signing the Indemnity Agreement was to ensure the Defendants would provide a legal bail bond that would remain in place throughout the duration of the defendant's criminal trial. Per the Agreement's language, "in consideration of mutual promises and covenants" and for "good and valuable consideration", the Plaintiff signed personally agreeing to hold Defendants harmless for any loss if the bond was forfeited. Were Plaintiff only to have been an Indemnitor to the bond arrangement, federal courts have consistently recognized that an indemnitor has standing to participate in an action regarding the subject of its indemnification obligations (see *Jack Henry & Assocs., Inc. v. Plano Encryption Techs. LLC, 910 F.3d 1199, 1206 (Fed. Cir. 2018)*)).  However, Defendants' new argument about guaranty law asks the Court to ignore the totality of the role that Plaintiff took on to enable the bond to be posted:  Plaintiff signed a Defendant Authorization Form as a duly

designated representative of the bond defendant; she entered into an Indemnity Agreement to hold Defendants' harmless; she provided Defendants with a $3,000,000 Promissory Note; and she paid the Defendants $147,000 for the bond.  (ECF #125-6)

The Defendants argue that the checks that Plaintiff wrote directly to 24/7 Bail Bonds LLC to pay for a valid bail bond, proceeds which were then distributed to all of the Defendants, were somehow a gift to an entirely different entity.  The Defendants then disingenuously represent to the Court that the Plaintiff admitted she was not a party to the bond and that they owe her nothing for her payment to them of $147,000.  (ECF #135, pgs. 21-22)  Such an argument defies reality. By this estimation, Plaintiff would have been making a gift of $147,000 to the Defendants with the $147,000 checks she paid them.

The $6,000,000 bond would not have been posted without the Plaintiff.  In fact, the Defendants did not even speak with the bond defendant before they posted the bond. (See ECF #146-1, pgs. 28-29, ¶7). There is no dispute that Plaintiff has standing as party to the bond arrangement.

**2.  Plaintiff has Suffered an Injury in Fact**

To accomplish their twisted logic that Plaintiff has suffered no injury in fact, Defendants falsely assert they fully performed the bond by arguing: 1) that their Motion to Revoke Bond - which informed the Court that they were in violation of CGS 38(a)-73(a) on the bond due to the incorrect reason of taking insufficient collateral for the bond [thereby also placing them in violation of CGS 38(a)-660(g)(f)] and asked the Court to be released from the bond - was never heard by the Court due to the bond defendant being comatose and the Prosecutor electing to place the Motion to Revoke Bond aside, and, 2) that the bond defendant died.

Even though the Motion to Revoke was not heard, the Court increased the bond from $6,000,000 to $6,500,000, on January 29, 2020 while the bond defendant was still living, rendering the Defendants even further out of compliance with Connecticut law CGS §38a-73(a) and further unable to perform the bond. (ECF #135 Ex. G January 29, 2020 Transcript)

More to the point, however, the day before the Defendants called for a Court hearing for the Motion to Revoke Bond on January 28, 2020, the Defendants repudiated their obligations on the bond on January 27, 2020 while the bond defendant was still alive when they informed their South Carolina regulator, the Connecticut regulator, and the Prosecutor that they were rescinding the defendant's liberty and returning him to jail. Specifically, Defendant Palmetto CEO Scott Willis ("Willis") wrote to Michael Shull ("Shull") of the South Carolina Department of Insurance (SCDOI) on January 27, 2020 stating that that bail bond agent and his attorney were "moving forward placing the defendant back in custody…Mr. McGuigan who handled this matter has notified the State Attorney's office and the CTDOI…They are filing paperwork now for the off bond motion." (ECF #146 Ex. C Willis to Shull Revocation Emails)

The Defendants' communication to the regulators and the Prosecutor on January 27, 2020, with their subsequent Motion to Revoke Bond admitting that they were in statutory violation on the bond and were therefore rescinding the bond, was a repudiation of their obligations under the bond before the duration of the bond was completed. Therefore, contrary to their argument, Defendants did not perform the bond, and have left Plaintiff without the $147,000 she paid for a bail bond that was to remain in place through the duration of the criminal defendant's trial, a concrete and actual injury. The Plaintiff, as the non-repudiating party, is afforded the right to damages as a result of Defendants repudiating their obligations before their

obligations were fulfilled.  *Semac Elec. Co., Inc. v. Skanska USA Bldg., Inc.*, 195 Conn. App. 695, 715, 226 A.3d 1095, 1107 (2020).

