# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ANNA CURRY,
    Plaintiff,

    v.

PALMETTO SURETY CORP., et al.,
    Defendants.

No. 3:21-cv-221 (SRU)

## RULING ON SUMMARY JUDGMENT MOTIONS

Anna Curry filed the instant case against two companies and two individuals in the business of bail bonds, Palmetto Surety Corporation; 24/7 Bailbonds, LLC; William Sobota; and Jerry Cao (collectively "the Bondsmen"). Curry sued the Bondsmen for their refusal to return Curry's deposit of $147,000, which she paid to secure the bond of Fotis Dulos, then a criminal defendant in state custody. The parties cross-moved for summary judgment.

For the following reasons, I **deny** the Bondsmen's Motion for Summary Judgment, **doc. no. 126**; **deny** Curry's summary judgment motion with respect to 24/7 and Cao's counterclaims, **doc. no. 120**; and **grant in part and deny in part** Curry's partial summary judgment motion with respect to Counts One and Four of the Amended Complaint, **doc. no. 125**.

## I.    Background

### A.   Bail Bonds and Their Regulation in Connecticut

Under the Connecticut Constitution, "[i]n all criminal prosecutions, the accused shall have the right . . . to be released on bail upon sufficient security, except in capital offenses, where the proof is evident or the presumption great." Conn. Const. art. I, § 8. Once an accused is arrested for a bailable offense, state law requires that the police officer, bail commissioner, or court release him if, among other potential requirements, he posts bond by paying a deposit of

money or property.  Conn. Gen. Stat. §§ 54-63c; 54-64a.  By posting bond, an accused obtains release from custody while securing his obligations to the state.  8A Am Jur 2d Bail and Recognizance § 1.  Accordingly, "[a] bail bond is a contract between the government and the defendant and his surety."  *State v. Garvin*, 242 Conn. 296, 305 (1997) (citation omitted).  "[T]he state agrees to release the defendant into the surety's custody" and the surety agrees to secure the defendant's compliance with the conditions of his bail agreement to make future appearances in court, remain within the proper legal jurisdiction, and comply with other relevant conditions.  8A Am Jur 2d Bail and Recognizance § 72.  The surety promises to be liable for the failure of the accused to fulfill his duties to the state.  *Id.*

To post bond, an accused may provide the full cash value of his bail amount or have a state-licensed bail agent post his bail for a fee set by statute.  *See* Conn. Gen. Stat. § 38a-660b.  A bail agent may independently provide the bail bond.  If an agent does not have sufficient assets to pay the bail bond should a defendant violate the conditions of his release, the agent may work with a state licensed insurer or surety company.  The surety bail agent assesses the accused's financial information to help the surety company determine whether the accused has a sufficiently healthy financial situation to support the bond.  If so, the surety company issues the bond and the surety bail agent posts bond.

Insurers, sureties, and surety bail bond agents also help accuseds finance the cost of their bail bonds.  Even though the cost of bail may not be "excessive," U.S. Const. amend. VIII, Conn. Const. art. I, § 8, many accuseds lack the financial resources for bail.  If an accused or his agent/indemnitor cannot afford to pay the amount in full, a surety may agree to finance a bond premium.  Conn. Gen. Stat. § 38a-660c.  In such a "premium financing agreement," the accused may pay a down payment—what the parties here call a "premium deposit"—of at least thirty-

five percent of the premium at a rate set by the surety and authorized by the Insurance

Commissioner, and enter into a promissory note to pay the balance within fifteen months.  *See*

*id.*  In a typical contract, the surety bail bond agent advances the accused or his agent/indemnitor

the balance, and the accused or his agent/indemnitor will pay it back in installments.  A non-

refundable bond premium serves as compensation for the surety.

Connecticut law recognizes that the innocent-until-proven-guilty are at risk of

exploitation at the vulnerable junction where one must choose between staying incarcerated or

financing release.  To protect consumer-accuseds, bail bond insurers and sureties are highly

regulated.  In addition to statutory limits on fees, bail bond sureties have fiduciary duties, *e.g., id.*

§§ 38a-660d, 38a-660g; must retain a statutory percentage of the premium paid in trust to

"compensate . . . for any losses [an] insurer . . . incurs in the apprehension of a defendant or to

pay forfeitures of bail bonds executed by the surety bail bond agent," *id.* § 38a-660f; and are

subject to extensive regulations governing the maintenance and reporting requirements

concerning collateral security, *id.* § 38a-660g.  Any agreement with a bail bond agent that

violates the provisions of Connecticut General Statutes Sections 38a-660b through 660k is void

as a matter of law.  *Id.* § 38-660g(f).  Any violation may subject a surety bail bond agent to

administrative sanction, *e.g.,* license suspension or revocation or a fine.  *Id.* § 38a-660*l.*

Due to the risk that an insurer or surety may need to satisfy multiple obligations arising

from bail violations *cum* forfeitures at any given time, the state imposes minimum financial

requirements on insurers for licensure.  Connecticut requires that "surplus funds bear a

reasonable relationship to its liabilities" and that the insurer's proportion of risk-based capital to

total capital is "adequate."[1]  Conn. Gen. Stat. § 38a-72(d).  To satisfy that requirement and

---

[1] This provision is applicable to all insurers.

adequately support its reserves, the insurer or surety must maintain "qualified assets" of no less than the sum of its liabilities and its minimum surplus requirements. *Id.* § 38a-71(b).  The statute imposes limits on the risk a surety or insurer may assume in any single transaction.  Specifically, "[n]o [state-licensed] stock insurance company" can "expose itself to loss on any one risk to an amount exceeding ten per cent of its paid-up capital and surplus." *Id.* § 38a-73.  The state also sets strict requirements with respect to determining the amount of such risk, an amount that an insurer or surety company may only reduce vis-à-vis a state-authorized reinsurer.[2] *Id.*  If a company violates those requirements, it may be subject to license suspension, revocation, or a fine. *Id.* § 38a-774.

### B. Curry's Claims Against the Bondsmen[3]

#### 1. *The Dulos Bond*

Palmetto Surety Corporation ("PSC"), a South Carolina company, provides bail surety bonds.

On January 9, 2020, PSC through its agent, 24/7 Bailbonds, LLC ("24/7"), posted a $6,000,000 bond ("the Bond") to secure the conditional release of Fotis Dulos, then a criminal defendant in the custody of the state of Connecticut.  Pl.'s Am. R. 56(a)(1) Stmt., Doc. No. 136 ¶ 6; *State v. Dulos*, 2020 WL 749877, at *1 (Conn. Super. Ct. Jan. 14, 2020) (describing Dulos's arrest on January 7, 2020).  24/7 is a Connecticut limited liability company and served as PSC's bail agent in the transaction. *Id.* ¶ 3.  William Sobota is the principal of 24/7. *Id.* ¶ 4.  Jerry Cao

---

[2] "[I]n determining the amount of such risk, no portion thereof that has been reinsured in any insurance company that meets the requirements of section 38a-85 or 38a-86 shall be included." Conn. Gen. Stat. § 38a-73.

[3] The facts are drawn from the parties' Local Rule 56(a)(1) Statements.  Curry submitted an amended Statement, doc. no. 136, after the Bondsmen noted deficiencies in her first Statement.  Doc. No. 135-1 at 1-2 ("General Objection").  Since Curry cured her Statement's noncompliance with Local Rule 56(a)(1), I treat the paragraphs where the defendants invoked only a "General Objection" as admitted.

was PSC's bail bond agent and an independent contractor for 24/7.  *Id.* ¶ 5.  Cao and 24/7 held

surety bail licenses in Connecticut during the events at issue.  *Id.* ¶¶ 3, 5.