**B.     The Surety Bail Bond was Void Ab Initio.**

In its Memorandum in Opposition to Plaintiff's Partial Motion for Summary Judgment, Defendants claim that the bail bond was not void ab initio (Defendants Memorandum, ECF #135, Sec B(1) (sic))).  The bail bond was void ab initio and Plaintiff extensively briefed this issue in in her Motion for Summary Judgment at ECF #125

The Defendants present several arguments in attempt to convince the Court they were "excusably ignorant of statutory requirements" for the state of Connecticut (ECF #135, p. 28) and to prop up their wishful thinking that the bond under the circumstances was not void ab initio due to being in violation of CGS §38(a)-73(a).  Defendants argue that they were simply unaware of Connecticut law CGS §38(a)-73(a), and that they only had a duty to comply with South Carolina law for a bond that was issued by the State of Connecticut Superior Court, underwritten by a Connecticut Managing General Agent, and posted by a Connecticut Bail Bond Agent.  Defendants then argue that they were under a reasonable belief that Connecticut insurance law was the same as South Carolina insurance law, and deferred to the National Association of Insurance Commissioners (NAIC), an organization that is not responsible for regulating or enforcing state insurance laws.

None of these arguments accounts for the fact that the Defendants 24/7 Bail Bonds LLC ("24/7") and William Sobota ("Sobota"), a Connecticut Managing General Agent and Connecticut Bail Bond Agent, respectively, signed a Managing General Agent (MGA) Agreement with Palmetto Surety Corporation ("Palmetto) in 2019 pursuant to CGS §38(a)-90(c), which stated, *inter alia,* that:

**In no event shall the MGA allow any appointed Bondsman to issue Bonds for a single risk which would exceed 10% of the Company's Total Capital & Surplus as stated on its most recent annual financial statement.** (ECF #146 Ex. A, Art. III, ¶4)

Nor do their arguments account for the fact that Sobota admitted that he willfully ignored the parameters of this Agreement in which he committed to not issue a bond in excess of 10% of Palmetto's capital and surplus when he underwrote the $6,000,000 bond. (ECF #146 Ex. W Sobota Tr2 p.84, lines 19-25, p. 85, lines 1-10, p. 139, lines 15-19)

The Defendants' signing of the MGA Agreement shows that they had knowledge before posting the $6,000,000 bond in January 2020 that Connecticut law did not allow bonds in excess of 10% of capital and surplus and that they knew they could not perform the bond before they even posted the bond.

Additionally, Palmetto CEO Scott Willis ("Willis") acknowledged to his regulators in an email on January 29, 2020 that he was aware of the complaint made to the CTDOI about Palmetto being illegal on the bond due to having insufficient capital and no qualified reinsurance (ECF 125-7 p. 1), but he dismissed the complaint as not factual. Specifically, Willis wrote to his regulators, "The states Attoney made it clear to the DOI in CT, a complaint filed by another bail agent were not factual. Made it clear to back off.  Please let me know if you should here from them.  Our Attoney Ryan can handle if so."  (Ex. A Jan 29, 2020 Willis to SCDOI Email)

Even with its awareness of the complaint to the CTDOI about Palmetto's capital shortfall and lack of qualified reinsurance, the Defendants still represented to the Court that they were in violation of Connecticut law due to insufficient collateral.

In addition to being in violation of CGS §38(a)-73(a), the Defendants' lack of due diligence on properties they took as collateral rendered them in violation of CGS §38(a)-660(g)(f) at the outset of posting the bond.  The Defendants conducted no title searches on the properties they

took as collateral (ECF #146-1, p.36, ¶43), and even recorded an overstated value for the collateral by eliminating certain debt values documented by the owner of the collateral properties. (ECF #125-14, ECF #125-15)