The Bond commanded a premium of $420,000.00 and a premium deposit of $147,000.00

("the Deposit").  *Id.* ¶ 7.  Anna Curry, a resident of North Carolina and Dulos's

agent/indemnitor, handled the initial transaction.  On January 8, 2020, Curry signed a Defendant

Authorization form agreeing to serve as an indemnitor on the bond, which included a $3,000,000

promissory note in the event Dulos fled.  *Id.* ¶ 27.  On January 9, 2020, she hand-delivered one

cashier's check for $22,000 to Sobota.  *Id.* ¶ 8.  The next day, she hand-delivered another

cashier's check for $125,000 to Sobota.  *Id.*  Both checks, totaling $147,000, were payable to

24/7.  *Id.*

By 2020, PSC had paid up capital and surplus of less than $5,000,000, meaning it could

not underwrite a single bail bond that was larger than $500,000 unless it was reinsured.  *Id.* ¶ 10.

PSC had not secured a reinsurance policy.  *Id.* ¶ 11.[4]  Instead, PSC secured collateral from Dulos

by placing liens on his real estate properties.  *Id.* ¶ 13.  The Bondsmen conducted their own due

diligence to estimate Dulos's properties' worth, but grounded their initial review on an

"informal, undated financial statement spreadsheet" of Dulos's assets.  *Id.* ¶ 26.

On January 16, 2020, a complaint was made to the Connecticut Department of Insurance

("CDI") alleging PSC could not underwrite a six-million-dollar bond.  Doc. No. 125-7 at 1.  The

CDI subsequently notified the South Carolina Department of Insurance of the complaint.  *See id.*

at 3.

---

[4] Defendants deny they lacked a reinsurance policy in their Rule 56(a)(1) Statement, doc. no. 135-1 ¶ 11.  However, the defendants do not deny that they lacked reinsurance; they merely argue Dulos's collateral "satisfied its reinsurance requirements" in accordance with South Carolina law and practice.  *Id.*  Insofar as defendants did not secure a reinsurance policy from another insurance provider, I treat this fact as admitted by the defendants.

On January 28, 2020, PSC moved to revoke the Bond in Connecticut Superior Court.  *See* Pl.'s Am. R. 56(a)(1) Stmt., Doc. No. 136 ¶ 17.  The parties dispute the impetus for the motion. PSC claimed problems with the bond's collateral were to blame, since there were some foreclosures of Dulos's properties.  *Id.*  Curry alleges the bond was void at its inception because PSC lacked sufficient capital and reserves to lawfully issue the bond.  Second Am. Compl., Doc. No. 173 ¶¶ 13-14 (citing Conn. Gen. Stat. § 38a-73).  The defendants claim PSC moved to revoke the bond due to Dulos's "failure to identify the imperfections in the collateral" that resulted in incurring too much risk for a single transaction.  Doc. No. 18-6 ¶ 5 (citing Conn. Gen. Stat. § 38a-73).

Specifically, Willis avers that "24/7 performed due diligence concerning Dulos' collateral, based on spreadsheets put together by Dulos and his attorneys setting forth the properties' equity and debt."  Willis's Aff., Doc. No. 18-9 ¶ 7.  After PSC checked Zillow and discovered foreclosures on Dulos's properties, PSC and 24/7 allegedly checked with Dulos's attorneys and were "assured that the matters had been taken care of and would not impair the collateral."  *Id.* ¶ 8.

The same day PSC moved to revoke the Bond, Dulos's attorney abruptly notified him that he must appear in court for an emergency hearing and return to jail due to insufficient collateral for the Bond.  Pl.'s Aff., Doc. No. 125-1 ¶ 26.  About forty-five minutes later, Dulos attempted suicide.  *Id.* ¶ 28.  Dulos died two days later on January 30, 2020.  *Id.* ¶ 29.

Dulos had complied with the Bond's release conditions until he attempted suicide on January 28, 2020.  Def.'s R. 56(a)(2) Stmt., Doc. No. 135-1 ¶ 22.  The state criminal court never adjudicated PSC's motion to revoke; PSC withdrew the motion the day Dulos died.  Sobota's Aff., Doc. 18-2 ¶ 15.

Curry has demanded the return of the $147,000 Bond Deposit, but the Bondsmen have retained the Deposit.  Doc. No. 173 ¶¶ 16-17.  The Bondsmen allege Curry owes more—approximately $272,150—and point to Curry's alleged signature on paperwork outlining an installment payment plan and an alleged receipt showing the unpaid balance.  Answer, Doc. No. 114 at 10 ¶ 11, 7 ¶ 2(d); Unpaid Premium Agreement, Doc. No. 18-5 at 2.  Curry claims that instead of asking her to pay the additional premium, or presenting her with the paperwork, or giving her the receipt, the Bondsmen forged her signature.  Doc. No. 173 ¶¶ 55-57.

On June 26, 2020, the CDI revoked PSC's authorization to write future surety bonds in Connecticut.  Doc. No. 135-1 ¶ 69.  CDI informed PSC that its practice of writing surety bail bonds for more than ten percent of its surplus without reinsurance violated Connecticut law.  *Id.* ¶ 68.

## C.  Procedural History

Curry brings eight claims against the Bondsmen: (1) unjust enrichment, (2) conversion, (3) statutory theft, (4) breach of implied contract, (5) breach of implied covenant of good faith and fair dealing, (6) fraudulent misrepresentation, (7) violation of Connecticut Unfair Trade Practices Act ("CUTPA"), and (8) civil forgery.  Doc. No. 173 ¶¶ 18-60.  Cao and 24/7 assert three counterclaims: (1) breach of contract, (2) breach of implied covenant of good faith and fair dealing, and (3) unjust enrichment.[5]  Doc. No. 114 at 8-13.  The counterclaims are premised on the fact that Curry has paid only a portion of the $420,000 Bond premium and refuses to pay any more.  *See generally id.*

On April 16, 2021, the Bondsmen filed a Rule 12(b)(1) Motion to Dismiss challenging Curry's Article III standing to bring this suit.  Bondsmen's Mot. to Dismiss, Doc. No. 18 at 1.

---

[5] Neither PSC nor Sobota have asserted counterclaims against Curry.

After I conducted a hearing on the Motion, the parties took additional discovery.  During a telephonic status conference on December 16, 2021, I expressed my concern with ruling on a Rule 12(b)(1) motion when I believed standing was bound up with the merits—specifically, whether the Bond was an enforceable contract.  Conference Memo. & Order, Doc. No. 48 at 2.  The parties agreed the standing issue could be taken up better in a Motion for Summary Judgment.  *Id.*  Accordingly, I denied the Motion to Dismiss without prejudice.  *Id.*

The parties amended their pleadings and extensive motion practice followed.  Curry moved to strike the Bondsmen's jury demand, doc. no. 115, moved to compel document production, doc. no. 116, moved for summary judgment against the Bondsmen's counterclaims, doc. no. 120, and moved for summary judgment on Counts One and Four of the Amended Complaint, doc. no. 125.  The Bondsmen moved for summary judgment on all eight of Curry's claims.  Doc. No. 126.

Curry's former attorney withdrew from representation with leave of the Court due to differences of opinion.  Doc. No. 156 at 1; Doc. No. 167.  With her new counsel, Curry moved to file a substitute Reply to the Bondsmen's summary judgment motion to convey her arguments more accurately.  Doc. No. 164 at 1.  I granted her motion and now treat her second Reply as a substitution for the first.  *See* Doc. No. 166.