The actions of Defendants in moving to revoke the bond without any attempts to resolve their false allegations that there was insufficient collateral show that they knew that the bond was void ab initio and that there was no way that they could solve for the bond due to Palmetto being in violation of Connecticut law.  After all, the Defendants stood to receive another $272,000 to keep the bond in place, and financial incentive would dictate that Defendants would have taken all measures to resolve the alleged bond issues if they could have been resolved.  Instead, the Defendants made no contact with the Plaintiff, the bond defendant, his attorneys, or the other indemnitors regarding alleged shortfalls in collateral or to obtain additional collateral.  Defendants ignored Plaintiff's offer of her own assets of collateral before the bond was posted. (Ex. B Curry Text Messages Re Offer of Collateral, p. 16).  The Defendants also chose not to post their own assets as collateral as they have done for other bonds (Ex. C 24/7 Bail Bonds LLC 1.24.2020 Bond File pgs. 14- 15, 27.  ECF #146 Ex. U Willis Tr. p. 208, lines 5-9) And the Defendants altogether ignored both the Plaintiff and the bond defendant on the morning of January 28, 2020 when they both immediately tried contacting Sobota to resolve the bond issue when they first learned of the emergency hearing to revoke the bond at 9:45am.  Sobota never returned either the Plaintiff's or defendant's attempt to reach him. (Ex. D Curry Sobota Text Messages, p. 15.  Ex. E Screenshot of Dulos Cell Phone Call to Sobota 1.28.2020)

Even so, Defendants attempt to argue that the bond served its purpose, conferring to the criminal defendant "the right of an accused to bail" as "enshrined in the State Constitution," given that a '[criminal] defendant has a fundamental constitutional right to bail pending trial in

all [cases] but [those involving] certain capital offenses.' (ECF #135, p. 27).  What Defendants fail to acknowledge, however, is that their illicit retention of the $147,000 bond premium on their illegal $6,000,000 bond would have *restricted* the defendant's constitutional right to bail pending trial:  the bond defendant would have had to pay twice for the same bond, and the chances of a defendant, his family and friends coming up with another $147,000 in cash to pay for a *legal* $6,000,000 bail bond premium would be slim.  The defendant's right to bail bond would effectively be blocked by the Defendants' illicit retention of the $147,000 premium that Plaintiff paid for the illegal bond.

The Defendants cite *Solomon v. Gilmore* 248 Conn. 769, 790, 731, A.2d 280 (1999) to caution the Court against rendering the bond unenforceable for its violation of CGS §38(a)-73(a) and its public policy intent.  The standard for determining whether a violative contract is void is clear, and depends heavily on the purpose of the statute and the potential harm to those that the statute protects.  In *Solomon,* the Court noted that the statute was intended to protect the consumer, and therefore should be construed liberally in favor of those it is designed to protect. The bond statutes were designed to protect consumers and to ensure that a surety did not overextend itself financially and therefore become unable to perform the contract.  Defendants acknowledged as much in their August 26, 2020 letter to the CTDOI when writing that "Palmetto now has a sufficient amount of reserves for the protection of Connecticut residents under current statutory and regulatory guidelines and requirements." (ECF #125-7. pp. 11-12)

There is no dispute to the fact that the bond was void ab initio due to being in violation of CGS §38(a)-73(a), against public policy, and that it should not be enforced.  The $147,000 premium should be returned to Plaintiff.

C.     **The Defendants Have Been Unjustly Enriched By Retaining the Bond Premium**

While the Defendants continue to maintain that Plaintiff was not a party to the bond arrangement, they argue at the same time that the Plaintiff got what she bargained for with the $147,000 she paid them because she spent 19 days with the bond defendant while he was out of custody.  Despite this argument contradicting their claim that Plaintiff was not a party to the bond arrangement, this argument is entirely nonsensical at its core. The bond was to remain in place until the defendant's criminal trial was concluded. The very purpose of a bail bond is to enable a criminal defendant to remain out of jail *through the duration of his trial* to prepare for his defense, which is made plainly clear on the State of Connecticut Superior Court Criminal Appearance Bond form. (ECF 146 Ex. B CT Superior Ct Criminal Appearance Bond). The Defendants now admit to this fact in their Opposition Memo at ECF #135, p.33 ¶2, whereas in their Motion for Summary Judgment they proffered the absurd argument that a criminal defendant's only concern was being out of jail until his next court hearing, ECF #126-2 p. 29, ¶2. The bond was only in place for 19 days, while the bond defendant's trial was to be scheduled many months (or even years) after he was arrested.