On November 28, 2023, I held oral argument on the cross-motions for summary judgment.  Min. Entry, Doc. No. 172.  I asked Curry to amend her complaint to provide greater clarity about which allegations are incorporated into which counts.  Tr. of Hearing, Doc. No. 177 at 59:2-9.  I also asked the parties to submit supplemental briefing on whether William Sobota or Jerry Cao were, as individuals, unjustly enriched from Curry's $147,000 Deposit, and whether individuals can be liable for CUTPA violations.  *Id.* at 63:3-10, 64:4-5, 91:10-16, 92:3-15.  Curry

subsequently filed an amended complaint, doc. no. 173, and the parties submitted the aforementioned supplemental briefing.  Docs. No. 175-76.

## II.      Discussion

### A.   Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986) (the nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party").  When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings, but must present sufficient probative evidence to establish a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992).  If the nonmoving

party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50. "As to materiality, . . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In those situations, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

"In addressing unsettled areas of state law," I am mindful that the role of "a federal court sitting in diversity is not to adopt innovative theories that may distort established state law. Instead [I] must carefully predict how the state's highest court would resolve the uncertainties that [I] have identified." *Travelers Ins. Co. v. Carpenter*, 411 F.3d 323, 329 (2d Cir. 2005) (Sotomayor, J.) (cleaned up). "In making such a determination, a federal court is free to consider all of the resources to which the highest court of the state could look, including decisions in other jurisdictions on the same or analogous issues." *Leon's Bakery, Inc. v. Grinnell Corp.*, 990 F.2d 44, 48 (2d Cir. 1993). I "give the fullest weight to pronouncements of the state's highest court,

. . . while giving proper regard to relevant rulings of the state's lower courts." *Maska U.S., Inc. v. Kansa Gen. Ins. Co.*, 198 F.3d 74, 78 (2d Cir. 1999) (cleaned up).

B. <u>Cross Motions for Summary Judgment</u>

I begin with Article III standing. The Bondsmen argue that Curry lacks constitutional standing because (1) she got what she paid for: Dulos remained out on conditional release, even if PSC underwrote an allegedly unlawful bond; (2) neither Curry nor Dulos suffered adverse consequences due to the Bond's inadequacies; (3) Curry's claim is moot because the Bondsmen performed all their obligations under the Bond until Dulos's suicide rendered further performance impossible; (4) Curry paid a non-refundable deposit for the Bond; and (5) Curry was not a party to the contract. Bondsmen's Mem. of Law, Doc. No. 126-12 at 16-18, 21, 23. Curry disagrees, maintaining that she (1) was a party to the contract, (2) the Bondsmen repudiated the contract, and, in any event, (3) she suffered a financial harm when she paid $147,000 without receiving the benefit of a bargain she entered into with PSC and its agents. Curry's Reply, Doc. No. 170 at 8-9, 12.

A plaintiff must establish she has standing to bring the cause of action she asserts. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The doctrine of standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.* As opposed to a "technical rule intended to keep aggrieved parties out of court" or a "test of substantive rights[,]" standing is "designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests." *Econ. Enterprises, Inc. v. T.D. Bank N.A.*, 2011 WL 446891, at *2 (D. Conn. Feb. 3, 2011) (internal citations omitted).

To establish the constitutional minimum of standing, a plaintiff must first establish she "has sustained an 'injury in fact' which is both 'concrete and particularized' and 'actual or

imminent' . . . ." *Cortlandt Street Recovery Corp. v. Hellas Telecommunications*, 790 F.3d 411, 417 (2d Cir. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  A concrete injury is one that "actually exist[s]." *Spokeo*, 136 S. Ct. at 1548.  "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* (quoting *Lujan*, 504 U.S. at 560 n.1).  The "mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship." *Simmonds v. INS*, 326 F.3d 351, 360 (2d Cir. 2003).  Second, the plaintiff must establish a "causal connection between the injury and the conduct complained of . . . ." *Field Day, LLC*, 463 F.3d at 175 (quoting *Lujan*, 504 U.S. at 560). The injury must be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court." *Id.* (quoting *Lujan*, 504 U.S. at 560).  Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (quoting *Lujan*, 504 U.S. at 561).

Curry, the party invoking jurisdiction, bears the burden of establishing standing. *Lujan*, 504 U.S. at 561.  At summary judgment, a plaintiff's injury must be shown through specific facts "by affidavit or other evidence . . . which for purposes of the summary judgment motion will be taken to be true." *Id.* (cleaned up).

The Bondsmen's standing arguments are interwoven with their merits arguments.  In breach of contract actions, the Second Circuit "ha[s] cautioned against arguments that would essentially collapse the standing inquiry into the merits[] and attempts to conflate the threshold question of the plaintiff's standing under Article III . . . with the question of whether [she] has a valid claim on the merits." *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 212 (2d Cir. 2020) (cleaned up).  The Bondsmen claim Curry suffered no actual or imminent injury because the

Bondsmen completely performed their obligations under the Bond and because Curry (and Dulos) received the full benefit of the bail bond.  Doc. No. 126-12 at 20-24.

The Bondsmen's standing arguments are unavailing.  Whether someone was a party to a contract is a matter of contractual standing, not Article III standing.  *SM Kids*, 963 F.3d at 212.  Regardless of whether Curry was a party to an implied contract with the Bondsmen, she suffered financial harm: $147,000.  Curry also alleges she did not receive the benefit of the bargain because the Bondsmen repudiated their contract hours before Dulos attempted suicide.  "[A] party that alleges harm due to another's breach of a contract has a justiciable controversy with the other party and [] the courts have jurisdiction to resolve the controversy."  *Id.* at 212.

Further, plaintiffs who have paid a premium on a contract they allege is void ab initio have standing.  *Dubuisson v. Stonebridge Life Ins. Co.*, 887 F.3d 567, 574 (2d Cir. 2018) ("[Plaintiffs] have articulated a concrete, economic injury: payment of premiums on a void or voidable insurance policy. That is all plaintiffs need allege to establish an injury in fact for the purposes of Article III standing.") (footnote omitted).

Curry has standing to sue the Bondsmen.  I now turn to the parties' summary judgment motions on each claim for relief.

C.  Curry's Motion for Summary Judgment: Counts One and Four

Curry and the Bondsmen cross-moved for summary judgment on her claims for unjust enrichment and breach of implied contract.  To succeed on her partial motion for summary judgment on Counts One and Four, Curry must demonstrate as a matter of law either that (a) the Bond was void ab initio, and the defendants were unjustly enriched by Curry's $147,000 premium payment, or (b) the Bondsmen breached an implied contract with Curry.  If a

reasonable factfinder could find for the defendants on the above issues, summary judgment is inappropriate.  I take each in turn.

    1.  *Was the Bond void ab initio?*

Curry assumes a legal conclusion that is a matter of first impression: whether a bail bond—or, for that matter, any other insurance transaction—in violation of section 38a-73 is unenforceable.  Upon review of similar statutes from nine other jurisdictions, none provides that contracts violating such statutes are unenforceable as a matter of law.  *See* Cal. Gov't Code § 6599.21; 215 ILCS 120/10; Ind. Code Ann. § 27-1-13-6(b); Kan. Stat. Ann. § 40-12a07; Mich. Comp. Laws Ann. § 500.640; Minn. Stat. Ann. § 471.981; N.C. Gen. Stat. Ann. § 58-15-15; N.D. Cent. Code Ann. § 26.1-03-01; Utah Code Ann. § 63E-1-304.

In Connecticut, a contract that fails to comply with a regulatory statute is not necessarily void as a matter of law.  "[W]hether a contract is enforceable or illegal is a question to be determined from all the facts and circumstances of each case.  Similarly the question of whether a contract is against public policy is a question of law dependent on the circumstances of the particular case."  *MedPricer.com, Inc. v. Becton, Dixon & Co*., 240 F. Supp. 3d 263, 268 (D. Conn. 2017) (cleaned up).