When Plaintiff paid $147,000 to secure the release of her friend throughout his trial, she did not get what she bargained for, and Defendants have been unjustly enriched by retaining Plaintiff's $147,000 for a bond they entered into illegally and repudiated their obligations under after just 19 days. Had the bond been legal, it would likely still be in place today given that the bail bonds of the co-defendants in this criminal matter are still in place some 1,335 days after those bonds were posted without any trials yet scheduled.

In further attempt to justify their illicit retention of Plaintiff's $147,000, the Defendants posit both that 1) there is "no reasonable basis to believe that Palmetto would have been relieved from its obligation to service the bail bond" (ECF #135, p.33), and 2) that the CTDOI would

have allowed the bond to remain in place because they allowed the Defendants' other illegal bonds to remain in place (ECF #135, p.18).  The notion that a Connecticut Court would require a surety company to continue servicing a bond that the surety admitted was in violation of Connecticut law, and asked the Court to be removed from, is an unlikely inference and unfounded speculation.  Defendants here also overlook that their action to return the defendant to court to revoke bond resulted in the bond being increased to $6,500,000, placing Defendants further out of compliance with CGS §38(a)-73(a).

      With respect to their revisionist history regarding the CTDOI, the Defendants ignore the fact that the CTDOI allowed their other illegal bonds to remain in place *after* the unfortunate attendant consequences occurred from the emergency bond revocation hearing for the $6,000,000 bond in which the bond defendant took his life less than an hour after being informed his liberty was rescinded for the false reason of insufficient bond collateral.  The Defendants also ignore that the CTDOI received a complaint about Defendants being in violation of Connecticut capital and reinsurance requirements on the $6,000,000 bond, that CTDOI opened up an "investigation in accordance with [Connecticut] laws and regulations" on the bond, then contacted the SDCOI about the bond. (ECF #125-7, p. 3) These actions are not suggestive of a regulator that intends to allow such an illegal bail bond to remain in effect.

      Even if the bond were not deemed void ab initio, the Defendants' own Terms and Condition of their Application for Appearance Bond (ECF 146 Ex. D Terms and Conditions) is a self-acknowledgment that retention of the bond premium in these circumstances would be unjust enrichment when they stipulate themselves that they will refund the bond premium if the defendant is surrendered prior to the time set for the defendant's appearances, which in this case was February 28, 2020 (ECF #146 Ex. B CT Superior Ct Criminal Appearance Bond).

## II. Conclusion

Defendants' opposition to Plaintiff's motion for summary judgment adds no new arguments for the Court, and Plaintiff is entitled to summary judgment on count one (and count four, in the alternative) of her amended complaint for the full return of the $147,000 premium that she paid to Defendants for a bond that was illegal at the outset and which Defendants did not and could not perform. Public policy and equity dictate that a company who violates the law at the outset of an arrangement and so quickly fails to perform that arrangement (because it legally cannot) should not be entitled to retain any consideration for that arrangement. Legislative history for Conn. Gen. Stat. 38a-73 notes that the purpose of the bill is to "enhance the Department's oversight of the surety bail bond licenses". (Connecticut Committee Transcript, INS 2/23/2017). As the Court stated in *Solomon*, if the purpose of the statute is to strengthen oversight, the purpose of the statute is undermined when courts sanction violations of the statute.

Partial summary judgment for unjust enrichment and breach of implied contract (in the alternative) should be entered on behalf of Plaintiff.

                                                                                                                               THE PLAINTIFF

                                                                                                                               Respectfully Submitted,

                                                                                                                               BY */s/ Jonathan J. Einhorn*
                                                                                                                               JONATHAN J. EINHORN
                                                                                                                               129 WHITNEY AVENUE
                                                                                                                               NEW HAVEN, CT 06510
                                                                                                                               FED BAR ct 00163
                                                                                                                               203-777-3777
                                                                                                                               einhornlawoffice@gmail.com

CERTIFICATION

    I hereby certify that on this 6th day of September, 2023, a copy of the foregoing Statement was filed electronically or served by mail on anyone unable to accept electronic filing. Parties may access this filing through the Courts CM/ECF System.

                                          /s/ *Jonathan J. Einhorn*
                                          JONATHAN J. EINHORN