I begin with the statute's "ordinary or natural" meaning in accordance with principles of statutory interpretation.  *See Smith v. United States*, 508 U.S. 223, 228-29 (1993); Conn. Gen. Stat. § 1-2z ("The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes.").  "No [state-licensed] stock insurance company" can "expose itself to loss on any one risk to an amount exceeding ten per cent of its paid-up capital and surplus."  Conn. Gen. Stat. § 38a-73.  The statute is silent regarding the consequences of violation.

Reviewing "the language and design of the statute as a whole," *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291 (1988), and the text of the Insurance Code, indicates that the General Assembly contemplated the Insurance Commissioner would enforce Title 38a and that remedies would be regulatory in nature. The Assembly expressly vested the enforcement of the Insurance Code in the Insurance Commissioner and charged that officer with "see[ing] that all laws respecting insurance companies . . . are faithfully executed" and "administer[ing] and enforc[ing] the provisions of [Title 38a]," including the requirements in Section 38a-73. *Id.* § 38a-8(a). To that end, the Assembly endowed the Commissioner with enumerated powers as well as "all further powers that are reasonable and necessary to . . . protect the public interest . . . with the duties imposed by this title." *Id.* Moreover, in Chapter 698 (of which Section 38a-73 is part) and Chapter 702, the Assembly set forth rules governing insurers licensed in Connecticut and requirements for licensure. Section 38a-774 establishes the Commissioner's authority to suspend or revoke an insurer's license to issue policies in Connecticut as well as the authority to issue a fine of up to $5,000.[6] *Id.* § 38a-774. On its face, the statutory scheme suggests that the remedy for noncompliance with financial requirements is limited to license suspension, revocation, and/or issuance of a fine. *See id.*

The Connecticut Supreme Court has previously held that "where the legislature wishes to limit enforcement of a statute to an administrative body, it has expressly done so." *Napoletano v. CIGNA Healthcare of Connecticut, Inc*., 238 Conn. 216, 251 (1996). The Assembly expressly vested Insurance Code enforcement in the Insurance Commissioner. Conn. Gen. Stat. § 38a-8. Preference for administrative remedies is also implicit in the Insurance Department's letter to PSC notifying the company of its noncompliance with the risk limitations requirement, which

---

[6] Section 38a-777 also describes financial penalties, but those fines are only applicable to surplus line broker licensees. *Id.* § 38a-777.

never explicitly stated that the Dulos bond was void.  *See* Conn. Ins. Dep't Letter, Doc. No. 18-11 at 2-3.  "Because Palmetto is licensed in Connecticut," PSC "[was] bound to operate in accordance with Connecticut General Statutes including CGS § 38a-73(a)."  *Id.* at 2.  Accordingly, the Department invoked the Commissioner's "authority to suspend an insurer's license or reduce, suspend, or limit [its] volume of business" and notified PSC that it could continue to "service its existing bonds" but that its authorization to initiate new business was revoked.  *Id.* at 3; *see* Conn. Gen. Stat. § 38a-8.  In other words, the Insurance Department did not treat PSC's violative bonds as void ab initio.  *See* Bondmen's Mem. of Law, Doc. 18-1 at 15.

I think it appropriate, however, to consider Section 38a-73 in the highly regulated context of bail bonds and that regulation's remedial purpose.  Chapter 700F regulates bail bonds and implicates a wider range of remedies than those set forth in the Insurance Code.  Specifically, any agreement with a bail bond agent violating Connecticut General Statutes Sections 38a-660b through 660k is subject to administrative sanction, including suspension or revocation of the agent's license or an administrative fine, *id.* § 38a-660*l, and* is also "void," *id.* § 38-660g(f).

Taken together, the face of the Connecticut General Statutes is inconclusive.

In two cases where statutes were facially inconclusive, the Connecticut Supreme Court instructively addressed whether contracts violating regulatory statutes were unenforceable.  The *Solomon v. Gilmore* Court held that a secondary mortgage contract violating the Secondary Mortgage Act was void as a matter of law.  248 Conn. 769 (1999).  Lenders issued a secondary mortgage to a homeowner without first obtaining the required license.  *Id.* at 771, 774.  The homeowner alleged that the lenders' noncompliance made the secondary mortgage unenforceable, and the Court agreed.  *Id*. at 771-74, 790-91.  The purposes of the statute were to protect consumers against "unscrupulous lending practices," support the legislature's ability to

exercise control over the industry, and deter unscrupulous lending practices by unlicensed lenders with statutory penalties. *Id.* at 776-777. The statute provided administrative penalties and endowed the banking commissioner authority to seek injunctive relief, pecuniary penalties, restitution, or a cease-and-desist order, but the court held those remedies were not exclusive. *Id.* at 780-81; *see also Westville & Hamden Loan Co. v. Pasqual*, 109 Conn. 110, 116-17 (1929); *G. Nicotera Loan Corp. v. Gallagher*, 115 Conn. 102, 106-07 (1932).

In contrast, in *D'Angelo Development*, the Connecticut Supreme Court held that the legislature did not intend to render contracts unenforceable if they did not comply with the New Home Construction Act. *D'Angelo Development and Construction Co. v. Cordovano*, 278 Conn. 237, 251-52 (2006). A contractor agreed to build a new home in violation of licensure requirements for new home builders. *Id.* at 239. The Court held the "omission of any provision regarding the enforceability of noncompliant contracts" was dispositive and distinguished the "comprehensive" remedies in the statute, including civil penalties, criminal penalties, and a private right of action under the Connecticut Unfair Trade Practices Act, from the more limited remedies implicated in *Solomon*. *Id.* at 246-49.

I rely on three principles from *Solomon.* 248 Conn. at 774. First, when a statute such as Section 38a-73 does not expressly address enforceability, the Court seeks to give effect to the intent of the General Assembly in enacting the provision. *Solomon,* 248 Conn. at 774.; *see also Miller v. French*, 530 U.S. 327, 336 (2000). Second, it is well-settled law that "contracts that violate public policy are unenforceable." *Solomon*, 248 Conn. at 774. "[N]o court will lend its assistance in any way toward carrying out the terms of a contract, the inherent purpose of which is to violate the law." *D'Angelo Dev. & Const. Co.*, 278 Conn. at 242 (citation omitted). Third, when a statute is part of a larger regulatory regime, "remedial statutes should be construed

17

liberally in favor of those whom the law is intended to protect." *Solomon,* 248 Conn. at 774-75 (quoting *Dysart Corp. v. Seaboard Surety Co*., 240 Conn. 10, 18 (1997)).

*First*, the legislature intended to protect insurance consumers against insurers' insolvency upon the ripening of a large number of contingent liabilities. The original version of Section 38a-73, enacted in 1871, is so old that it predates state legislative history records. Conn. Joint Standing Committee Hearings, Insurance, 1911 Sess., p. 66, Remarks of Insurance Commissioner Theo H. MacDonald ("This law was enacted in '71."). Debate regarding its 1933 expansion provides some guidance on the statute's legislative purpose. One insurer then reminded the legislature that "[t]he purpose of this statute was plainly to protect the policyholder against risk of insolvency to the company that might come from reckless multiplication of catastrophe possibilities." Conn. Joint Standing Committee Hearings, Insurance, 1933 Sess., p. 47, Remarks of George C. Long, Jr., Vice-president, Phoenix Fire Ins. Co., Conn. Fire Ins. Co. At a time when factory fires devastated communities, one legislative critic of the mutual proposal wondered whether the out-of-state "fire mutuals [were] capable of collecting five times their risk in times of a catastrophe." *Id*., p. 32, Remarks of Sen. Fuller Barnes; *see also id.* at 52, Remarks of Sen. Blackall ("the possible contingent liability in case of conflagration"). In short, the provision was intended to protect consumers against the risk of insurers' default.

*Second*, reasonable minds could differ whether the "inherent purpose" of PSC's agreement with Curry was "to violate the law." *D'Angelo Dev. & Const. Co.*, 278 Conn. at 242. There is no dispute that PSC violated Section 38a-73. Curry alleges—and PSC agreed in its Consent Order with the CDI—that PSC violated Section 38a-73 by "underwrit[ing] a surety bail bond issued to a Connecticut resident in an amount in excess of ten percent of [Palmetto's] paid

up capital and surplus, in violation of current statutory requirements." Doc. No. 125-3 at 20
(citing Stipulation and Consent Order, Doc. No. 125-7 at 17).

PSC's counterargument is premised on its subjective ignorance of the law. A factfinder
could reasonably find that Sobota was approached by Dulos's lawyers to facilitate the bond, that
he relied on Dulos's representations regarding the equity in Dulos's properties used to
collateralize the bonds, and he believed that imperfections in the equity—specifically,
foreclosures on and overvaluing of those properties—caused PSC to exceed the statutory
limitations of risk. Sobota's Aff., Doc. 18-2 at 2-4; Doc. No. 146-4 at 3 (email from Willis
stating that Dulos's attorney failed to mention a foreclosure on a collateral property). A
factfinder could also reasonably find that PSC had subjective and/or constructive knowledge that
its failure to obtain reinsurance from an approved insurance agency was the reason it believed its
bond exceeded the statutory limitations of risk. *See supra.* Under the latter theory—Curry's
theory—the Bondsmen moved to revoke their bond in the state court on January 28 only because
somebody filed a complaint with CDT on January 16 alleging the Bond violated Connecticut
law. *See* Doc. No. 125-7 at 1.

Regardless, PSC acted promptly to revoke the bond upon allegedly learning that the
collateral was insufficient. Sobota's Aff., Doc. 18-2 at 5. Similarly, in *D'Angelo*, there was no
evidence of illegal purpose where the contractor was unaware of requirements of the New Home
Construction Contractors Act and acted promptly to get in compliance. *D'Angelo,* 278 Conn. at
242. I conclude it is possible for a reasonable jury to find that PSC did not enter into the Bond
Agreement with an unlawful purpose.

*Third*, I turn to whether Curry is in the class of individuals intended to be protected by
Section 38a-73 given Chapter 700F's remedial purpose. There is no doubt that the state is the

19

party intended to be protected by the statute, because the state bears the risk of bail bond insurers and sureties' default due to an overabundance of risk. If many individuals violate their conditions of bail and must forfeit entire bail amounts at once, the state—not an accused or his agent/indemnitor—stands to lose. Connecticut law evinces intent to protect the state from agents, sureties, and insurers' defaults. For example, bail surety agents must retain trust accounts for the express purpose of "compensat[ing the state] . . . for any losses [an] insurer . . . incurs in the apprehension of a defendant or to pay forfeitures of bail bonds executed by the surety bail bond agent." *Id.* § 38a-660f.

Nevertheless, the General Assembly has enacted an extensive regulatory regime evincing an intent to protect accuses or their agents/indemnitors from exploitation by bail surety agents. Statutes provide consumer protections in bail bond financing agreements, setting limits on fees, and rigorously protecting the collateral used as bail bond deposits. *E.g.,* Conn. Gen. Stat. § 38a-660d.[7] Violating those provisions expressly voids a bail bond surety agreement. *Id.* § 38a-660g(f). When the Bondsmen violated Section 38a-73, PSC moved to revoke the bond and Dulos would have returned to incarceration absent his suicide. It is reasonable to infer that accuses like Dulos, and their indemnitors like Curry, are among the class of individuals Chapter 700F intended to protect.

In sum, the question of PSC's knowledge and/or intent is not a material fact. Based on the above legal principles, I conclude that the Connecticut Supreme Court would hold that Curry's agreement with PSC was void ab initio. Therefore, Curry's motion for partial summary

---

[7] A law review article cites Connecticut as an example of a state explicitly regulating bail bond financing agreements. *See* Alex Kornya et al., *Crimsumerism: Combating Consumer Abuses in the Criminal Legal System,* 54 Harv. C.R.-C.L. L. Rev. 107, 131 (2019).

judgment regarding Counts One and Four, doc. no. 125, is granted insofar as the Bond was void ab initio.

### 2. *Unjust Enrichment*

"[W]herever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract, restitution of the value of what has been given must be allowed . . . . Under such circumstances, the basis of the plaintiff's recovery is the unjust enrichment of the defendant." *Jay v. A & A Ventures, LLC*, 118 Conn. App. 506, 515-16 (2009) (quoting *New Hartford v. Connecticut Resources Recovery Authority*, 291 Conn. 433, 451-52 (2009)). "[T]he lack of a remedy under the contract is a precondition for recovery based upon unjust enrichment." *Rent-A-PC, Inc. v. Rental Mgmt., Inc.*, 96 Conn. App. 600, 605 (2006) (cleaned up).

"Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy.  Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.*, 231 Conn. 276, 283 (1994) (internal citations omitted).

The Bondsmen benefited from Curry's Bond premium payment.  Sobota Dep., Doc. No. 175-5 at 6-7 (the Bond premium was disbursed between Sobota, 24/7, Cao, and PSC).  Although she argues otherwise, Curry received *some* benefit of her agreement with the Bondsmen.  Curry's Deposit secured Dulos's 21-day conditional release, even if the cause of PSC's later motion to revoke the bond is disputed.  Bondsmen's R. 56(a)(1) Stmt., Doc. No. 126-1 ¶ 76 ("[O]n the morning of January 9, 2020, PSC posted the surety bail bond with the Court, and Dulos was released from custody.").  It is undisputed that the bond agreement exceeded the statutory

21

limitations of risk at the time it was made, even if the parties disagree about the reasons the limitations were exceeded.  *See id.* ¶¶ 54-55 ("As of December 31, 2019, PSC's Surplus was $4,801,663.00, meaning" PSC needed reinsurance to write a $6,000,000 surety bail bond).

Curry, though, did not receive the entire benefit of what she bargained for.  It is undisputed the Bondsmen moved to revoke the bond even though, as analyzed above, the bond was void ab initio.  *See* Bondsmen's R. 56(a)(2) Stmt., Doc. No. 135-1 ¶ 62.  Dulos's 21-day release might impact Curry's damages, but not the Bondsmen's liability.  *But see United Coastal Industries, Inc. v. Clearheart Construction Co.*, 71 Conn. App. 506, 515 (2002) ("In an unjust enrichment case, damages are ordinarily not the loss to the plaintiff, but the benefit to the defendant, for which the fact finder may rely on the plaintiff's contract price when the benefit is too difficult to determine.").  But for Dulos's attempted suicide, he would have been sent back to jail due to an insufficient bond.  Although Dulos's received 21 days of conditional release, a factfinder could determine that Curry did not receive the full benefit of her bargain with the Bondsmen.

a.  Non-Refundability and Breach

The Bondsmen argue that Curry paid a non-refundable deposit for Dulos's release.  Doc. No. 135 at 17.  Whether or not the Bond premium was refundable may shed light on whether the Bondsmen remain unjustly enriched from Curry's premium payment.  *Cf. Jay v. A & A Ventures*, 118 Conn. App. at 514, 517-18 (affirming a trial court's finding of unjust enrichment when the defendant orally agreed to refund moneys if the plaintiff did not purchase a property, and subsequently held onto the moneys in violation of the agreement).  If Curry (or Dulos's estate) should have been refunded, "the defendants unjustly did not pay the plaintiff[]" what was owed her.  *Hartford Whalers Hockey Club*, 231 Conn. at 283.  The result is similar to, but should not

be confused with, giving Curry a remedy under contract. "Because a contract that is void ab initio is unenforceable," the appropriate remedy is rescission and restitution, not a refund through enforcement of the contract. *PHL Variable Ins. Co. v. Charter Oak Tr.*, 2012 WL 2044416, at *6 (Conn. Super. Ct. May 4, 2012).

Curry cites Willis' email conversations with Michael Shull, an employee of the South Carolina Department of Insurance, as evidence that the bond premium should have been refunded. On January 27, 2020, the pair discussed "moving forward placing the defendant back in custody." Doc. No. 146-4 at 3. Shull questioned: "[t]his means the bond is revoked and Palmetto Surety is released from it and will not be responsible for any future payments other than a refund of premium, correct?" Doc. No. 146-6 at 2.

The Bond's terms and conditions state that "[i]n the event surrender of Defendant is made prior to the time set for Defendant's appearances, and for reason other than as enumerated below in paragraph 3, then Defendant shall be entitled to a refund of the bond premium." Doc. No. 146-5 at 2 ¶ 3. Paragraph four lists enumerated conditions under which Dulos would be in breach, none of which include the surety company moving to revoke the bail bond. *See id.* ¶ 4(a)—(e).

On January 28, 2020, PSC's attorney emailed the State's Attorney's office that "Palmetto is returning Mr. Dulos to court for the purposes of Revoking Bail" because of "imperfections in the collateral provided." Doc. No. 146-7 at 2. In an internal e-mail, Scott Willis confirmed, "[y]es, the hearing was for us revoking the bond[.]" Doc. No. 175-2 at 2. Imperfections in collateral, however, have no bearing on whether the bond was valid or void under Connecticut law.

Further, it is unclear whether the Bond was revoked or terminated.  The Bondsmen filed

their Motion to Revoke the Bond in state criminal court on January 28, 2020.  After Dulos

attempted suicide—but before he was taken off life support—the prosecutor elected to place the

Motion to Revoke Bond aside, and the court increased the bond by $500,000.  Bondsmen's R.

56(a)(2) Stmt., Doc. No. 135-1 ¶ 62.  The Bondsmen claim "the Dulos bond remained in force

and effect," *id.* ¶ 62, while Curry claims "[i]t is unclear that the bond was in effect.  Dulos was

handcuffed in the hospital."  Doc. No. 146-1 ¶ 94.

By statute, the principal's death or incapacity does not automatically terminate a bail

bond.  Conn. Gen. Stat. § 54-66a (listing bases by which bond is automatically terminated).  The

court must order a bond's termination.  Conn. Gen. Stat. § 54-65a(a)(1).  *But see Parker v.*

*Bidwell*, 3 Conn. 84, 86 (1819) ("Had the principal died, it would have discharged the bail.").

Even so, the Bond was void ab initio and invalid from the beginning.

Curry has provided enough evidence for a factfinder to determine the Bondsmen (1)

benefited and (2) unjustly did not refund money to her for their benefits, since the bond was void

ab initio, and (3) their failure to pay was to Curry's detriment, since she paid $147,000 for an

invalid bond.  *Hartford Whalers Hockey Club*, 231 Conn. at 282-83.  The evidence, however, is

not conclusively in Curry's favor as a matter of law.

### 3.  *Breach of Implied Contract*

Curry alleges breach of implied contract as an alternative ground for relief.  Doc. No. 173

¶¶ 35-41.  Curry and the Bondsmen cross-moved for summary judgment on that claim.

"[A]n implied in law contract is not a contract, but an obligation which the law creates

out of the circumstances present, even though a party did not assume the obligation . . . . It is

based on equitable principles to operate whenever justice requires compensation to be made.  An

24

implied in law contract may arise due to one party being unjustly enriched to the detriment of the other party.  Accordingly, an implied in law contract is another name for a claim for unjust enrichment." *Vertex, Inc. v. City of Waterbury*, 278 Conn. 557, 574 (2006) (cleaned up). "Consequently, . . . the plaintiffs only need to demonstrate the traditional three elements of [an unjust enrichment] cause of action." *Osho Int'l Found. v. O'Neill*, 2011 WL 2418186, at *5 (Conn. Super. Ct. May 17, 2011).

For the same reasons as above, I deny the parties' cross-motions for summary judgment on the breach of implied contract claim.

D. <u>The Bondsmen's Motion for Summary Judgment</u>

The Bondsmen moved to dispose of the remaining claims: conversion and civil theft, breach of implied covenant of good faith and fair dealing, fraudulent misrepresentation, CUTPA, and civil forgery.

Curry is the nonmoving party.  Thus, the facts of the record are construed in the light most favorable to the Curry, with all ambiguities and reasonable inferences drawn against the Bondsmen. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

1. *Common Law Conversion, Civil Theft Under Conn. Gen. Stat. § 52-564*

Conversion is "[a]n unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights. . . . It is some unauthorized act which deprives another of his property permanently or for an indefinite time." *Aetna Life & Casualty Co. v. Union Trust Co.*, 230 Conn. 779, 790 (1994).  "[P]ossession, originally rightful, becomes wrongful by (1) reason thereafter of a wrongful detention, or (2) a wrongful use of the property, or (3) the exercise of an unauthorized dominion over the property." *Luciani v. Stop & Shop Cos.*, 15 Conn. App. 407, 410 (1988).  "The elements of [§ 52-564] civil theft are also

largely the same as the elements to prove the tort of conversion." *Sullivan v. Delisa*, 101 Conn. App. 605, 620 (2007).

Under Connecticut's civil theft statute, "[a]ny person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages." Conn. Gen. Stat. § 52-564. The elements of civil theft are the same as Connecticut's statutory larceny elements: "intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner." *Id.* § 53a-119; *Sullivan v. Delisa*, 101 Conn. App. 605, 619-20 (2007). "[T]heft requires a plaintiff to prove the additional element of intent over and above what he or she must demonstrate to prove conversion." *Sullivan v. Delisa*, 101 Conn. App. at 619 (cleaned up).

The Bondsmen have not refunded Curry's $147,000 partial premium payment for a bond that was void ab initio. Since the bond was void ab initio, a factfinder could determine the Bondsmen's mere retention of the $147,000 constitutes an "unauthorized act" and is conversion.

As for the civil theft statute's required mental state—"the additional element of intent"—the Bondsmen claim they were "operating under a well-founded belief that their conduct was legal." Doc. No. 126-12 at 31. As discussed below, *infra* Section III.E.3, Curry presents evidence that the Bondsmen engaged in a general business practice of issuing bonds in violation of Connecticut law. A factfinder could determine the Bondsmen were violating Connecticut law willfully both before and after they issued the Dulos Bond, *infra*, and thus a factfinder could find the Bondsmen held the requisite mental state for conversion.

2. *Breach of Implied Covenant of Good Faith and Fair Dealing*

"[E]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement . . . . [T]he existence of a contract between the parties is a

necessary antecedent to any claim of breach of the duty of good faith and fair dealing." *Hoskins v. Titan Value Equities Group, Inc.*, 252 Conn. 789, 793 (2000) (citations omitted). "If an implied contract exists, there also exists an implied covenant of good faith and fair dealing." *Biello v. Town of Watertown*, 2004 WL 304309, at *2 (Conn. Super. Ct. Jan. 30, 2004).

Having concluded there are genuine issues of material fact regarding the unjust enrichment and breach of implied contract claims, I deny the Bondsmen's motion for summary judgment for breach of the implied covenant of good faith and fair dealing. *See id.* ("[t]he court having found there are genuine issues of material [f]act as to whether an implied contract exists, denies the motion for summary judgment as to [the implied covenant of good faith and fair dealing].").

### 3. *CUTPA*

Curry alleges the Bondsmen violated the Connecticut Unfair Trade Practices Act ("CUTPA") by issuing the Bond knowing they had no legal authority to do so and deceptively inducing Curry to pay $147,000 for the Bond.

Curry alleges CUTPA violations against Cao and Sobota individually. Individuals may be liable under CUTPA when they act as an agent or officer of a business and "participated directly in the entity's deceptive or unfair acts . . . or . . . had the authority to control them." *Joseph Gen. Contracting, Inc. v. Couto*, 317 Conn. 565, 589, 593 (2015). The individual must have "actual knowledge of the entity's material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Id.* at 590 (cleaned up). If an individual "directly participated in the wrongful conduct or . . . had the ability to control it[,]" a court may assume the individual "knew of or should have known of [the conduct's] wrongfulness." *Id.* at 593.

Curry worked directly with Cao and Sobota to procure the Dulos bond.  Curry Dep. Tr., Doc. No. 126-6 at 131:7-132:7.  Sobota solicited the $147,000 Bond premium from Curry.  *Id.* at 242:24-243:4.  Sobota has been 24/7's sole employee since the company's inception, and thus directly worked on the deals that Curry alleges were a deceptive general business practice.  *See* Sobota Dep. Tr., Doc. No. 175-6 at 8:7-9:18.  A factfinder could conclude that Cao and Sobota knew of PSC and 24/7's alleged deceptive acts.

I next evaluate whether the Bondsmen's conduct was "performed with such frequency as to indicate a general business practice."  *Farmington Vill. Dental Assocs., LLC v. Cincinnati Ins. Co.*, 549 F. Supp. 3d 249, 264 (D. Conn. 2021), *aff'd*, 2022 WL 2062280 (2d Cir. June 8, 2022) (quoting *McCulloch v. Hartford Life & Acc. Ins. Co.*, 363 F. Supp. 2d 169, 182 (D. Conn. 2005)).  "[O]ccasional[] [] bad faith or reckless" conduct usually does not rise to a CUTPA violation, *LPP Mortgage Ltd. v. Underwood Towers L.P.*, 205 Conn. App. 763, 836 (2021), although a single unscrupulous act may violate CUTPA.  *Locascio v. Imports Unlimited, Inc.*, 309 F. Supp. 2d 267, 272 (D. Conn. 2004).

A factfinder could find the Bondsmen violated CUTPA as a general business practice.  Cao and 24/7 held Connecticut surety bond licenses.  Pl.'s Am. R. 56(a)(3) Stmt., Doc. No. 136 ¶¶ 3, 5.  Connecticut law expressly limits risk and specifies how to legally reinsure against excess risk:

> No stock insurance company doing business in this state shall expose itself to loss on any one risk to an amount exceeding ten per cent of its paid-up capital and surplus; but, in determining the amount of such risk, no portion thereof that has been reinsured in any insurance company that meets the requirements of section 38a-85 or 38a-86 shall be included.

Conn. Gen. Stat. § 38a-73(a).

The Bondsmen routinely issued bonds in excess of their risk ceiling, without reinsurance, before they issued the Dulos bond on January 9, 2020.  PSC and its agent 24/7 issued six violative bonds in excess of its risk ceiling in 2019.  Doc. No. 175 at 7 (citing Doc. No. 170-8).  PSC issued more violative bonds through other agents.  *Id.*

The CDI revoked PSC's license in June 2020 and again in December 2020, except with regards to outstanding bonds.  Doc. No. 125-7 at 7-8, 27-28.  PSC continued to issue new bonds while unlicensed.  *See generally* Doc. No. 170-8.  Three days after CDI revoked its license in June, PSC's CEO Scott Willis wrote, "I am sure the young lady whom revoked us will be shocked this morning as we are still writing bonds in CT."  Doc. No. 170-7 at 3.  PSC was not even compliant with South Carolina's more flexible standard.  On June 4, 2020, the South Carolina Department of Insurance notified PSC that three of its bonds were not written with sufficient collateral or reinsurance.  Doc. No. 125-19.  Even after regulatory intervention from two states, PSC continued to engage in a pattern of willful violations.  Although the Bondsmen claim they were ignorant of Connecticut reinsurance requirements (and did not willfully violate the requirements), a juror could disagree.  PSC and 24/7's violations were frequent enough to be "indicate a general business practice," *Farmington Vill. Dental Assocs.*, 549 F. Supp. 3d at 264, and crossed the line past "occasional[]" recklessness into CUTPA territory.  *LPP Mortgage*, 205 Conn. App. at 836.

Next, I evaluate Curry's CUTPA claim with the following "cigarette rule" criteria:

(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors, or other businessmen.

*Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 120 (2d Cir. 2004) (cleaned up).

I begin with public policy.  Connecticut regulates bail bonds to protect consumers against the risk of insurers' default.  *See supra* Section III.B.1.  One remark from the legislative history, for example, emphasizes that "[t]he purpose of this statute was plainly to protect the policyholder against risk of insolvency to the company that might come from reckless multiplication of catastrophe possibilities."  Conn. Joint Standing Committee Hearings, Remarks of George C. Long, Jr.  The Bondsmen continued to issue new bonds after the CDI revoked PSC's license in June 2020 and again in December.  Doc. No. 125-7 at 7-8, 27-28; *see* Doc. No. 170-2; *see also* Doc. No. 170-8.

Second, a factfinder could determine the Bondsmen engaged in "immoral, unethical, oppressive, or unscrupulous" behavior.  *Naples v. Keystone Bldg. & Dev. Corp.*, 295 Conn. 214, 227 (2010).  "In the absence of aggravating unscrupulous conduct, mere incompetence does not by itself mandate a trial court to find a CUTPA violation."  *Id.* at 229.  The Bondsmen argue that they thought they were, "in good faith," lawfully issuing bonds in compliance with South Carolina's bail bond regulations.  Doc. No. 176.  South Carolina, however, has less stringent regulations for its bail bonds than Connecticut.  The Bondsmen's claimed belief that they were complying with South Carolina law says little about their belief, or perhaps willful ignorance, of whether they complied with Connecticut's reinsurance requirement.

Moreover, Curry presents enough evidence for a factfinder to determine the Bondsmen willfully violated Connecticut's reinsurance requirement.  The Bondsmen's more flagrant reinsurance violations occurred in 2020 after CDI twice revoked PSC's license, and after the South Carolina Department of Insurance revoked PSC's license.  *See also* Sobota Email, Doc. No. 170-9 (in January 2021, Sobota wrote to Scott Willis, "These people at this [Connecticut] insurance department or something else I don't know what their deal is that's what happens

when you do business in a democrat state LOL").  However, the Bondsmen jointly issued at least

six violative bonds in 2019 before they issued the Dulos Bond in January 2020, and PSC issued

many more violative bonds through other agents.  *See* Doc. No. 175 at 7 (citing Doc. No. 170-8).

A factfinder could determine the Bondsmen's more unscrupulous behavior in 2020-2021 also

occurred in 2019, when the Bondsmen jointly issued at least six violative bonds in Connecticut.

Third, the illegal bonds could cause substantial injury to customers.  Curry paid over a

hundred thousand dollars in upfront "nonrefundable" premium on a bond PSC suddenly moved

to revoke.  But-for Dulos's suicide attempt, Dulos would have returned to jail and Curry would

have conceivably shopped for a new bond with fewer financial assets.  When the CDI revoked

PSC's license, it alleviated the potential for similar injuries by allowing the Bondsmen to

continue serving fifteen outstanding bonds.  *See* Doc. No. 126-12 at 19 ("the CDI would have

allowed the Defendants to continue to service Dulos's bond just as it allowed PSC to continue

servicing *fifteen* other bonds exceeding ten percent of its surplus and capital as of June 2020.")

Had the Secretary of Insurance not done so, fifteen consumers could have been harmed due to

the Bondsmen's violation of Connecticut law.

The Bondsmen are therefore not entitled to summary judgment on Curry's CUTPA

claim.

### 4.  *Fraudulent Misrepresentation*

"The essential elements of a cause of action in fraud are: (1) a false representation was

made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3)

it was made to induce the other party to act upon it; and (4) the other party did so act upon that

false representation to his injury."  *Harold Cohn & Co. v. Harco Int'l*, 72 Conn. App. 43, 51

(2002) (quoting *Citino v. Redevelopment Agency*, 51 Conn. App. 262, 275-76 (1998)).

"Additionally, the party asserting such a cause of action must prove the existence of the first three of the elements by a standard higher than the usual fair preponderance of the evidence, which higher standard we have described as clear and satisfactory or clear, precise and unequivocal." *Id.* (cleaned up).

As discussed above, the Bondsmen's knowledge and intent as to their violations of § 38a-73 is a genuine issue of material fact. Whether the Bondsmen's representations to Curry that they could legally issue bonds in Connecticut were false is thus a genuine issue of material fact. Summary judgment on Curry's claim of fraudulent misrepresentation is denied.

### 5. *Civil Forgery*

Curry alleges the Bondsmen forged her signature on the "Unpaid Premium Agreement," doc. no. 18-5, that states a remaining unpaid balance of $272,150.00 on the Bond to be paid in installments. Doc. No. 173 ¶¶ 55-57. The Bondsmen's only argument for summary judgment on the civil forgery claim is that Curry lacks standing to raise that claim. Doc. No. 126-12 at 35-36.

"Whether the elements of breach of contract, including the existence of a contract, are satisfied, . . . goes to the merits, not to a court's power to resolve the controversy." *SM Kids*, 963 F.3d at 212. Whether the Bondsmen forged Curry's signature is a question of fact that must be determined by a factfinder. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 50 (1986) ("any genuine factual issues [] properly can be resolved only by a finder of fact."). Thus, the Bondsmen are not entitled to summary judgment on Count Seven.

### E. Curry's Partial Motion for Summary Judgment as to 24/7 & Jerry Cao's Counterclaims

Cao and 24/7 assert three counterclaims to collect on Curry's remaining $274,000 premium balance: breach of contract, breach of implied covenant of good faith and fair dealing, and unjust enrichment. Doc. No. 114 at 8-13. Curry alleges the counterclaims are time barred by

Connecticut's statute reforming bail bonds and moved for summary judgment on those

counterclaims.  *See* Doc. No. 120 (citing Conn. Gen. Stat. § 38a-660c(b)).

> The pertinent statute provides:

> If a surety bail bond agent enters into a premium financing arrangement, such agent shall require (1) the principal on the bail bond or any indemnitor to make a minimum down payment of thirty-five per cent of the premium due, at the premium rate approved by the commissioner pursuant to chapter 701,1 and (2) the principal and any indemnitor to execute a promissory note for the balance of the premium due. Such promissory note shall provide that such balance shall be paid not later than fifteen months after the date of the execution of the bail bond. ***If such balance has not been paid in full to the surety bail bond agent by the due date or a payment due under such arrangement is more than sixty days in arrears, such agent shall file a civil action seeking appropriate relief with the court not later than seventy-five days after such due date.*** The surety bail bond agent shall make a diligent effort to obtain judgment after filing such complaint on such promissory note unless good cause is shown for failure to obtain judgment, including, but not limited to, the filing for bankruptcy by the principal or the indemnitor or failure to serve process despite good faith efforts.

Conn. Gen. Stat. § 38a-660c(b) (emphasis added).

> Bond agents who violate Section 38a-660c(b) may be penalized by the commissioner of

insurance.  "The commissioner may suspend or revoke the license of a surety bail bond agent, or

may impose a fine in lieu of or in addition to such suspension or revocation . . . for any violation

of section 38a-660 and sections 38a-660b to 38a-660k, inclusive."  *Id.* § 38a-660*l*.

> Curry argues an additional penalty exists: a seventy-five day statute of limitations.  *Id.*

§ 38a-660c(b) ("such agent shall file a civil action . . . not later than seventy-five days").  Breach

of contract claims under Connecticut law, by contrast, have a six-year statute of limitations.  *Id.*

§ 52-576.

> Curry's interpretation of Section 38a-660c(b) is inconsistent with the statute's legislative

history.  Representative Menga characterized the bill as:

> [R]eally a whole host of statutes empowering the Department of Insurance to further regulate surety bond agents, managing agents and surety companies as well as professional bondsmen. . . . Briefly, Mr. Speaker, this Bill does things like requires full

> premium to be collected by the surety bond agents. It seeks to prevent what is commonly referred to as undercutting. . . . And does things like requiring the surety companies to conduct audits on bail agents . . . and ensure that they receive full payment when posting bail bonds.

54 H.R. Proc., Pt. 16, 2011 Sess. pp. 005365-5366, Remarks of Representative Robert W. Menga.

No legislator discussed the bill as imposing a statute of limitations. It seems, in addition to Representative Menga's remarks, the legislature desired to put pressure on criminal defendants to satisfy their financial responsibilities regarding bail, which necessitated compelling bond agents to collect unpaid premiums. The vast majority of Section 38a-660's legislative history discusses perceived issues in (a) criminal defendants too easily making bail without paying anything upfront, (b) defendants facing domestic abuse charges too easily making bail, (c) defendants making bail too quickly before "cooling off," (d) bond agents undercutting rates by not requiring any premium up-front, (f) the Department of Insurance's difficulty in bringing administrative charges against bond agents in noncompliance. *See generally* 54 H.R. Proc., Pt. 16, 2011 Sess. Given that the legislature sought to ensure that criminal defendants paid their full statutory bail premiums, a seventy-five day statute of limitations period would be contrary to legislative intent.

Statutory language across the Connecticut Code supports the same conclusion. The legislature routinely establishes statute of limitations with "No action . . . shall be brought" verbiage. *See, e.g.*, Conn. Gen. Stat. § 52-584 ("No action . . . shall be brought but within two years from the date when the injury is first sustained"); § 52-577 ("No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."); § 52-576 ("No action . . . shall be brought but within six years after the right of action accrues").

34

I conclude Section 38a-660c(b) does not establish a seventy-five-day statute of limitations.  I therefore deny Curry's summary judgment motion on 24/7 and Cao's counterclaims because the counterclaims are timely under Connecticut's breach of contract statute of limitations.

### III.     Conclusion

For the foregoing reasons, I **deny** the Bondsmen's Motion for Summary Judgment, **doc. no. 126**; **deny** Curry's summary judgment motion as to 24/7 and Cao's counterclaims, **doc. no. 120**; and **grant in part and deny in part** Curry's partial summary judgment motion with respect to Counts One and Four of the Amended Complaint, **doc. no. 125**.

So ordered.

Dated at Bridgeport, Connecticut, this 28th day of March, 2024.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge